UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN LABELLE,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL INC.,<br><br>Defendant. | Case No.<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Brian La Belle, by and through undersigned counsel, alleges as follows for his Complaint against Barclays Capital Inc. ("Barclays").

### NATURE OF THE ACTION

1. This is a whistleblower case.

2. Plaintiff was the Head of Commercial Real Estate Trading and Distribution at Barclays. During Plaintiff's tenure at Barclays, he witnessed a culture in which basic risk management and risk controls were flagrantly disregarded, serious compliance issues were ignored, and senior management engaged in potentially fraudulent and illegal misconduct. Employees were pressured by senior management to engage in misconduct, and told that there were certain "distasteful" actions they would need to take, and certain "unwritten rules" they would need to follow, if they wanted to advance in the company. If an employee did have the courage to speak up, that employee was threatened and retaliated against. This is exactly what happened to Plaintiff.

3. As is required by Barclay's own internal policies, Plaintiff did speak up about what he witnessed and repeatedly raised serious and troubling issues, first with his superiors and then with Human Resources, Compliance and Whistleblowing. Not only were Plaintiff's complaints ignored and dismissed, but – contrary to company policy and assurances that he received that he would be protected – Plaintiff's superiors retaliated against him for reporting the misconduct. Left with no other option, Plaintiff was ultimately forced to report Barclays' misconduct to various regulators including SEC, FINRA and the Federal Reserve. Just weeks after doing so, he was illegally terminated as retaliation for this reporting.

## THE PARTIES

4. Plaintiff Brian LaBelle is an individual residing at 17 Sherwood Lane, East Hampton, NY 11937.

5. Defendant Barclay's Capital Inc. has an office at 745 Seventh Avenue, New York, NY 10019. It is a subsidiary of Barclays PLC whose stock is publicly traded on the New York Stock Exchange.

## JURISDICTION

6. Prior to initiating this lawsuit, Mr. La Belle timely filed a whistleblowing complaint against Barclays with the Department of Labor. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C.§ 1514A(b)(1)(B) because the Secretary of Labor has not issued a final determination of Plaintiff's administrative proceeding under the Sarbanes-Oxley Act, and more than 180 days has passed since the commencement of that proceeding.

7. Venue is proper within this district, pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in New York, New York.

## FACTS

### I. Plaintiff Excelled at Barclays

8. In July 2015, Plaintiff began work for Barclays as a Vice President in Securitized Products. In January 2016, less than a year after being hired, Plaintiff was promoted to Head of Primary Commercial Mortgage Backed Securities ("CMBS") Trading and Distribution where he was responsible for, among other things, pricing, hedging and distribution of commercial mortgages, securities and subordinate debt. Plaintiff was directly responsible for the syndication and distribution of new issue commercial mortgage securities syndications and placing securities and mezzanine debt with foreign and domestic money managers, pension funds, insurance companies and hedge funds.

9. As a result of Plaintiff's efforts during his tenure at Barclays, its standing within the CMBS league tables improved dramatically, from the bottom quartile all of the way into the top six. Moreover, client and overall market perception of Barclays' commercial mortgage group materially improved. Plaintiff's performance was recognized by his supervisors, and just months before being illegally terminated he received what he was told was the "highest base salary raise and bonus of any director in the firm."

10. Up until the time that Barclays began retaliating against him, Plaintiff received nothing but stellar reviews. In his three years with the firm, Plaintiff was directly responsible for generating record profits for the group. Since his illegal termination, upon information and belief, that same group has returned to performing poorly.

## II. Barclays' Employees and Management Routinely Violated its Mandatory Block Leave Policy and Barclays Retaliated Against Plaintiff for Reporting These Violations

11. Plaintiff's mistreatment by Barclay's began around August 2017. Plaintiff was a Series 24 Principal Supervisor and designated MRT - material risk taker. Thus, Plaintiff was subject to various deferred compensation arrangements and an annual Mandatory Block Leave.

12. Employees such as Plaintiff who are subject to Mandatory Block Leave are not permitted to perform any work at all during the time they are on leave. Mandatory Block Leave is an important fraud prevention device adopted by many banks and other financial institutions, including Barclays. It is included in the FDIC's Risk Management Manual of Examination Policies under section 4.2 Basic Elements of Internal Control under "vacation policies" which states: "Banks should have a policy that requires all officers and employees to be absent from their duties for an uninterrupted period of not less than two consecutive weeks." After completing Mandatory Block Leave, Barclays' employees are required to sign an attestation stating that they have complied with the policy and did not perform any work during that time period.

13. Twice while on mandatory block leave, first in August 2017 and later in December 2017, Plaintiff's superiors, Mr. Kravetz and Mr. Wu, flagrantly violated Barclay's mandatory block leave policy and pressured Plaintiff into performing trades, contacting clients, and assisting with the closing of mezzanine loans, pricing of new loans, adjusting of derivative hedges and placing securities and commercial mortgage loans with clients while on leave. Numerous Barclays' team members, including Mr. Wu, repeatedly communicated with Plaintiff during his block leave. Mr. Kravetz knew, and expected, that Plaintiff would work during his

4

mandatory block leave and Plaintiff reasonably believed that if he did not, it would adversely affect his career.

14. On January 4, 2018, shortly after Plaintiff's second unsuccessful attempt at taking block leave, Plaintiff had enough and reported it to the appropriate channels at Barclays. From that point on, Plaintiff's employment at Barclays began a downward spiral that ultimately resulted in his illegal termination. That day, Plaintiff worked from home because of blizzard-like conditions in New York City. In response to an e-mail from Mr. Kravetz questioning why he was not in the office that day, Plaintiff responded by stating that he would be working remotely that day, just as he had done during his recent mandatory block leave.

15. In response, Mr. Kravetz called Plaintiff. He was furious. He chastised Plaintiff for documenting and creating a record that Plaintiff had been forced to work through his mandatory block leave. Mr. Kravetz threatened Plaintiff and specifically said, among other things:

"How could you be so fucking stupid to put that in an email";

"You just fucked yourself and you fucked me";

"Everybody works on their block leave. I work on my block leave";

"Don't call compliance. I will call compliance. Do you hear me, don't call compliance."

16. Shortly thereafter, consistent with Barclay's policy and procedures, and despite Mr. Kravetz's demands that Plaintiff not do so, Plaintiff properly reported this matter to the compliance department and refused to attest that he had complied with Barclays' mandatory block leave policy.

17. Later that day, Mr. Kravetz called Plaintiff back to discuss the matter. Mr. Kravetz stated, "I don't know why you sent that email. It's a crazy email." Plaintiff expressed

his concern that by reporting that he was forced to work during his block leave, he had negatively affected his standing, compensation and career at the firm. Mr. Kravetz stated: "I have no idea what it's going to do. I don't know if it's a negative or a neutral, but it's not a plus. Now we're dealing with compliance." When Plaintiff stated that he felt that Mr. Kravetz was threatening him, Mr. Kravetz said: "It's not a threat. I don't know what the implications are, but what I do know is I had to go to compliance with it . . . This was a really dumb thing you did. This was incredibly bad judgment and use better judgment."

18. Later in the day, Mr. Wu -- Mr. Kravetz's right hand man -- called Plaintiff to further discuss the situation, presumably at Mr. Kravetz's instruction. Playing "good cop" to Mr. Kravetz's "bad cop," Mr. Wu advised Plaintiff, among other things, that at Barclays "there are certain unwritten rules you have to live by" and to succeed and advance at Barclays there are many "distasteful" things one must do. Working during your block leave and being quiet about it was one of those "distasteful" things. Mr. Wu was articulating the view of many in senior management at Barclay's that all that mattered was making a profit, even if that meant working through block leave or engaging in other "distasteful" activities that violate Barclay's policy or the law. Moreover, Barclays' employees were expected to be quiet about it.

19. Mr. Wu's advice to Plaintiff that he follow certain nefarious "unwritten rules" and engage in "distasteful" conduct if he wants to succeed at Barclays, reflects the actual culture at Barclays. However, it is directly at odds with what Barclays has stated to investors, regulators and the public. For example, in its 2018 annual report, Barclays boasted that: "We have also developed a strong values-based culture that enables us to serve our customers, to make a significant contribution to society, to reward shareholders and to protect ourselves from the reputational damage associated with poor industry conduct." The exact opposite is true.

6

Barclays has made dozens of other similar and demonstrably false allegations to the investing public.[1]

20. During the same call, Mr. Wu also advised Plaintiff that by reporting the misconduct he had damaged, if not irreparably damaged, not only his relationship with Mr. Kravetz, but also his career at Barclays:

> You sent an email that directly puts Larry at risk and he's just reacting to that. You're creating a gap between him and you and you need him on your side. You just have to say "you know what, I fucked up, I totally get it. I shouldn't have done that." You don't have to tell him that you felt like your job was on the line. I'm sure he knows that. I'm sure he knows that you felt a lot of pressure and this wouldn't have been an issue if you just didn't write that email.
>
> \* \* \*
>
> You guys have crossed a line that you may never be able to come back from, but you have to try because the alternative is something I don't even want to think about. Try to at least get it back to where it was.
>
> \* \* \*
>
> Larry has this thing when he turns against someone, he does it. You're not there yet, but you're trending in that direction.

---

[1] For example, in its 2018 Annual Report Barclays also falsely claimed: "Our five Values . . . hold us to account and guide us to behave in the right way. They have always underpinned our Purpose and will continue to do so. Because 'Creating opportunities to rise' must never come at the cost of what is right. It will always be grounded in the deep-rooted Values of our organisation – Respect, Integrity, Service, Excellence and Stewardship. The Barclays Code of Conduct – 'The Barclays Way' – outlines the Values and Behaviours which govern our way of working across our business globally. It constitutes a reference point covering all aspects of our working relationships, specifically with other Barclays employees, customers and clients, governments and regulators, business partners, suppliers, competitors and the broader community. The objective is to define the way we think, work and act at Barclays to ensure we deliver against our Purpose of 'Creating opportunities to rise'. We want to see Barclays playing a key role in restoring the professionalism of banking and want this bank to be respected and admired for the strength of its character; for our ability to foster trust between Barclays and its customers, clients and society. The Barclays Way is aligned to the Code of Professional Conduct, published by the Chartered Banker Professional Standards Board, which sets out the ethical and professional attitudes and behaviours expected of bankers. Barclays subscribes to this code and is committed to ensuring the broad principles into our business continue to apply."

21. Mr. Wu's statements are a direct admission by Barclays that by reporting the misconduct he saw and was pressured into participating in, Plaintiff would be retaliated against unless he did something to repair the situation.

22. But rather than follow Mr. Wu's advice and try and repair his relationship with Mr. Kravetz by lying and covering up this misconduct, that same night Plaintiff instead reported that misconduct to Monica De Martin, Barclay's Head of Whistleblowing and Investigations Americas. After Barclays commenced a whistleblowing investigation, Plaintiff met with Ms. De Martin. Ms. De Martin, trying to shield Barclays' improper conduct from the outside world, specifically instructed Plaintiff "not discuss this investigation with anyone inside or outside the firm."

23. Ms. De Martin told Plaintiff that he would be protected, and provided him with a copy of the employee handbook with highlighted sections on retaliation, citing a strict policy against retaliation against employees who raise concerns regarding misconduct. However, contrary to these assurances and company policy, Plaintiff almost immediately became the victim of retaliatory conduct. In February 2018, Plaintiff received his very first negative performance review from the company, despite that Plaintiff and his group had a record year of profitability. Prior to the whistleblowing report, all of Plaintiff's reviews had been stellar. In addition, Barclays retaliated against Mr. La Belle by awarding him a bonus for 2017 that was several hundred thousand less than the bonus that he was told by Mr. Kravetz in early December 2017 was due to him.

24. In addition, during March 2018, Marty Attea -- Mr. Kravetz's superior -- told Plaintiff that he would not be made Managing Director, a promotion which comes with a

8

significant increase in compensation, anytime soon in part because he reported the block leave incident.

25. In April 2018, the retaliation against Plaintiff, specifically from Mr. Kravetz, intensified. Plaintiff received several reports from sales people and other members of the commercial real estate team that Mr. Kravetz and Mr. Wu had been asking for information about Plaintiff. In May 2018, one of the group's Executive Assistants advised Plaintiff that Mr. Kravetz -- while on vacation -- called and asked her to access Plaintiff's calendar and read off every meeting that Plaintiff had attended for the prior two months and that Plaintiff had scheduled for the following two months.

26. Around the same time, this Executive Assistant also witnessed Mr. Kravetz accessing the computer of another group Executive Assistant, without authorization and in violation of Barclay's policy, seeking information concerning Plaintiff. Mr. Kravetz acknowledged to the Executive Assistant that he had in fact accessed her computer in an effort to seek information on Plaintiff. Accessing another employee's computer without permission is not only a clear violation of Barclay's company policy, it is likely illegal. That Executive Assistant was subsequently terminated by Barclays under very suspicious circumstances, and upon information and belief, was done so to prevent her from speaking up about the situation.

27. On May 7, 2018, Plaintiff sent another email to HR and Compliance explaining Mr. Kravetz's retaliatory behavior. On May 15, 2018, Plaintiff met with both Ho Chan Lee, HR Employee Relations, Ms. De Martin and Tarik Lacene, HR Employee Relations. Plaintiff again explained the retaliation and hostile work environment that he had been subjected to, and advised them that he had recordings of some of the calls with Mr. Kravetz and Mr. Wu discussed above. Mr. Lacene directed Plaintiff to turn over to Barclays all copies of the recordings evidencing

Barclays' retaliatory conduct. Upon information and belief, this was an attempt by Barclays to destroy evidence of the matter and to continue to cover up what had occurred. Plaintiff refused to comply with this troubling request, but did agree to provide Barclays a copy of the recordings.

28.     During the week of May 21, 2018, Mr. Kravetz and Mr. Wu continued their retaliatory harassment of Plaintiff by instructing two of his direct reports to take numerous actions contrary to what Plaintiff had instructed them. In addition, Mr. Kravetz and Mr. Wu excluded Plaintiff from numerous meetings and calls, including with his direct reports. Plaintiff again reported this retaliatory behavior to Ms. De Martin and Mr. Chan Lee.

29.     Around this time, another one the group's Executive Assistants was interviewed as part of Barclays' internal investigation of Plaintiff's whistleblowing complaint. When she was asked about Mr. Kravetz, upon information and belief she said "he's a bully, he's clearly out to get Brian. The work environment here has become extremely hostile."

30.     During the first week of June 2018, Mr. Wu accessed the computer of Chris Burke, a VP originator, while Mr. Burke was away without authorization, in violation of company policy and possibly the law, and sent an outlook calendar invite to Steve Caldwell entitled "oil massage" and walked away laughing. When Mr. Burke returned to his desk, he saw the calendar invite and expressed his concern. Plaintiff also reported this event to HR and whistleblowing.

31.     On June 6 and 7, 2018, Plaintiff again advised Mr. Chan Lee and Ms. DeMartin that he was being excluded by Mr. Kravetz from relevant meetings, calls and emails and that the reason for this misconduct was retaliation.

32.     The conduct of Barclay's, in particular Mr. Kravetz and Mr. Wu, led Plaintiff to reasonably believe that his superiors not only expected him to comply with certain "unwritten

rules" to violate company policy and possibly the law, but also keep quiet about it and not bring the issue to the attention of upper management or compliance. Specifically, he was told that it is routine and expected for employees at Barclays to work through their block leave (and presumably falsely attest that they did not.) Plaintiff witnessed a culture at Barclays where an important fraud prevention control, mandatory block leave, was routinely and flagrantly ignored. By reporting the misconduct he saw and refusing to continue to cover it up, Plaintiff subjected himself to retaliatory conduct and put both his future compensation and prospects for career advancement at Barclays at it risk.

### III.    Plaintiff Reports Additional Misconduct and Is Again Retaliated Against

#### A.    Misconduct Related to the Client 1 Transaction

33.    In late May 2018, Barclays was awarded the lead mandate to provide a client (hereinafter referred to as "Client 1") with $550 million of financing on a portfolio of hotels. The deal was brought to Barclays by Mr. Kravetz and Mr. Wu.

34.    The proposed transaction had a large cash out -- return of equity -- to Client 1. From the beginning, Plaintiff expressed his concern that the cash out was too large, especially given the age of the assets, which were built in the 1990s and required significant capital improvements. Plaintiff advised senior management that the transaction was very risky and that Barclays should take its time and be careful with the execution of this loan. Plaintiff's opinion was ignored and the team moved forward aggressively with the deal.

35.    As part of the pre-marketing of the mezzanine loans, Plaintiff reached out to a small circle of potential investors. The feedback that Plaintiff received was consistent: the debt load on this asset was far too high, especially considering the age of the assets and the large cash out to Client 1. Plaintiff reported the feedback to the deal team and again advised senior management to be careful with this loan. Plaintiff was again ignored.

11

36. As part of the deal, Client 1 would be required to negotiate an updated management agreement with its hotel management company. The new management agreement included a Planned Improvement Plan ("PIP") that required Client 1 to make significant capital improvements to the properties which included external structural improvements, case goods, and improvements to common areas.

37. Client 1 provided Barclays with an initial estimate of the costs to cover the PIP. But this estimate seemed too low. Thus, Barclays retained a firm to perform an independent analysis of the updated management agreement, the PIP and to provide an estimate of the amount it would cost. The report came back at more than triple Client 1's initial estimate, making the proposed transaction extremely risky, if not downright impossible.

38. Plaintiff informed the deal team that it would need to make the report available to potential investors. However, Plaintiff was instructed by Mr. Kravetz and Steven Caldwell, Senior Originator, that "under no circumstances are you to share this report with any potential investors." When Plaintiff advised Mr. Kravetz and Mr. Caldwell that he had already shared some of this information with investors, he was removed from any further conversations regarding the report.

39. The deal team at Barclays sent the report results to Client 1 and its commercial mortgage broker who said the report was "ridiculous." In response, Barclays put Client 1 and the mortgage broker directly in contact with firm that produced the report. Plaintiff believed this was a serious conflict of interest, or at the very least gave the appearance of impropriety, and told this to senior management at Barclays. However, Plaintiff was excluded from any further calls and meetings concerning the report, so he does not know exactly what happened. However, the result of these calls and meetings was that just one week later, the company revised the report

showing a very significant reduction in the estimated amount of improvement costs. If true, this would mean the proposed transaction would still be risky, but at least potentially viable. Plaintiff had serious misgivings about the legitimacy of this very significant change and expressed his concerns that the report may have been improperly altered by the appraiser under pressure from Barclays, Client 1 and the mortgage broker, all of whom had a significant financial stake in closing the deal.

40. Despite being told not to do so, Plaintiff nevertheless let investors know his concerns about the report, the significant change in the figures over just a one-week period, and told them it would be prudent to conduct their own analysis. This warning gave many investors pause about the deal. Several investors passed and one investor referred to this deal as "complete garbage."

41. Despite Plaintiff's serious concerns about whether Barclays was providing potential investors with complete and accurate information, Client 1, its mortgage broker and Barclays' senior management (Mr. Kravetz, Mr. Wu and Mr. Caldwell) pushed hard to close the deal.

42. Barclays had difficulty marketing the deal. After weeks of trying to do so, it became apparent that two foreign investment companies would be the best bid on the senior and junior mezzanine loans. Plaintiff again informed Mr. Kravetz, Mr. Wu and Mr. Caldwell along with Spencer Kagan (head of credit) and Daniel Vinson (head of securitization) that Barclays had a duty to be 100% transparent with these investors, especially considering they were not as familiar with the United States market or limited service hotel portfolios. Plaintiff suggested delaying closing until the foreign investors finalized their credit work, site visit, and review of the relevant legal documents. Plaintiff sent multiple emails to the deal team advising them that

the foreign investors did not have a chance to review these documents and provide comments. Putting the interest of Barclays' profits from the transaction ahead of everything else, Mr. Kravetz and Mr. Caldwell told Plaintiff that they couldn't delay the transaction.

43. During the week of July 4th, Mr. Kravetz pressured Plaintiff to begin pre-marketing the securities, especially the riskiest tranches. Plaintiff responded saying that given the report, the fact that the mezzanine loans weren't placed and the fact that 4th of July week is a low liquidity environment with most market participants away from the office, this would be irresponsible. Plaintiff escalated his concerns to his supervisor, Brian Wiele who didn't respond. Plaintiff ultimately placed a portion of the AAA/BB/B tranches with various investors, but made them all aware either verbally or in writing regarding the valuation. Mr. Kravetz and Mr. Caldwell decided to fund the loan despite Plaintiff's request not to given the many outstanding issues that had not yet been resolved.

44. Plaintiff reported these allegations which, if true, could amount to securities fraud pursuant to 18 U.S.C. §§ 1348 and 3301, among other things, to Ms. DeMartin, Mr. Chan Lee and Mr. Wiele among others. Nothing was done by Barclays in response.

### B. Misconduct Related to Client 2

45. Plaintiff was also not included in the calculation and analysis of risk on a very large, six-month commitment, principal risk transaction for another Barclay's client (hereinafter referred to as "Client 2") with respect to its acquisition of another hotel chain. This transaction would have been the largest transaction, and longest principal risk commitment, for the team to date. Instead, of coming to Plaintiff as would have been typical, Mr. Kravetz instead side-stepped Plaintiff and instructed two junior employees, David Kung and Peter Taylor, to "massage the data" by running dozens of scenarios until they showed an "absolutely perfect outcome" that

greatly understated the risk to the Barclays. Mr. Kung and Mr. Taylor told Plaintiff that they were pressured by Mr. Kravetz to "massage" the scenarios and data in a fashion that would result in the best possible outcomes for Client 2, but which materially understated the risk to Barclays. Plaintiff was inexplicably excluded from this process.

46. Concerned by what Mr. Kung and Mr. Taylor told Plaintiff, Plaintiff reviewed each of the scenarios and determined that Mr. Kravetz in fact had massaged the data to misrepresent the potential downside loss to Barclays by a factor of 10x or more by cherry picking the data sets used. This too potentially could be fraudulent or illegal, or at a very bare minimum a flagrant disregard for Barclays' internal risk management controls that could expose Barclays' to significant loses and damages.

47. Plaintiff escalated his concerns to Mr. Wiele and Marty Attea. But his concerns were again ignored and the deal passed committee. Had Plaintiff's legitimate concerns been addressed, perhaps the deal would not have been agreed to, or perhaps it would have been agreed to on terms less favorable to Client 2.

48. On June 4, 2018, Plaintiff filed another report about this misconduct to Ms. De Martin and Mr. Chan Lee. This report also included information concerning the fact that Plaintiff had been excluded from several meetings, calls and e-mails on the Client 1 transaction detailed above. On June 13, 2018, Plaintiff escalated the situation further to Mr. Wiele and Mr. Attea via e-mail, advising them that the data was not accurate and that it had been massaged and misrepresented. Barclays did nothing in response.

49. Barclays' was ultimately not involved in the transaction, as Client 2 did not win the competitive acquisition. However, just two weeks after the deal closed, Mr. Wu, Mr. Kravetz's right hand man who was heavily involved in the deal, was not only hired by Client 2,

15

but by the exact deal team at Client 2 that was involved in the above transaction. It appears that Barclays' originators within commercial real estate were rewarded by their borrowers whom they had just offered a sweetheart deal by misrepresenting risk to the risk committees in exchange for obtaining a new job with those borrowers.

### C. Plaintiff Reports Additional Misconduct

50. In addition, on July 11, 2018, Plaintiff caught an unlicensed junior employee, soliciting pre-marketing securities at the direction of Mr. Kravetz after he had been told specifically multiple times that it was illegal for him to do so. Plaintiff reported this misconduct to Mr. Wiele and Anna Zhuravitsky in Compliance. Barclays acknowledged and admitted the illegal conduct. However, Barclays did nothing. Instead, Mr. Wiele chastised Plaintiff for documenting these compliance issues in writing. He said "Stop putting these things in email, you're causing problems." During this conversation Plaintiff advised Mr. Wiele of ongoing investigations, and advised that as a Principal Supervisor, Plaintiff would continue to properly document and report all issues consistent with Barclays' internal policies and securities law.

51. Plaintiff subsequently filed another report about this misconduct which violates FINRA Rule 1210. Barclay's senior management failed to act on my complaints to Ms. De Martin and Mr. Chan Lee.

### IV. Barclays Terminates Plaintiff As Retaliation For Reporting Misconduct

52. On June 14th, 2018, Ms. De Martin called Plaintiff and asked him to meet her on the HR floor. At the meeting, Mr. Chan Lee said:

> We have investigated each of your concerns, we have determined this is an HR case, not a whistleblowing case. We have found no evidence of retaliation against you. We did find some behaviors of senior management that were an issue and we have taken appropriate actions. We cannot change your reporting line for "various reasons" and we consider this matter closed.

16

53.     Plaintiff advised Ms. DeMartin and Mr. Chan Lee that Mr. Wu and Mr. Kravetz had been harassing him, created a hostile work environment, no longer even made eye contact with him, and only communicated with him in large scheduled meetings with other employees present.  Plaintiff also advised that he was being circumvented in the management of his team and being excluded from risk management discussions and analysis.  Essentially admitting that retaliation had occurred, Ms. DeMartin stated: "We hope the messaging we have delivered to certain senior managers finally resonates, just focus on doing your job."  The meeting then adjourned.

54.     That night, Plaintiff filed whistleblower complaints against Barclays with the SEC, FINRA, the FCA and the Federal Reserve.  Plaintiff has met at length with the SEC who, upon information and belief, is investigating these issues.  Plaintiff has also spoken with the Federal Reserve and the FCA -- the Financial Conduct Authority which is the primary regulator of financial services firms and financial markets in the UK.

55.     On July 10, 2018, having continued to be ignored by Barclays, Plaintiff filed another whistleblowing complaint with the SEC concerning his concerns with respect to the Client 1 matter.

56.     On July 15, 2018, Plaintiff again advised Mr. Wiele of the rampant misconduct with relation to the Client 1 and Client 2 transactions and the Barclays' employee illegally soliciting securities without a license.  Mr. Wiele said that he "will take care of it."  But again, he did nothing.

57.     On August 1, 2018, Barclays terminated Plaintiff.

58. On October 26, 2019, Plaintiff filed a Whistleblower Complaint against Barclays pursuant to the Sarbanes-Oxley Act with the Secretary of Labor. The Secretary has not issued a final decision within 180 days of the filing of the complaint.

### FIRST CAUSE OF ACTION – RETALIATION PUSRUANT TO SECTION 806 OF THE SARBANES-OXLEY ACT OF 2002, 18 U.S.C. § 1514A

59. The allegations contained in the preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

60. As detailed above Plaintiff engaged in "protected activity" by reporting conduct that he "reasonably believe[d] constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."

61. Barclays knew or suspected that Plaintiff engaged in the protected activity.

62. As detailed above, Plaintiff was retaliated against and ultimately terminated.

63. Plaintiff's "protected activity" was a contributing, if not sole, factor in his termination.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in his favor and issue a judgment against Barclays:

A. awarding Plaintiff compensatory damages, including back pay and lost future earnings in an amount to be proven at trial but expected to exceed $10,000,000;

B. awarding Plaintiff reinstatement with the same seniority status that Plaintiff would have had but for the retaliation;

C. awarding Plaintiff compensation for special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, and reasonable attorney fees in an amount to be proven at trial;

D. awarding Plaintiff compensation for reputational damage caused by the retaliation in an amount to be proven at trial;

E.  awarding Plaintiff compensation for emotional distress in an amount to be determined at trial;

F.  awarding Plaintiff punitive damages in an amount to be proven at trial;

G.  awarding Plaintiff interest as is allowed by law; and

H.  granting Plaintiff such other and further relief as the Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Dated: April 29, 2019

LAW OFFICE OF STEVEN BARENTZEN

/s/ Steven Barentzen
Steven Barentzen
17 State Street, Suite 400
New York, NY 10004
Phone: (917) 476-0953
Fax:    (202) 888-6268
Steven@barentzenlaw.com

**Mailing Address:**

1750 K Street, NW, Suite 700
Washington, DC 20006
Phone:  (202) 289-4333

*Attorney for Plaintiff*