EPSTEIN BECKER & GREEN, P.C.
Ronald M. Green
John F. Fullerton III
875 Third Avenue
New York, NY 10022
Tel: 212.351.4500
Fax: 212.878.8600
RGreen@ebglaw.com
JFullerton@ebglaw.com

BALLARD SPAHR LLP
Elizabeth K. McManus
1675 Broadway, 19th Floor
New York, NY 10019
Tel: 212.223.0200
McManusE@ballardspahr.com

*Attorneys for Defendant*
  *Barclays Capital Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| BRIAN LABELLE, | : | |
| Plaintiff, | : | Civil Action No. 19-CV-03800 |
| | : | (JPO) (GWG) |
| - against - | : | |
| | : | |
| BARCLAYS CAPITAL INC., | : | |
| | : | |
| Defendant. | :: | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT BARCLAYS CAPITAL INC.'S
LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Barclays Capital Inc. ("Barclays"), by its attorneys Epstein Becker & Green,

P.C. and Ballard Spahr LLP, pursuant to Rule 56.1 of the Local Civil Rules of the United States

District Court for the Southern and Eastern Districts of New York, respectfully submits that the

following material facts are undisputed and support the grant of summary judgment in favor of

Defendant:

**A.      Barclays' CMBS Business**

1.      Barclays conducts its Commercial Mortgage-Backed Securities ("CMBS") business primarily through two trading desks: the CMBS Primary Origination desk and the Syndicate−Securitization desk. (Ex. 14; Ex. 3, at 7:10-8:11; Ex. 5, at 75:6-15).

2.      The CMBS Primary Origination business has several functional teams/roles, including *Originators*, whose responsibilities include originating large commercial-real estate loans for institutional borrowers; *Underwriters*, who are responsible for conducting due diligence and handling underwriting of the loan; and *Securitization* specialists, who are responsible for securitizing the loan and preparing investor-facing disclosure documents. (Ex. 14; Ex. 3, at 6:7-11:4; Ex. 5, at 205:24-206:19, 207:9-208:6; Ex. 6, at 9:14-12:14; Ex. 1, at 329:15-330:6; Ex. 15, at BARCLAYS_CMBS_000000081-0082, 0092).

3.      The Syndicate−Securitization desk is responsible for, among other things, the pricing and distribution of securitized products, including CMBS. (Ex. 14; Ex. 5, at 12:19-17:22; Ex. 3, at 12:21-23).

4.      The Syndicate−Securitization desk supports the CMBS large loan business by providing input on the pricing and structure of large loans. (Ex. 14; Ex. 5, at 12:19-17:22).

5.      The Syndicate−Securitization desk also helps Barclays' sales force distribute mortgage bonds and mezzanine loans to the market. (Ex. 14; Ex. 6, at 24:22-25:5).

6.      All members of the CMBS Primary Origination and Syndicate−Securitization teams at Barclays are responsible for risk management. (Ex. 6, at 25:22-26:12; Ex. 1, at 25:24-26:9).

**B.      Plaintiff's Employment with the CMBS Team**

7.      Plaintiff Brian LaBelle ("Plaintiff") began his employment with Barclays on or about July 6, 2015, as a Vice President in Securitized Products. Starting in 2015, he reported to Larry Kravetz, Managing Director and Barclays' Head of Primary CMBS Origination. (Ex. 16; Ex. 17; Ex. 18; Ex. 1, at 14:11-12, 22:22-23, 41:6-42:5, 91:13-21; Ex. 19, ¶ 2).

8.      Later in 2016, due to a reorganization within Barclays, Plaintiff was transferred to Syndicate–Securitization, reporting to Brian Wiele, Managing Director and Barclays' Global Head of Securitized Products–Syndicate. (Ex. 1, at 41:6-42:5, 91:13-21; Ex. 5, at 31:2-21).

9.      While part of the Syndicate–Securitization desk, Plaintiff primarily worked for the CMBS Primary Origination desk with a remaining "dotted" line reporting to Mr. Kravetz. (Ex. 1, at 22:13-17; Ex. 5, at 29:25-30:6, 75:6-15; Ex. 3, at 99:19-100:19; Ex. 19, ¶ 4).

10.     Mr. Kravetz managed Plaintiff in his role arranging the distribution of bonds and mezzanine debt associated with commercial real estate loan offerings. (Ex. 19, ¶ 4).

11.     Mr. Kravetz has supervised the CMBS Primary Origination desk since 2011. (Ex. 19, ¶¶ 2-3; Ex. 3, at 7:10-19)

12.     Eric Wu, formerly Managing Director and Barclays' Head of Originations for Large Loan Commercial Real Estate, led the Origination team until June 2018. (Ex. 14; Ex. 6, at 9:20-23).

13.     Martin Attea, Managing Director and Barclays' Head of Securitized Products, is Mr. Kravetz's supervisor. (Ex. 1, at 22:13-17; Ex. 3, at 215:7-8).

14.     Justin D'Ercole, Managing Director and Barclays' former Head of U.S. Investment Grade Syndicate and current Co-Head of Global Fixed Income Syndicate, has at all relevant times been Mr. Wiele's supervisor. (Ex. 5, at 27:13-15).

15.     David Kung Director, Bond Structuring, Syndicate, also reported to Mr. Wiele and supported the work of the CMBS team. (Ex. 1, at 78:2-6; Ex. 13, ¶¶ 3, 4).

16.     Peter Taylor, another CMBS employee, also reported to Mr. Wiele. (Ex. 1, at 78:2-6; Ex. 5, at 19:19-20:5).

17.     Effective March 1, 2016, Barclays promoted Plaintiff to Director and Head of CMBS Primary Trading and Distribution. (Ex. 20, at D000127).

18.     As Head of CMBS Primary Trading and Distribution, Plaintiff was responsible for, among other things, pricing, hedging and distribution of commercial mortgages, securities, and subordinate debt. (Ex. 21, at D000158; Ex. 5, at 70:6-73:17).

19.     Several other individuals, including Shazim Hasan and Kristin Khanna, assisted Plaintiff in fulfilling his role. (Ex. 1, at 110:7-16; Ex. 5, at 109:5-10).

20.     Plaintiff directly supervised Mr. Hasan and Ms. Khanna. (Ex. 1, at 110:7-16; Ex. 5, at 109:5-10).

21.     As part of his role, Plaintiff was involved in risk management. (Ex. 1, at 25:24-26:9; Ex. 6, at 25:22-26:12; Ex. 22, at 56:21-23).

22.     Plaintiff has stated: "We're principal risk, we're taking a s**tload of risk, especially at this point in the market. You have to." (Ex. 22, at 56:21-23).

23.     Prior to January 4, 2018, Plaintiff acknowledged that he had disagreed with Mr. Kravetz with respect to the risks related to certain deals. (Ex. 23, at 26:20).

24.     Plaintiff stated: "[T]here's always going to be natural debate when you're involved in dealmaking and risk-taking and how to win and how to protect the firm." (Ex. 23, at 26:17-20).

**C.**     **Applicable Barclays Policies**

25.     At the time of Plaintiff's hire, Barclays provided him with its U.S. Region Employee Handbook ("Handbook"), which contains various policies relevant to employment at Barclays. (Ex. 1, at 188:10-13; Ex. 24; Ex. 25).

26.     As set forth in Plaintiff's offer letter and in the Handbook, Plaintiff's employment at Barclays was "at will," meaning that either he or Barclays could "terminate the employment relationship at any time, for any reason or for no reason, with or without cause." (Ex. 16, at D000122; Ex. 24, at D000184).

27.     The Handbook emphasizes the importance of attendance and punctuality as a job performance metric: "A superior attendance and punctuality record is expected of all employees and is a component of overall performance. You are expected to be at work on time every day except for scheduled time off that has been approved by your immediate manager, such as vacation, personal days, and floating holidays." (Ex. 24, at D000187).

28.     Barclays' Handbook states that an employee "will not be retaliated against for having brought, in good faith, a complaint to the attention of your immediate manager, immediate manager's manager, or Human Resources." (Ex. 24, at D000191).

29.     Per Barclays' Handbook, "unauthorized voice recordings are prohibited as such recordings may increase the likelihood that confidential information may be disclosed to third parties." (Ex. 24, at D000184).

30.     Plaintiff was aware of Barclays' policy prohibiting unauthorized voice recordings. (Ex. 26, at 66:12-68:21; Ex. 1, at 188:7-189:14).

**D.**     **Mandatory Block Leave**

31.     Barclays maintains a voluntary internal policy called the Mandatory Block Leave Standard. (Ex. 27).

32.     Under Barclays' Mandatory Block Leave Standard, certain "Covered Individuals" are required "to take 10 consecutive business days off each year," and refrain from engaging in certain business activities during that time for that leave to qualify as Mandatory Block Leave ("MBL"). (Ex. 27, at D000261-0264; Ex. 7, at 53:9-21, 93:25-94:1).

33.     MBL is an "internal safeguard against internal fraud," which is not mandated by law. (Ex. 27, at D000261).

34.     SOX-covered companies are not required to implement MBL policies under any law, rule, or regulation of the U.S. Securities and Exchange Commission ("SEC") or any other regulatory agency. (Ex. 7, at 18:8-22; Ex. 28, at 1, 4-6, 10; Ex. 29; Ex. 30; Ex. 31).

35.     Some banks, like Barclays, adopt mandatory vacation policies like MBL with the purpose of discovering potential fraud by the employee on MBL. (Ex. 7, at 54:25-55:11, 73:2-74:7; Ex. 1, at 73:16-25; Ex. 2, at 24:18-21).

36.     By denying the employee on MBL access to the firm or its systems for an extended period, a bank is more likely to uncover any fraudulent activity in which the employee might have been engaging. (Ex. 7, at 55:12-56:2; Ex. 1, at 73:16-25).

37.     Under the MBL Standard, Plaintiff was a Covered Individual, required to take MBL. (Amended Compl., ECF No. 147, ¶ 11; Ex. 27, at D000261).

38.     Mr. Kravetz and Mr. Wu were not Covered Individuals subject to MBL under the MBL Standard in either 2017 or 2018. (Ex. 22, at 24:16-25:3; Ex. 32, at 26:11-18; Ex. 7, at 65:23-25).

39.     The sole purpose of MBL is to prevent fraud by the Covered Individual, not by a group of employees or the Covered Individual's supervisor. (Ex. 7, at 73:17-74:5).

40.     Upon completing MBL, Covered Individuals must submit an attestation that the Covered Individual's MBL is complete, and the Covered Individual has not engaged in certain business activities during the MBL period. The attestation must be approved by the Covered Individual's supervisor. (Ex. 27, at D000264; Ex. 7, at 36:8-37:24, 98:21-99:12; Ex. 5, at 51:4-16; Ex. 1, at 90:19-91:4; Ex. 23, at 32:2-5).

41.     If a Covered Individual ultimately must work during what was intended to be a scheduled MBL, it is not a breach of the MBL standard provided the employee does not attest that they completed their MBL in compliance with the MBL Standard. (Ex. 27, at D000262-0263; Ex. 7, at 122:11-20; Ex. 1, at 115:24-116:2, 215:20-216:5).

42.     The appropriate course of action when the need to work interrupts an employee's scheduled MBL is to cancel and reschedule the MBL. (Ex. 7, at 91:21-92:17, 116:18-117:8, 132:3-7, 134:13-23).

43.     It is the responsibility of the employee to ensure compliance with Barclays' MBL Standard. (Ex. 7, at 72:4-6, 91:21-92:9).

44.     If a Covered Individual is unable to meet the 10-day MBL requirement in the allotted time, he or she may request an extension until March 31 of the following year. (Ex. 27, at D000264; Ex. 7, at 84:3-10).

45.     It is not unusual for Covered Individuals to end up having to work during a leave that had intended to be used as MBL. (Ex. 8, at 270:11-16; Ex. 7, at 85:22-86:5; Ex. 23, at 28:19-29:12).

**E.     Plaintiff's Work Performance**

46.     Plaintiff owns a home in East Hampton, New York. (Ex. 1, at 121:12-20).

47.     Plaintiff runs a personal business called Montauk Rum Runners. (Ex. 1, at 256:5-9).

48.     Plaintiff often would leave work early on Fridays or arrive late on Mondays, flying a private plane back from his second home in East Hampton. (Ex. 1, at 122:13-123:21; Ex. 3, at 65:16-66:9, 67:3-16, 68:24-69:17, 72:5-20, 230:17-231:9; Ex. 5, at 134:23-137:13; Ex. 9, at 81:11-23; Ex. 32, at 14:15-20; Ex. 22, at 28:16-29:18; Ex. 21).

49.     Mr. Kravetz testified that Plaintiff's "chronic absenteeism" was an issue in 2016, 2017, and worsened in 2018. (Ex. 4, at 418:8-15).

50.     Mr. Kravetz testified that he "started receiving complaints from [Plaintiff's] co-workers of a lack of engagement, not following up on things, not following deals, them having to remind [Plaintiff], not taking notes, not remembering . . . so on and so forth." (Ex. 3, at 232:11-16).

51.     Plaintiff's 2016 Performance Review, prepared by Mr. Wiele, noted that several people "have commented to Brian about his hours in the office" and "at various times in 2016[,] Larry [Kravetz] and Eric [Wu] have spoken to Brian about working harder and being in the office more. Brian needs to focus on this in 2017." (Ex. 21, at D000160).

52.     When acknowledging his review in early 2017, Plaintiff commented that he "appreciate[d] the candid feedback" and stated, "Larry [Kravetz] and Brian [Wiele] are excellent managers who I am proud to work with/for." (Ex. 21, at D000167).

53.     Plaintiff's performance issues persisted in 2017, as Plaintiff failed to focus on important aspects of his work responsibilities. (Ex. 4, at 372:18-373:21, 374:4-376:23, 418:8-15; Ex. 5, at 37:22-39:5, 40:12-41:19).

54.     Justin D'Ercole as Co-Head of Global Syndicate was asked to identify "What" and "How" performance ratings for 2017 for certain directors on his team by November 10, 2017, and Mr. D'Ercole submitted rankings, including rankings for Plaintiff, by that date. (Ex. 33; Ex. 34).

55.     Prior to December 1, 2017, Plaintiff was rated as "Improvement Needed" for the "Values (the 'how')" aspect of his 2017 Objectives and Performance Review ("2017 Review"), which reflects an assessment of Plaintiff's performance in connection with Barclays' Values. (Ex. 35, at D000244-0245; Ex. 9, at 63:23-64:7, 65:25-66:8, 73:19-25; Ex. 5, at 260:18-261:8; Ex. 36; Ex. 40; Ex. 34).

56.     "How" measures how employees respect and value their peers, how they service clients and customers, and their use of skills, energy, and resources to deliver results. (Ex. 35, at D000244).

57.     On December 1, 2017, Barclays' Human Resources submitted final 2017 performance ratings for Barclays' global banking business (including Plaintiff) to the Performance Management Operations team, stating that the global ratings have been "submitted via a bulk submission," and asking that the team "confirm receipt of the attached file and ensure that ratings are uploaded ahead of the 4 December ratings lock." (Ex. 36, at D027032).

58.     Plaintiff's performance rating was locked in Barclays' system by early December 2017. (Ex. 10, at 40:2-8; Ex. 9, at 30:20-31:6; Ex. 36, at D027032).

59.     In January 2018, after Plaintiff completed his self-assessment, Mr. Wiele drafted Plaintiff's 2017 Review. (Ex. 5, at 32:15-34:21, 99:24-101:13, 261:2-22; Ex. 38; Ex. 10, at 86:6-87:8).

60.     In the comments to the 2017 Review, Mr. Wiele noted examples of instances leading to "a wide gap in perception by Brian and other business partners (specifically the COO team and the Compliance team) on his adherence to Firm policies and procedures." (Ex. 35, at D000244).

61.     Several examples cited by Mr. Wiele in the 2017 Review had occurred prior to January 4, 2018, including "considerable pressure and reminding to take the Series 79 exam" (Ex.

39); an incident surrounding Barclays Know Your Customer ("KYC") protocol (Ex. 40); and issues involving the use of chat rooms in a way that did not follow protocol (Ex. 41). (Ex. 35, at D000244).

62.     Mr. Wiele also wrote in Plaintiff's 2017 Review: "Looking at the cumulative effect of these examples, there's a pattern of behavior that needs to be corrected. Each situation ends up demanding a lot of time from business partners in legal, compliance the COO group, operations, etc. Compared to his peers at similar seniority levels, there are just too many challenging situations that keep happening." (Ex. 35, at D000244).

63.     Mr. Wiele delivered Plaintiff's 2017 Review to him on January 29, 2018. (Ex. 40; Ex. 5, at 261:2-4).

**F.     Plaintiff's Compensation**

64.     Plaintiff complained about his compensation being low in 2016 and stated to Mr. Kravetz via email that if his salary was not adjusted to "market zone," he "would respectfully ask we figure out how to go our separate ways with immediate effect." (Ex. 42).

65.     Plaintiff's unhappiness with his compensation persisted into 2017 when he wrote in his year-end comment for his 2016 review that "[e]ven at the $900,000 figure, I am significantly undercompensated relative to my peers." (Ex. 21, at D000160).

66.     Plaintiff's compensation included both fixed compensation and discretionary compensation (or bonus). (Ex. 10, at 34:11-19; Ex. 43, at D000142-0147; Ex. 44).

67.     Total fixed compensation includes three components: base salary, additional fixed pay ("AFB") and role-based pay ("RFB"). In Banking, fixed salary is generally set by corporate grade, and RBP is dependent on role. (Ex. 10, at 57:12-58:13; Ex. 43).

68.     As part of Barclays' typical compensation timeline and process, the first compensation round typically occurs during the first two weeks of December and includes an

initial bonus allocation. (Ex. 10, at 70:2-5; Ex. 3, at 48:12-22, 60:21-61:3; Ex. 5, at 25:25-27:5; Ex. 45).

69.     A second compensation round typically occurs in the first week of January, which includes a finalized bonus allocation for the prior year as well as a fixed compensation recommendation for the upcoming year. (Ex. 10, at 70:6-22; Ex. 46).

70.     On December 14, 2017, Mr. D'Ercole provided compensation recommendations for Syndicate employees, including Plaintiff. (Ex. 47; Ex. 10, at 67:2-21).

71.     In emails regarding the recommendation, he noted that the recommendations in the spreadsheet "net[ted] to zero," and that his "asks," should additional funds become available, included "Brian labelle to 910." (Ex. 47).

72.     On December 19, 2017, during the initial compensation round, Plaintiff was allocated a bonus of $500,000 in Barclays' system. (Ex. 44; Ex. 10, at 68:7-69:10).

73.     The second round of compensation recommendations were finalized on January 4, 2018, which included final bonus recommendations as well as fixed compensation recommendations. (Ex. 49; Ex. 48).

74.     Barclays *increased* Plaintiff's bonus by an additional $10,000 to a final bonus amount of $510,000. (Ex. 44; Ex. 10, at 68:7-69:10).

75.     Combined with the total fixed compensation recommendation of $400,000, the final total compensation amount recommended was $910,000. The increase to $910,000 was uploaded into Barclays' system on January 6, 2018. (Ex. 50; Ex. 46; Ex. 48; Ex. 44; Ex. 10, at 68:7-69:10; Ex. 51; Ex. 43, at D000142-0147).

76.      In an email dated January 22, 2018, Justin D'Ercole, Head of Syndicate, emailed Mr. Kravetz asking if he would consider moving Plaintiff out of the CMBS group and into trading. (Ex. 52).

77.     Mr. Kravetz responded: "No. He's too important to the Primary business," and retained Plaintiff in his group. (Ex. 52; Ex. 5, at 261:23-262:20).

78.     Mr. Wiele informed Plaintiff of his bonus for the 2017 performance year on Friday, February 23, 2018. (Ex. 53, at D026923-6924).

**G.      Plaintiff's 2017 MBL**

79.     Plaintiff originally scheduled his 2017 MBL from August 28, 2017, through September 8, 2017, but postponed his leave until December due to work obligations. (Ex. 54, at BL000006-0007; Ex. 2, at 33:1-4).

80.     Barclays' MBL system auto generates the end date of a Covered Individual's MBL so there is no confusion surrounding when an MBL ends. (Ex. 7, at 54:10-19).

81.     On August 25, 2017, three days before his MBL was scheduled to begin, Plaintiff, in consultation with Mr. Kravetz, Mr. Wu and Compliance, cancelled his MBL scheduled for August 28, 2017, through September 8, 2017. (Ex. 54, at BL000006-0007; Ex. 55).

82.     On August 25, 2017, Plaintiff rescheduled his 2017 MBL for December 18, 2017, through December 29, 2017. (Ex. 55).

83.     Although Plaintiff cancelled his MBL scheduled to start August 28, 2017, on August 25, 2017, he did not return to the office until September 11, 2017. (Ex. 56; Ex. 55).

84.     Plaintiff did not attest to taking MBL in August of 2017. (Ex. 1, at 94:3-9, 109:19-110:3, 213:12-20, 216:19-217:5; Ex. 57).

85.     Plaintiff began his rescheduled 2017 MBL on December 18, 2017. (Ex. 55).

86.     Plaintiff's scheduled December MBL ended December 29, 2017. (Ex. 55).

87.     Plaintiff planned to be in the Bahamas until January 2, 2018, and did not plan to return to the office until January 3, 2018. (Ex. 2, at 62:20-63:7; Ex. 56; Ex. 58; Ex. 59).

88.     As he did in August 2017, Plaintiff could have cancelled and rescheduled his December 2017 MBL if he elected to engage in activity affecting Barclays' books and records during the scheduled period. (Ex. 60, at 8:9-13; Ex. 7, at 116:18-117:8, 131:24-132:9, 134:13-23).

89.     Instead of accepting any communications from Barclays' employees, Plaintiff could have explained that he was on MBL and directed them to whomever he had arranged to cover for him during his absence. (Ex. 27, at D000262-0263; Ex. 7, at 131:24-132:2; Ex. 1, at 114:5-13).

90.     Plaintiff did not seek to cancel and reschedule his MBL scheduled for December 2017, or any time prior to January 4, 2018. (Ex. 55; Ex. 1, at 439:16-24).

91.     Plaintiff did not contact Mr. Kravetz, Mr. Wiele, Compliance or HR during his MBL to raise any concern that he was being asked to work during that period or to discuss the fact that he could not attest to taking his MBL. (Ex. 1, at 439:16-24).

92.     Plaintiff has identified only three phone calls in his cell phone records with Barclays' employees, lasting a combined total of approximately 90 minutes, on December 18, December 20, and December 22, respectively. (Ex. 61; Ex. 1, at 96:11-97:4; Ex. 2, at 51:8-53:7, 55:11-56:9).

93.     Plaintiff has produced no evidence of any text messages from his personal cell phone to or from anyone at Barclays during the period from December 18, 2017, through December 29, 2017. (Ex. 2, at 54:9-55:10).

94.     Plaintiff testified that he worked on a "rented" phone during his scheduled December 2017 MBL while in the Bahamas, but Plaintiff did not remember providing anyone at

Barclays with the phone number to that phone or receiving any calls thereon and does not "have records of the phone." (Ex. 2, at 49:7-15, 52:19-53:2, 55:3-6).

95.     Plaintiff testified that he used the "rented phone" because his cell phone "didn't work at various points." (Ex. 2, at 49:11-15).

96.     Plaintiff's cell phone records from December 18, 2017, through December 29, 2017, list multiple successfully completed phone calls on his personal cell phone every day of his MBL period, including the days he was in the Bahamas, except for on Christmas Day. (Ex. 62).

97.     One of the deals that Plaintiff allegedly worked on during his scheduled December 2017 MBL was a deal with his wife's then current employer. (Ex. 2, at 46:14-47:15; Ex. 63; Ex. 64; Ex. 11, at 43:23-45:25, 47:15-48:9).

98.     Because Plaintiff contended that he had worked during his planned December 2017 MBL, he did not attest to completing his MBL upon his return from leave. (Ex. 1, at 213:12-20; Ex. 65).

99.     Plaintiff applied for an extension to complete his 2017 MBL until March 31, 2018. (Ex. 1, at 97:9-16).

100.    Plaintiff completed his 2017 MBL from March 20, 2018, through April 2, 2018. (Ex. 55).

## H.     Plaintiff's January 4, 2018 Email to Larry Kravetz and Related Calls

101.    On January 3, 3018, Plaintiff emailed Mr. Kravetz wishing him a "Happy 2018!" and in that email expressed his support for another Barclays employee to attend an upcoming conference. (Ex. 66).

102.    Plaintiff's January 3, 2018 email to Mr. Kravetz said nothing about having worked during his scheduled December 2017 MBL. (Ex. 66).

103.     Prior to January 4, 2018, Mr. Kravetz was not aware that Plaintiff allegedly worked during his December 2017 MBL. (Ex. 1, at 439:16-24; Ex. 3, at 162:25-163:5; Ex. 67).

104.     On January 4, 2018, Plaintiff was scheduled to have lunch in Manhattan with Mr. Kravetz and a group of foreign investors. (Ex. 67).

105.     On January 4, 2018, Plaintiff sent an email from his second home in East Hampton, New York, to Mr. Kravetz and clients canceling the lunch meeting scheduled to take place in Manhattan, New York, due to inclement weather. (Ex. 67, Ex. 2, at 58:3-14).

106.     At or around 8:18 AM on January 4, 2018, Plaintiff sent an email to Mr. Kravetz and the investors stating, "We should reschedule today's lunch due to the storm, our apologies for the inconvenience." (Ex. 67).

107.     Plaintiff did not contact Mr. Kravetz separately before sending this cancellation email to explain why he was cancelling. (Ex. 1, at 129:16-130:23; Ex. 22, at 21:13-23:7).

108.     In response to Plaintiff's email, at or around 8:28 AM on January 4, 2018, Mr. Kravetz, who was in the office, asked whether Plaintiff planned to come into the office. (Ex. 67).

109.     At or around 8:49 AM on January 4, 2018, Plaintiff responded to Mr. Kravetz, stating: "[The investor] just called me to cancel lunch today because of the weather. Given the blizzard conditions I will be working from home today along with a few members of my team. As you are aware[,] I was able to field questions and calls from team Barclays and our clients while on my two week mandatory block leave resulting in a smooth closing on 225 PAS, Grand Lakes Mezz A and keeping Red Roof alive, (all massively critical deals for Barclays per senior banking and risk management)[.] I'm fully capable of performing my role while working remotely. If this is an issue I'd be happy to discuss further." (Ex. 67).

110.     During a 2:44 PM phone call on January 4, 2018, with Mr. Kravetz, Plaintiff again stated that "[The investor] called me on my cell at home today and said, look, man, I think we should cancel." (Ex. 60, at 16:11-16:13).

111.     Plaintiff's cell phone bill does not list any call to or from the investor on January 4, 2018, or any phone calls at all prior to Plaintiff's 8:49 AM email cancelling the lunch. (Ex. 62, at BL-000847).

112.     At or about 9:54 AM on January 4, 2018, the investors sent Mr. Kravetz and Plaintiff an email, in response to Plaintiff's email cancelling the lunch, noting that they were still available for lunch that afternoon with Mr. Kravetz. (Ex. 68).

113.     In his 8:49 AM email to Mr. Kravetz on January 4, 2018, Plaintiff said that he had worked during his leave because clients and co-workers had contacted him during his scheduled December 2017 MBL. (Ex. 67; Ex. 69, at D004638).

114.     Plaintiff's January 4, 2018 email to Mr. Kravetz said nothing about an alleged breach of the MBL policy or anything regarding MBL attestation. (Ex. 67).

115.     Prior to Plaintiff's January 4, 2018 email, Mr. Kravetz was not aware that Plaintiff had worked during his scheduled December 2017 MBL, and Plaintiff had not complained to Mr. Kravetz about performing work during that scheduled MBL. (Ex. 1, at 439:16-24; Ex. 60, at 2:23-4:11; Ex. 70, at BARCLAYS_CMBS_000238073-8074).

*Plaintiff's First January 4, 2018 Call with Mr. Kravetz*

116.     Mr. Kravetz called Plaintiff at or around 9:02 AM on January 4, 2018, to discuss Plaintiff's email. (Ex. 1, at 146:16-22; Ex. 3, at 162:25-167:7, 169:4-173:7; Ex. 62, at BL-000847).

117.     During that conversation, Mr. Kravetz was admittedly angry and expressed his frustration with Plaintiff's poor judgment in sending an email that Mr. Kravetz felt falsely accused

him of knowing that Plaintiff had worked during his MBL and told Plaintiff that he would call Compliance regarding Plaintiff's alleged MBL issue. (Ex. 1, at 442:12-19; Ex. 3, at 162:25-167:7, 169:4-173:17).

118.    Mr. Kravetz was clear that he wanted to contact Compliance to best figure out the situation and get the best result. (Ex. 3, at 171:3-17).

119.    Plaintiff's wife was listening to this unrecorded call between Mr. Kravetz and Plaintiff. (Ex. 11, at 96:25-97:6).

120.    During her deposition, Plaintiff's wife was asked: "Q. Did you hear Mr. Kravetz tell Mr. LaBelle that he should falsely sign his attestation? And her response was: "No. But he said that Brian was stupid for having put in writing that he worked on his block leave." (Ex. 11, at 96:25-97:6).

121.    After his first call with Plaintiff on January 4, 2018, Mr. Kravetz spoke to Compliance. (Ex. 60, at 9:3-9, 10:3-13).

*Plaintiff's January 4, 2018 Call with Anna Zhuravitsky*

122.    On January 4, 2018, at or around 10:15 AM, Plaintiff and/or his wife recorded Plaintiff's call with Anna Zhuravitsky of Banking & Capital Markets Compliance, on January 4, 2018. (Ex. 2, at 6:19-7:2, 11:10-13; Ex. 71).

123.    During the January 4, 2018 call with Ms. Zhuravitsky, Plaintiff stated that he was "honestly worried about, A, getting fired or, B, having my bonus." (Ex. 71, at 5:16-18).

124.    During this January 4, 2018 call with Ms. Zhuravitsky, Plaintiff did not mention his MBL attestation. (Ex. 71).

125.    Plaintiff testified that he called Compliance on January 4, 2018, "[b]ecause in my career on Wall Street . . . I've never been spoken like that – to – by anyone, let alone a managing

director, who may or may not be responsible for my promotions and compensation." (Ex. 1, at 442:20-443:3).

*Plaintiff's Second January 4, 2018 Call with Mr. Kravetz*

126.     After Mr. Kravetz spoke with Compliance, he called Plaintiff again at or around 2:44 PM on January 4, 2018. (Ex. 62, at BL-000847; Ex. 60)

127.     On January 4, 2018, Plaintiff surreptitiously recorded the second call between him and Mr. Kravetz at the suggestion of his wife, Ms. Sarris, who listened in on the call. (Ex. 1, at 144:8-23; Ex. 11, at 98:4-12; Ex. 60).

128.     During the second call with Mr. Kravetz on January 4, 2018, Mr. Kravetz stated that he went back and looked through both his personal email and work email and phone and confirmed he had "zero" interaction with Plaintiff while Plaintiff was on his December 2017 MBL. (Ex. 60, at 2:12-25).

129.     Plaintiff told Mr. Kravetz that he sent Mr. Kravetz and Mr. Wu a text, to which Mr. Wu responded with a meme. Mr. Kravetz responded "[b]ut I went back, and I haven't had 'em. I don't know what number you used. I'm telling you, I have nothing." (Ex. 60, at 3:17-25).

130.     Plaintiff asked Mr. Kravetz to confirm his phone number, and Mr. Kravetz confirmed that the phone number Plaintiff asked about was the number for his Barclays-issued mobile device. (Ex. 60, at 4:4-9).

131.     Mr. LaBelle said Mr. Kravetz's work mobile phone number was "the only cell I have for [Mr. Kravetz] in my phone." (Ex. 60, at 4:12-14).

132.     During the second call on January 4, 2018, Plaintiff did not refute Mr. Kravetz's statement that he had never told Plaintiff he had to work on his block leave. (Ex. 60, at 6:19-8:20).

133.    During the second call on January 4, 2018, Mr. Kravetz noted that Plaintiff had other members of the team covering for Plaintiff and said that if Plaintiff had to work "you should've done what we did last time. It was said, let's figure—let's call Compliance and figure it out." (Ex. 60, at 6:24-7:6).

134.    During the second call with Plaintiff on January 4, 2018, Mr. Kravetz referred to Plaintiff's "horrible judgment," stating that the email was "factually inaccurate, as it relates to me." (Ex. 60, at 12:9-16).

135.    Mr. Kravetz further stated that Plaintiff's statement in the January 4, 2018 email that Mr. Kravetz knew Plaintiff had completed work during his MBL was "an outright lie" and that it "implicates me, and falsely so." (Ex. 60, at 11:3-7, 17:24-18:1).

136.    Mr. Kravetz said that he had made comments during their initial January 4, 2018 call that "you f--ked yourself, and you f--ked me," because Plaintiff had exhibited poor judgment. (Ex. 60, at 13:5-16).

137.    Mr. Kravetz explained that he did not threaten Plaintiff but "yelled because I was upset." (Ex. 60, at 23:20-21).

138.    Plaintiff stated that he viewed Mr. Kravetz's email that day asking him whether he planned on coming into the office as a "dig" and "taking "a shot at [him] for working from home on a snow day" and that it "doesn't feel good" and "doesn't feel like the work that's been done, going above and beyond, is appreciated." (Ex. 60, at 15:6-9, 22:2-12).

139.    Plaintiff told Mr. Kravetz: "[t]he email was sent to show you I am completely effective working from home." (Ex. 60, at 15:9-25)

140.    Mr. Kravetz testified that he viewed Plaintiff's January 4, 2018 email as "a boast. He's bragging to me that look how great I am. I can work from home. I worked on my MBL. This is what this was, and so that's what I'm reacting [to]." (Ex. 3, at 166:6-10).

141.    During the second call with Plaintiff on January 4, 2018, with respect to MBL attestation, Kravetz stated that if "you felt you weren't going to be able to attest to it when you came back, then there are ways to handle it, and this was not the way." (Ex. 60, at 21:12-14).

142.    Mr. Kravetz told Plaintiff that he had spoken with Compliance, that he did not yet "have an answer," but that he wanted to update Plaintiff that he'd spoken with Compliance. (Ex. 60, at 9:3-20).

143.    Compliance emailed Mr. Kravetz on January 4, 2018, after his calls with Plaintiff, and said that because Plaintiff had not yet attested to taking his 2017 MBL "he still has room to cancel it." (Ex. 72).

144.    Mr. Kravetz then emailed Plaintiff to relay the information from Compliance, writing: "Since you haven't attested to taking your MBL, you still have the opportunity to cancel it. When you get the request, make sure you cancel it – do not attest to it." (Ex. 57).

*Plaintiff's January 4, 2018 Call with Eric Wu*

145.    On January 4, 2018, at or around 3:29 PM, Eric Wu called Plaintiff, and Plaintiff's wife surreptitiously recorded the call while she listened in on the call. (Ex. 32; Ex. 1, at 97:17-23; Ex. 11, at 106:24-107:3).

146.    During the January 4, 2018 call, Mr. Wu noted that Plaintiff had made errors in judgment "a couple of times" and that on January 4, 2018, Mr. Kravetz was reacting to how Plaintiff had "acted in the past couple of years," including when Plaintiff did not come in on

Fridays and his repeated absences from the office. (Ex. 32, at 10:24-11:5, 14:10-15:10, 30:12-31:19).

147.    During the January 4, 2018 call with Mr. Wu, Plaintiff agreed with Mr. Wu that he "ha[sn't] even been in the office . . . this year." (Ex. 32, at 14:23-15:2).

148.    During the January 4, 2018 call, Mr. Wu never referred to any "unsavory" things or "unspoken" rules that Plaintiff was expected to do as part of his employment at Barclays. (Ex. 32).

149.    Mr. Wu's reference to "unwritten rules" during this call was unrelated to MBL, but rather, referred to "soft stuff," and the specific example that Mr. Wu gave was Plaintiff's refusal to do "simple things like going to Marty's holiday party." (Ex. 32, at 2:4-7:4; Ex. 22, at 49:11-13).

150.    Mr. Wu also referred to Plaintiff's failure to do other "simple things that are in your control, like, going to the Syndicate meeting, right? It's like, for some reason, you just refuse to do it." (Ex. 32, at 16:9-22).

151.    Plaintiff admitted that he had failed to attend Syndicate meetings in the past. (Ex. 32, at 16:9-22).

152.    Mr. Wu also told that Plaintiff's behavior "comes off as if you don't have a level of maturity that you should have at your level." (Ex. 32, at 16:23-17:2).

153.    Mr. Wu told Plaintiff he should "stop telling [Mr. Kravetz] how hard you work," because "despite what you may think, you don't work harder than a lot of people here. You work on par with a lot of people here," which created a "gap" in how he is perceived. Plaintiff responded "Yeah." (Ex. 32, at 20:23-22:6).

154.    To Mr. Wu's points, Plaintiff stated "I know that. And everything you're saying, I understand and agree with." (Ex. 32, at 22:4-6).

155.    Mr. Wu stated that Mr. Kravetz did not know Plaintiff was working on his December MBL, which Plaintiff did not refute. (Ex. 32, at 22:15-24).

156.    Mr. Wu told Plaintiff that Mr. Kravetz was "not reacting to this one day" and "that you worked from home" – rather that Mr. Kravetz is "reacting to the 25 days that you did that." (Ex. 32, at 30:12-20).

157.    Mr. Wu also told Plaintiff that he disagreed with Plaintiff's statement that he can do his job remotely; Mr. Wu noted that he needed Plaintiff in the office and that when Plaintiff left the office at 5:00 PM, it was frustrating. (Ex. 32, at 31:3-19).

158.    During their call, Plaintiff did not disagree with Mr. Wu's statements that Plaintiff overused work flexibility for personal matters. (Ex. 32, at 35:20-36:4).

159.    Mr. Wu also noted that Plaintiff did not communicate effectively, and that Plaintiff was "not organized." (Ex. 32, at 40:24-41:3).

160.    Mr. Wu referred also referred to the "5,000 other things" Plaintiff did that "drove [Mr. Kravetz] crazy." (Ex. 32, at 18:14-19:7).

161.    During the call with Mr. Wu on January 4, 2018, there was no discussion whatsoever regarding Plaintiff's MBL attestation. (Ex. 32).

*Plaintiff's January 4, 2018 Call with Elyse Gonzalez*

162.    On January 4, 2018 at or around 4:04 PM, Plaintiff and his wife surreptitiously recorded Plaintiff's call with Elyse Gonzalez, Barclays' Human Resources Business Partner. (Ex. 2, at 65:9-18; Ex. 11, at 126:25-127:24; Ex. 73).

163.    Plaintiff did not tell Ms. Gonzalez that he was in East Hampton, but instead said, "Larry [Kravetz] sent an email to me saying, 'Aren't you coming in today?' And you know, there's

a blizzard warning. The PATH – I live in Jersey City. I typically drive in. The PATH train is not really running. It's a mess." (Ex. 73, at 5:5-9).

164.    Plaintiff told Ms. Gonzalez that Mr. Kravetz told him "[e]verybody works on block leave. I work on block leave. You're going to work on block leave." (Ex. 73, at 12:15-19).

165.    Plaintiff told Ms. Gonzalez that "folks are calling me at home on block leave and I don't have a firm device because of the banking syndicate split. So I don't have a Blackberry. I have my personal cell, and that's all I have. And they're calling me at home." (Ex. 73, at 13:15-24).

166.    Plaintiff also told Ms. Gonzalez that Mr. Wu, who had called Plaintiff that day, "was trying to give me advice as a friend. He's not trying to screw me." (Ex. 73, at 15:20-16:1).

167.    After Plaintiff's phone call with Ms. Gonzalez ended, Plaintiff said out loud to his wife: "I'm worried about my bonus. I'm worried about my bonus. I'm worried about my bonus. Just keep – my old coach used to say this. When you need to get a point across, just keep . . . on it." (Ex. 73, at 21:15-21).

### *Plaintiff's January 4, 2018 Call with Monica De Martin*

168.    On January 4, 2018, at or about 5:11 PM, Plaintiff or his wife surreptitiously recorded Plaintiff's call with Monica De Martin, formerly a Director and Barclays' Head of Americas Compliance Investigations and Whistleblowing - Conduct Oversight. (Ex. 62, at BL-000847; Ex. 23; Ex. 11, at 13:4-14:7; Ex. 2, at 86:8-87:17).

169.    During Plaintiff's call with Ms. De Martin, Plaintiff stated, "did anyone at Barclays hold a gun to my head or put it in writing, you know, on Barclays letterhead that, 'Hey Brian, you'd better work and get this done?' No. Of course not. No one would jeopardize themselves that way." (Ex. 23, at 9:9-14).

170.    Plaintiff did not tell Ms. De Martin on the January 4, 2018 call that either Mr. Kravetz or Mr. Wu pressured him to sign the attestation. (Ex. 69; Ex. 23).

171.    During his deposition, Plaintiff was asked if Mr. Wu ever asked him to falsely attest, and his response was, "[t]hose exact words, no." Plaintiff was also asked "did Mr. Kravetz or Mr. Wiele ever tell you to falsely attest to taking mandatory block leave when you did not in fact take mandatory block leave?" Plaintiff's responded, saying "[t]hey did not use those exact words[.]" (Ex. 1, at 117:25-118:14).

172.    When Ms. De Martin asked Plaintiff if he was "doing any hedging or security work for this particular deal while you're on your MBL," he responded, "No." (Ex. 23, at 19:1-5).

173.    Ms. De Martin then asked Plaintiff whether his reported work over MBL was "managing relationships and trying to close," to which Plaintiff responded, "Yes." (Ex. 23, at 19:6-9).

174.    Plaintiff told Ms. De Martin, "I've asked for a firm phone, and there's something between [B]anking and [S]yndicate. And I don't have one. They haven't given me one." (Ex. 23, at 40:19-21).

175.    Ms. De Martin assured Plaintiff that he was not in breach of his MBL because he had not attested to completing it and that he would need to retake it. (Ex. 23, at 18:7-20).

176.    Ms. De Martin discussed the fact that it was common for individuals to have to work during their scheduled MBL and told Plaintiff that he should not sign the attestation but should reschedule his MBL. (Ex. 23, at 28:19-29:12, 30:10-22).

177.    Plaintiff told Ms. De Martin that Mr. Wu "wasn't [calling] to be threatening at all" during their call on January 4, 2018, and said that Mr. Wu was trying to help him "by telling

[Plaintiff] that this is actually the lay of the land and this is what you actually need to do" to repair his relationship with Mr. Kravetz. (Ex. 23, at 47:9-48:13, 49:14-24).

178.    Ms. De Martin asked Plaintiff to prepare a "memo of [his] conversation" with Mr. Kravetz, asking him to "quote as much as [he] can from memory." (Ex. 23, at 35:10-15).

179.    Ms. De Martin asked Plaintiff for this memo to create "a factual record of [his] interaction with [Mr. Kravetz] today." (Ex. 23, at 36:7-12).

180.    On January 4, 2018, per Ms. De Martin's request, Plaintiff sent her an email setting forth his concerns in writing. (Ex. 69, at D004638).

181.    Plaintiff testified that MBL was designed to discover "fake trades," recounting an instance wherein a London-based UBS trader, Kweku Adoboli, "did not adhere to the mandatory block leave standard, and resulted in a 2-plus billion-dollar fraud to the firm by booking illegal trades, which went unnoticed for months." (Ex. 1, at 277:7-25, 73:16-25).

182.    Plaintiff did not report that he had engaged in improper trades during his MBL. (Ex. 2, at 94:2-4).

183.    On January 4, 2018, on referral from Ms. Zhuravitsky, Ms. De Martin opened an investigation labeled "Project Twist" to assess Plaintiff's allegation that he had worked during his scheduled December 2017 MBL and to determine whether Plaintiff breached Barclays' internal MBL Standard. (Ex. 74; Ex. 76).

184.    Barclays interviewed Plaintiff, Ms. Zhuravitsky, Ms. Gonzalez, Danielle De La Vega of Barclays' BI Compliance Training and MBL Business Advisory, and the CCO Team. (Ex. 74, at D000273-0275; Ex. 77, at D000362-0363).

185.    As part of the investigation, Compliance searched for emails or text messages from Plaintiff's personal cell phone to Mr. Kravetz's Barclays's issued Blackberry. (Ex. 78).

186.   Compliance's search did not identify any Blackberry text messages sent to or from Mr. Kravetz during Plaintiff's December 2017 MBL period. (Ex. 78).

187.   During her Twist investigation interview, Ms. De la Vega reported that "[i]t is not a breach of policy if an employee works during their MBL provided that the employee does not sign the MBL attestation upon their return to the office." (Ex. 74, at D000274).

188.   Plaintiff did not submit an attestation for his scheduled December 2017 leave. (Ex. 74, at D000274; Ex. 1, at 213:12-20).

189.   On March 22, 2018, Compliance issued an Investigation Report for "Project Twist," concluding that there was no substantiated violation of Barclays' MBL policy because "[i]t is not a breach of the *MBL Standard* if a manager or another employee contacts an employee during their MBL about work matters provided that the employee reports that they engaged in work during their leave and does not sign his/her MBL attestation upon return," and Plaintiff "did not sign the MBL attestation upon his return to the office." (Ex. 74, at D000275).

190.   The Twist Investigation Report noted that Barclays' Human Resources was separately addressing the "interpersonal issues between [Plaintiff] and Mr. Kravetz." (Ex. 74, at D000275).

*Plaintiff's January 16, 2018 Meeting with Mr. Kravetz*

191.   On January 16, 2018, Plaintiff met with Mr. Kravetz in person to discuss Plaintiff's MBL concerns and Plaintiff's performance. (Ex. 1, at 164:21-24; Ex. 22).

192.   Plaintiff surreptitiously audio recorded part of that in-person conversation with Mr. Kravetz. (Ex. 1, at 164:21-165:15; Ex. 22).

193.    During that conversation, Mr. Kravetz told Plaintiff that his concerns raised to Compliance regarding his MBL would have "no implications" for Plaintiff's bonus, his review or "anything." (Ex. 22, at 3:18-20).

194.    During the recorded portion of the January 16, 2018 meeting, Mr. Kravetz told Plaintiff they can "move forward" and "vouch[ed] to [Plaintiff]" that they can "work together like we had been," to which Plaintiff agreed. (Ex. 22, at 10:23-11:22).

195.    During the recorded portion of the January 16, 2018 meeting, Plaintiff told Mr. Kravetz "[n]othing nefarious happened" during his scheduled December 2017 MBL. (Ex. 22, at 5:19-22).

196.    During the recorded portion of the January 16, 2018 meeting, Plaintiff stated that that he "could have done better" in handling the January 4, 2018 email situation. (Ex. 22, at 54:25-55:8).

197.    Mr. Kravetz expressly denied stating on January 4, 2018 that "everyone works on their block leave." (Ex. 22, at 24:6-20).

198.    Mr. Kravetz told Plaintiff that he actually stated, "everybody works on their vacations" in their January 4, 2018 conversation. (Ex. 22, at 24:6-20).

199.    Mr. Kravetz stated: "I was very specific in talking about block leave. I've actually said it – I said everybody works on their vacations. Because you're the only one here – well . . . I've talked about Eric, I talked about Spencer, I talked about me and said we work on our vacations. I don't have block leave." (Ex. 22, at 24:16-25:3).

200.    Plaintiff acknowledged that it appeared to others that he was not at Barclays' offices enough and was "goofing off." (Ex. 22, at 23:10-16).

201.    Mr. Kravetz told Plaintiff the ways Plaintiff chose to work puts "more stress and pressure on the rest of the group" and that Plaintiff needed to work on "communicating . . . more proactively" regarding his whereabouts. (Ex. 22, at 28:16-29:24).

202.    Plaintiff admitted that he did not "update [his] calendar sometimes." (Ex. 22, at 30:9-17).

203.    Plaintiff admitted that he could do a better job of proactively communicating with his team, stating, "I could focus on that more," and "I can fix that. I mean, I can work on that." (Ex. 22, at 42:20-43:12).

204.    Mr. Kravetz recounted, and Plaintiff acknowledged, that Mr. Kravetz had made a comment to Plaintiff about his absences from the office in 2016. (Ex. 22, at 59:25-60:10).

205.    Mr. Kravetz also relayed performance feedback to Plaintiff from Mr. Wu, noting that Mr. Wu needed Plaintiff "more engaged in the deals." (Ex. 22, at 36:1-19).

206.    Plaintiff's recording of the January 16, 2018 meeting did not go through the end of the meeting. Plaintiff testified that, as he recalled, his "phone battery died during this recording." (Ex. 1, at 166:22-24; Ex. 22, at 63:11).

I.      **Plaintiff Raises Concerns of Retaliation and Barclays Begins the Tweed Investigation**

207.    On May 7 and 8, 2018, Plaintiff emailed Ms. Gonzalez, Amanda Cohen, Human Resources Business Partner, and Anne Marie DeVoti, Human Resources Business Partner, to report his concerns that Mr. Kravetz was asking other Barclays employees for his whereabouts because Plaintiff had raised an issue with his MBL in January. (Ex. 79).

208.    On May 15, 2018, Barclays' Employee Relations team, assisted by Ms. De Martin of Compliance, opened an investigation into Plaintiff's complaints, referred to as "Project Tweed." (Ex. 80).

28

209.    On May 15, 2018, Plaintiff met with Ms. De Martin, and Tarik Lacene, Director of Employee Relations. (Ex. 26).

210.    During this meeting, Plaintiff complained that Mr. Kravetz was retaliating against him for raising concerns about his scheduled December 2017 MBL in January by asking other employees for his whereabouts and had improperly accessed the computer of Natasha Bavaro, an administrative assistant, to determine Plaintiff's location. (Ex. 26, at 16:14-18:21).

211.    On May 23, 2018, Plaintiff expanded the scope of his complaints, stating that in addition to asking for Plaintiff's whereabouts, Mr. Kravetz was circumventing Plaintiff by working directly with Plaintiff's subordinates, Ms. Khanna and Mr. Hasan. (Ex. 81, at D008469-8470).

212.    On June 8, 2018, Ms. De Martin circulated an email with the findings with respect to Project Tweed. (Ex. 82).

213.    Mr. Kravetz's behavior was in response to Plaintiff's frequent absences from the office, his decreased performance, his lack of focus, and his disengagement, and because Mr. Kravetz felt that Plaintiff was not fully committed to his role. (Ex. 82; Ex. 83, at D000381-0382).)

214.    Although Employee Relations had determined that Mr. Kravetz had asked colleagues about Plaintiff's whereabouts, scheduled meetings without Plaintiff's participation, and worked directly with Plaintiff's subordinates, there was no substantiation that any action by Mr. Kravetz was related to or in retaliation for Plaintiff's previous complaint about his scheduled December 2017 MBL. (Ex. 82).

215.    On June 12, 2018, Mr. Kravetz met with Barclays' Human Resources Business Partners, including Amanda Cohen, to discuss these issues with Mr. Kravetz. (Ex. 19, ¶ 9; Ex. 4, at 435:4-7; Ex. 84, ¶ 11; Ex. 9, at 35:9-18; Ex. 85; Ex. 86; Ex. 87).

216.     On June 14, 2018, Mr. Lee and Ms. De Martin met with Plaintiff to inform him that the Tweed investigation was complete, concluding with a determination that his retaliation allegations were not substantiated. (Ex. 1, at 237:3-14; Ex. 88, at 3:8-4:19, 6:9-12).

217.     Barclays issued the final Investigation Report for Project Tweed on July 12, 2018. (Ex. 80).

## J.   Barclays Decides to Terminate Plaintiff's Employment.

218.     As had happened in prior years, Plaintiff was unhappy with his bonus and thought he was entitled to more money—in excess of $1 million. (Ex. 21, at D000160; Ex. 89, at D016377; Ex. 90; Ex. 91; Ex. 53).

219.     After Plaintiff received his incentive compensation award for 2017 on February 23, 2018, Mr. Kravetz and Mr. Wiele felt that Plaintiff's job performance demonstrably deteriorated. (Ex. 9, at 61:5-10, 63:16-64:7; Ex. 19, ¶ 6; Ex. 5, at 37:22-39:5, 40:12-41:19; Ex. 1, at 375:21-376:8, 411:10-24; Ex. 92; Ex. 3, at 311:19-313:3, 315:11-20, 316:16-25; Ex. 93, at D000255-0256).

220.     Despite prior conversations with Mr. Kravetz and Mr. Wiele about attendance and maintaining appropriate communication, Plaintiff continuously failed to keep his calendar up to date or otherwise keep the team informed of his whereabouts when he was out of the office. (Ex. 5, at 74:22-76:11, 105:7-106:15, 256:25-257:24; Ex. 94, at D007316; Ex. 22, at 29:19-30:17; Ex. 92).

221.     Plaintiff's performance had a negative impact on his colleagues' morale. (Ex. 19, ¶ 6; Ex. 3, at 187:14-191:16, 241:19-242:2, 316:16-25, 322:7-25, 325:20-327:23; Ex. 4, at 371:3-17, 372:18-373:21, 374:4-376:23, 402:16-403:4, 404:1-4, 418:8-15; Ex. 5, at 37:22-39:5, 67:22-69:8, 45:17-49:4, 97:16-98:4, 122:9-124:23, 170:10-17, 188:10-20, 205:12-23; Ex. 95).

222.    Mr. Kravetz sought guidance from Barclays' Human Resources Business Partners, including Amanda Cohen, about managing ongoing problems with Plaintiff's attendance and performance. (Ex. 19, ¶ 7; Ex. 84, ¶¶ 6-8; Ex. 9, at 70:17-71:15).

223.    On March 2, 2018, Mr. Kravetz informed Ms. Cohen, Mr. Wiele, and Ms. Gonzalez of the frustrations of his team members with Plaintiff. (Ex. 95; Ex. 84, ¶¶ 6-7).

224.    Mr. Kravetz also noted his own issues with Plaintiff's performance, stating that he was "concerned about [Plaintiff's] ability to effectively manage the mezzanine debt placement process." (Ex. 95).

225.    In mid-March 2018, Plaintiff had drinks with Mr. Kravetz and Mr. Attea to try to get Plaintiff's performance back on track after Plaintiff had been disruptive because his bonus failed to meet his own expectation of $1 million. (Ex. 3, at 309:17-310:17).

226.    Despite being told to improve both his attendance in the office and his communications regarding his whereabouts, his managers' perception was that Plaintiff continued to be absent from the office on Friday afternoons and failed to properly update his calendar or communicate his whereabouts to his team. (Ex. 5, at 74:2-76:22, 105:7-106:15, 134:12-135:17, 173:12-21, 256:25-257:24; Ex. 96, at D006749; Ex. 4, at 428:13-24).

227.    Mr. Kravetz and Mr. Wiele felt that Plaintiff failed to pay requisite attention to important aspects of his work, demonstrated an overall lack of engagement, and failed to remember conversations regarding deals, and made mistakes to Barclays' detriment. (Ex. 3, at 227:12-228:4, 230:17-232:16, 234:10-24, 259:16-270:25, 300:4-301:19, 320:16-321:4, 322:7-25, 329:19-330:4, 348:21-349:12, 350:4-13; Ex. 5, at 37:22-39:5, 43:10-49:4, 63:25-66:23, 67:22-69:8, 74:2-76:22; 154:21, 258:18-259:20; Ex. 97, at D015685.00001-0002).

228.    On May 7, 2018, during a phone call, Mr. Kravetz and Mr. Wiele raised additional concerns to Ms. Cohen, including Plaintiff's continued absences from work without notice, particularly on Fridays, and his late arrivals to the office and failures to show up to meetings. (Ex. 84, ¶ 8; Ex. 98, at BARCLAYS_CMBS_000238082-8085).

229.    During their May 7, 2018 conversation, Mr. Kravetz, Mr. Wiele, and Ms. Cohen also discussed Plaintiff's lack of appropriate communication and engagement, which Mr. Wiele previously had identified as areas of improvement for Plaintiff during his 2017 Performance Review, and which Mr. Kravetz and Mr. Wu had both discussed with Plaintiff previously. (Ex. 84, ¶ 8; Ex. 98, at BARCLAYS_CMBS_000238084-8085; Ex. 32; Ex. 22; Ex. 5, at 256:25-257:24).

230.    Mr. Kravetz and Mr. Wiele informed Ms. Cohen that they would be meeting regularly with Plaintiff to provide additional feedback about being present in the office to perform his job adequately. (Ex. 84, ¶ 8; Ex. 98, at BARCLAYS_CMBS_000238085-8086).

231.    On May 9, 2018, Ms. Cohen asked Mr. Kravetz to delay conversations with Plaintiff about his performance due to ongoing discussions between Barclays' Human Resources, Employee Relations, and Legal. (Ex. 99).

232.    Ms. Cohen did not explain the substance of those conversations to Mr. Kravetz. (Ex. 19, ¶ 8; Ex. 99).

233.    On May 21, 2018, Mr. Kravetz and Mr. Wiele discussed ongoing problems with Plaintiff's attendance and lack of leadership. (Ex. 100).

234.    On May 22, 2018, Mr. Wiele and Mr. Wu also discussed various frustrations with Plaintiff's performance including his late arrivals on Monday mornings, feeling as though Plaintiff was not doing his job, and failure to demonstrate leadership. (Ex. 101).

32

235. On May 23, 2018, Mr. Wiele spoke with Plaintiff in person and again discussed his persistent absences and late arrivals to the office and the resulting frustration of other team members about his availability. (Ex. 102, at D009202).

236. During the May 23, 2018 conversation, Mr. Wiele advised Plaintiff, to be at work during expected hours, communicate with his team about his schedule, and be engaged in his job. (Ex. 103; Ex. 102, at D009202).

237. Mr. Wiele informed Ms. Cohen about his May 23, 2018 conversation with Plaintiff. (Ex. 102, at D009202).

**K.    Decision to Terminate Plaintiff**

238. On June 12, 2018, Mr. Kravetz met with Ms. Cohen and Ms. DeVoti. (Ex. 19, ¶ 9; Ex. 4, at 435:4-7; Ex. 84, ¶ 11; Ex. 9, at 33:23-35:22; Ex. 85; Ex. 86; Ex. 87).

239. During that June 12, 2018 conversation, Ms. Cohen asked whether, as a means of alleviating the conflicts between Mr. Kravetz and Plaintiff, Barclays could change Plaintiff's reporting line away from either Mr. Kravetz or the CMBS desk; Mr. Kravetz explained that Barclays could not change the reporting line for Plaintiff's position, which was essential to the CMBS desk. (Ex. 84, ¶ 11; Ex. 19, ¶ 9; Ex. 85; Ex. 87).

240. During the June 12, 2018 meeting, Mr. Kravetz stressed that Plaintiff disrupted his team to such an extent that it could not continue to operate properly, and it was clear that the right thing for the team was to terminate Plaintiff's employment. (Ex. 84, ¶ 11; Ex. 19, ¶ 9; Ex. 9, at 33:23-36:3; Ex. 85; Ex. 87).

241. On June 12, 2018, after meeting with Mr. Kravetz, Ms. Cohen had conversations with her colleagues in Human Resources and Employment Legal, and following those discussions, reached the conclusion that Plaintiff should be terminated because he had lost the trust and

confidence of the business and was no longer effectively performing his duties. (Ex. 84, ¶ 11-12; Ex. 9, at 33:23-36:3; Ex. 85).

242.    Barclays made the decision to terminate Plaintiff's employment on June 12, 2018. (Ex. 19, ¶¶ 9-10; Ex. 84, ¶¶ 11-12, 15; Ex. 4, at 370:25-371:2, 446:12-19; Ex. 9, at 33:23-34:3; Ex. 5, at 35:21-36:3; Ex. 85).

243.    Following that June 12, 2018 decision, Ms. Cohen met with senior managers in Plaintiff's reporting line on June 15 and June 19, who agreed with the decision to terminate Plaintiff's employment because of his ongoing failures and deficiencies. (Ex. 84, ¶¶ 13; Ex. 19, ¶¶ 10; Ex. 9, at 33:23-36:3).

244.    During a call between Mr. Kravetz and Mr. Wiele on June 18, 2018, Mr. Wiele asked Mr. Kravetz if there was "anything new after our conversation on Thursday last week" regarding Plaintiff, to which Mr. Kravetz responded: "we're gonna . . . there is a meeting tomorrow with Martin Ragde. But we're gonna . . . move forward and get him out of here." (Ex. 104, at BARCLAYS_CMBS_000238090-8091).

245.    Because Mr. Kravetz's team had two important deals pending, which required assistance from someone acting in Plaintiff's role, Mr. Kravetz sought to delay Plaintiff's termination date until the expected close of those two deals in mid-July. (Ex. 19, ¶ 12; Ex. 84, ¶ 17; Ex. 104, at BARCLAYS_CMBS_000238091).

246.    In addition, on June 18, 2018, Mr. Wu, a key member of the team, informed Mr. Kravetz that he was resigning from Barclays. (Ex. 104).

247.    Mr. Kravetz and Mr. Wiele discussed delaying the actual termination date during their June 18, 2018 call because it was "deal wise what makes the most sense." (Ex. 104, at BARCLAYS_CMBS_000238091).

248.     On June 19, 2018, Mr. Kravetz and Mr. Wiele further discussed the circumstances surrounding Plaintiff's impending termination and Mr. Kravetz stated that the circumstances of Plaintiff's departure were based on "[l]ack of trust. The business doesn't trust him." (Ex. 105, at 10:23-11:2).

249.     As of June 12, 2018, the day the decision was made to terminate Plaintiff's employment, and June 15, 2018, or June 19, 2018, the days that termination plan was approved, neither Ms. Cohen nor Mr. Kravetz were aware that Plaintiff had complained to the SEC or any other regulator or had otherwise claimed that Barclays had violated federal securities laws. (Ex. 84, ¶ 15; Ex. 19, ¶¶ 15-16).

**L.     Plaintiff's Performance Failures Continue**

250.     Following the decision to terminate Plaintiff, Mr. Kravetz continued to inform Ms. Cohen of additional performance failures and frustrations caused by Plaintiff's lack of clear communication with his team. (Ex. 106; Ex. 107; Ex. 108; Ex. 109; Ex. 110; Ex. 111; Ex. 19, ¶ 11; Ex. 112; Ex. 93, at D000254-0255).

251.     Barclays planned to inform Plaintiff of his termination on Friday, July 27, 2018, but moved the termination date to August 1, 2018, because Plaintiff was out of the office. (Ex. 113, at D006691; Ex. 19, ¶¶ 12-13).

252.     On August 1, 2018, Mr. Wiele informed Plaintiff that Barclays had terminated his employment because of his performance, as the team had lost confidence in Plaintiff's ability to do his job. (Ex. 114, at 2:10-18; Ex. 5, at 34:22-34:4).

**M.**     **The Client 1 Transaction**

*Barclays Engaged in the Client 1 Transaction and the Investment Banking Deal Committee ("IBDC") Process Begins*

253.     In the spring of 2018, Client 1 engaged Barclays for refinancing a portfolio of Courtyard by Marriott hotels that it owned. (Ex. 115).

254.     Eastdil Secured, a commercial mortgage broker that Client 1 had retained to assist it in refinancing the portfolio, first approached Barclays about the transaction around March 2018. (Ex. 115).

255.     Barclays, along with another investment bank, loaned Client 1 $550 million as part of a seven-year interest-only financing package. (Ex. 116; Ex. 6, at 77:21-78:2).

256.     Barclays was responsible for approximately 70 percent of the financing, and the other bank provided the remaining 30 percent. (Ex. 116; Ex. 6, at 90:22-91:7).

257.     The debt was structured as a mortgage with a senior mezzanine loan and a junior mezzanine loan. (Ex. 116; Ex. 1, at 293:6-13; Ex. 6, at 24:2-6).

258.     The mortgage note was securitized into CMBS bonds. (Ex. 116; Ex. 1, at 287:23-24; Ex. 6, at 18:4-19:4).

259.     After an offer of a mandate on a potential deal, Barclays' CMBS desk must obtain internal approval from the Bank's IBDC before proceeding with the underwriting. (Ex. 116; Ex. 1, at 296:8-10; Ex. 6, at 55:22-56:8).

260.     The IBDC plays a role in assessing risks of deals and determining which deals Barclays will pursue. (Ex. 1, at 10:6-12:14; Ex. 117; Ex. 6, at 55:14-56:8).

261.     The IBDC is comprised of senior members from several constituencies within Barclays, including Market Risk, Credit Risk, Structured Products, and Distribution, and IBDC decisions must be based on their collective view. (Ex. 1, at 10:6-12:14; Ex. 117).

262.    Plaintiff was not a member of the IBDC, but he attended meetings in connection with deals his team was presenting to the IBDC for approval. (Ex. 1, at 10:10-13).

263.    This IBDC approval process generally takes place in two steps: in a Stage 1 approval, the IBDC reviews the proposed term sheet and authorizes the desk to begin underwriting the deal. (Ex. 6, at 55:22-56:8; Ex. 15, at BARCLAYS_CMBS_00000085-0087).

264.    Later, in the Stage 2 approval, the IBDC reviews the final deal structure, as informed by the underwriting and diligence process, and approves the desk to close and fund the loan. (Ex. 6, at 194:17-24; Ex. 15, at BARCLAYS_CMBS_00000085-0087).

265.    The IBDC conducted its Stage 1 review of the Client 1 deal on May 7, 2018, and authorized the desk to begin underwriting the Client 1 transaction. (Ex. 116; Ex. 6, at 76:4-23).

266.    The Stage 1 meeting presented the risks of the Client 1 transaction to the IBDC. (Ex. 116; Ex. 118; Ex. 6, at 55:22-58:7, 64:14-65:3, 83:17-84:11, 91:5-92:4, 113:19-114:3).

*Client 1 and Management Agreement*

267.    Client 1's relationship with Marriott was governed by a management agreement that permits Client 1 to operate the hotels under the Marriott brand or "flag." (Ex. 119; Ex. 6, at 47:3-48:7).

268.    At the time Barclays was engaged to underwrite the loan, Client 1's management agreement with Marriott was due to expire in 2025, prior to the end of the loan term, so Client 1 proposed to negotiate an early extension to the management agreement to reduce uncertainty. (Ex. 6, at 47:3-48:8; Ex. 120; Ex. 119).

269.    Client 1 and Barclays anticipated that the agreement would include a high-level schedule of planned capital improvements, and Barclays believed these capital expenditures would be discretionary. (Ex. 6, at 92:5-17, 150:7-12, 191:2-192:2, 192:10-13, 205:1-9; Ex. 119).

270.     On or around June 2, 2018, Barclays learned that an amended management agreement between Client 1 and Marriott was nearing completion and that the amended management agreement required Client 1 to complete certain renovations to the hotels before certain deadlines. (Ex. 6, at 53:4-54:13, 201:1-204:11; Ex. 121).

271.     Client 1 estimated a budget of approximately $81 million for mandatory renovations under the amended management agreement. (Ex. 122; Ex. 123).

272.     As part of its due diligence, Barclays typically commissions a set of standard "third party" reports for deals, which include the appraisal, property condition (or engineering) and environmental reports. These standard reports must meet certain requirements and are typically provided to investors. (Ex. 15, at BARCLAYS_CMBS_000000095-0097).

273.     As an independent "trust-but-verify" approach, Barclays decided to conduct additional due diligence to confirm that Client 1 had reasonably budgeted for the amount it would need to invest in the properties. (Ex. 6, at 57:12-59:24, 305:19-306:12; Ex. 120).

274.     The Gettys Report was not an "appraisal," which must follow certain regulatory requirements that did not apply to Gettys' analysis. (Ex. 6, at 195:17-196:6, 222:23-223:9; Ex. 124; Ex. 15, at BARCLAYS_CMBS_000000095-0096).

275.     Barclays selected the Gettys Group ("Gettys") to perform the analysis of the reasonableness of Client 1's estimated budget. (Ex. 6, at 213:11-214:13; Ex. 124; Ex. 125).

276.      Gettys is a consulting company specializing in hotel budgeting, development, branding, design, and procurement services. (Ex. 6, at 129:9-130:2).

277.     Gettys had specific expertise in select service properties, which what the Marriott Courtyard properties are. (Ex. 6, at 129:9-130:2).

278.    Gettys' work was intended to provide only a rough "desktop" assessment of the portfolio's capital expenditure needs, as Gettys did not actually visit the properties. (Ex. 6, at 59:11-62:6, 234:11-21; Ex. 126; Ex. 127).

279.    Plaintiff was not involved in the selection of or any discussions with Gettys. (Ex. 1, at 330:21-331:11, 338:16-19).

280.    The Gettys Report helped provide the deal team with additional comfort that there were sufficient dollars budgeted to cover the work required under the amended management agreement during the term of the deal. (Ex. 6, at 309:3-310:12).

281.    In completing its initial "desktop" analysis, Gettys made several assumptions by utilizing (1) pictures of the rooms found online, (2) a high-level history of the properties' capital improvements to date, and (3) Gettys' own interpretation of Marriott's standard renovation schedules. (Ex. 6, at 60:14-62:6; Ex. 124; Ex. 128).

282.    Because of the management agreement was still being finalized when Gettys was retained, and the lack of detail regarding the exact scope of the mandatory renovations, Gettys made several assumptions as part of its preliminary analysis, often assuming the maximum amount of work required. (Ex. 6, at 250:23-251:14, 253:25-255:2, 256:24-257:15; Ex. 129).

283.    As a result, the initial draft analysis by Gettys, dated June 19, 2018, estimated that the cost to comply with expenditures called for by the amended management agreement would be approximately $136 million. (Ex. 128, at BARCLAYS_CMBS_000167254).

284.    In the transmittal email from Gettys to Barclays with the draft report, Gettys noted that the initial draft was preliminary and subject to change and stated: "As discussed earlier, we will be happy to get on the phone with ownership and then adjust this report as needed." (Ex. 128).

285.     To understand the disconnect between Client 1's estimated budget and Gettys' initial draft estimate, Barclays worked with Client 1 to identify areas where Gettys' assumptions did not match the actual requirements or expectations of the amended management agreement. (Ex. 6, at 256:24-257:15; Ex. 123; Ex. 130; Ex. 131).

286.     During subsequent conversations and emails involving Barclays, Client 1, and Gettys, Client 1 explained the actual scope of work required by the amended management agreement to the Gettys team. (Ex. 6, at 261:5-262:20, 292:20-293:8; Ex. 132).

287.     Based on the additional information from Client 1, Gettys corrected its assumptions, updated its analysis, and issued a revised estimate on June 20, 2018, and a final report on June 21, 2018. (Ex. 6, at 257:2-15, 258:3-259:6, 275:24-276:21, 287:3-289:5; Ex. 134; Ex. 133).

288.     Once Gettys updated its assumptions to be consistent with the scope of work that Marriott actually was requiring of Client 1 under the management agreement, Gettys' final report estimated that Client 1 would need to invest approximately $88 million to meet the required expenditures per the amended management agreement. (Ex. 133; Ex. 122).

289.     The most significant difference in estimated costs between Gettys' initial estimate and its final report was attributable to corrected assumptions regarding replacement of the hotels' case goods—i.e., the furniture, cabinets, and related fixtures, sometimes referred to as "hard goods." (Ex. 6, at 242:4-243:9, 247:3-21, 248:12-16, 295:21-296:3; Ex. 122).

290.     Gettys initially had assumed that Client 1 would be required to replace the case goods during the life of the loan for most of the properties, but Client 1 provided Gettys with corrected information from Marriott, indicating that the case goods for almost all the properties

were not due for replacement until after the loan term expired. (Ex. 6, at 247:3-21, 253:25-256:14; Ex. 132; Ex. 122).

291.    Another significant revision to Gettys' estimate was due to a corrected estimate of tub-to-shower conversion rates; although Gettys initially had assumed that Client 1 would be required to convert 100 percent of the hotels' tubs to showers, neither the amended management agreement nor the Marriot brand standards required it. (Ex. 6, at 278:11-279:16, 289:9-292:19; Ex. 122).

292.    In its initial estimate, Gettys also incorrectly assumed that Client 1 would expand the fitness centers in each hotel property, but Client 1 explained that space constraints prevented it from doing so at many properties, so Gettys revised its estimate accordingly. (Ex. 6, at 298:12-301:4 Ex. 135, at BARCLAYS_CMBS_000194837; Ex. 122).

293.    The resulting changes in Gettys' analyses between the June 19, 2018 draft and the June 21, 2018 final report were based on the removal of cost items unnecessary under brand standards and consistent with the scope of improvements required under the amended management agreement. (Ex. 6, at 255:14-257-15, 258:3-259:6, 276:6-21, 287:3-289:5, 295:24-296:3, 298:12-301:4; Ex. 122).

*Plaintiff and Client 1 Deal Marketing Efforts*

294.    On June 21, 2018, Barclays' CMBS team had a call to discuss pre-marketing the Client 1 deal to potential mezzanine lenders. (Ex. 1, at 359:20-366:16; Ex. 136).

295.    Plaintiff and other members of the CMBS team took part in the June 21, 2018 call. (Ex. 1, at 359:20-366:16; Ex. 136).

296.    During the June 21, 2018 call, the team discussed the fact that Gettys had revised its analysis. (Ex. 1, at 359:20-366:16; Ex. 136, at BARCLAYS_CMBS_000237967, BARCLAYS_CMBS_000237974).

297.     During the June 21, 2018 CMBS team call, Plaintiff did not raise concerns about Gettys' revisions or the way the desk was interacting with Gettys as potentially fraudulent or illegal. (Ex. 136).

298.     On June 22, 2018, shortly after the CMBS team call, CMBS team member Matt Higgins prepared a draft email, which included an attached copy of Gettys' final report, to send to potential mezzanine lenders, describing the amended management agreement and the work Gettys had performed to estimate the likely costs of the required expenditures per that agreement. (Ex. 1, at 347:3-348:8; Ex. 127).

299.     The draft email stated, in part: "The report concluded that the required work would be a total of $88.8MM vs [Client 1's] estimate of $80.7MM, which we considered to be within the realm of reasonable given the scope of the report, [Client 1's] extensive relationship with Marriott (over 200 Marriott-branded hotels in their portfolio) and economies of scale that [Client 1] can bring to the table." (Ex. 127, at BARCLAYS_CMBS_000013490).

300.     Plaintiff reviewed the draft email and responded that the email "look[ed] good" and was "a draft/guide on how we intend to mitigate the situation, should get folks comfortable." (Ex. 1, at 347:3-352:6; Ex. 127, at BARCLAYS_CMBS_000013490).

301.     On June 22, 2018, Plaintiff sent a version of that draft email to several potential mezzanine lenders, attaching the final Gettys report, and did not indicate that he thought the Gettys report was fraudulent. (Ex. 1, at 325:11-14, 355:8-356:10; Ex. 137; Ex. 138; Ex. 139; Ex. 140).

302.     In response to a separate June 22, 2018 email from Mr. Higgins sent to Plaintiff regarding the Gettys Report, noting that "[t]he report concluded that the required work would be a total of $88.8MM vs [Client 1's] estimate of $80.7MM, which we considered to be within the realm of reasonable given the scope of the report, [Client 1's] extensive relationship with Marriott

(over 200 Marriott-branded hotels in their portfolio) and economies of scale that [Client 1] can bring to the table," Plaintiff wrote "excellent." (Ex. 126).

303.    The offering circular document (which acts like a prospectus for a new bond or security offering) disclosed that Client 1 planned "to invest approximately $80.7 million ($18,428 per key) into rooms, lobby and common area renovations as well as exterior/facade modernizations," but that "[w]e cannot assure you that funds in the applicable Reserve Funds will be sufficient to pay all costs and expenses that may be incurred with connection with such immediate repairs and required capital improvement plans." (Ex. 141, at BARCLAYS_CMBS_000000375).

304.    The appendices to the offering circular also noted that "the next hard goods renovation will occur after the fully extended maturity of the Mortgage Loan," alerting bond investors that hard goods were not included, and additional investment would need to be considered as part of any refinancing of the portfolio. (Ex. 141, at BARCLAYS_CMBS_000000640).

305.    Plaintiff never reported to any of Barclays' senior management team, employees of Barclays' Human Resources, nor Barclays' Compliance or Legal teams, that he believed Gettys' final report was illegal, fraudulent, procured by fraudulent means, or akin to securities or shareholder fraud. (Ex. 136).

306.    Throughout May and in June 2018, Plaintiff actively marketed the Client 1 deal to the real estate investment firm that employed his wife, including via direct contact with his wife's boss. (Ex. 142; Ex. 143; Ex. 144).

307.    Plaintiff sent the Gettys Report to his wife, Ms. Sarris. (Ex. 11, at 87:24-89:10).

*Closing the Client 1 Deal*

308.     The Closing of the Client 1 deal was delayed from its initial projected close date of June 25, 2018, to July 9, 2018, to permit Barclays adequate time to complete the appropriate due diligence. (Ex. 6, at 100:5-101:5, 239:17-240:17).

309.     On July 6, 2018, the IBDC completed the Stage 2 meeting and related approval for the Client 1 deal. (Ex. 145; Ex. 146).

310.     The Stage 2 meeting conveyed to the IBDC the risks associated with the Client 1 transaction. (Ex. 146; Ex. 145; Ex. 147, at BARCLAYS_CMBS_000095767-5771).

311.     Based in part on a bid from a Korean mezzanine lender (hereinafter, "Potential Mezzanine Lender 1"), the CMBS team sought and received approval to close the loan from the IBDC on Friday, July 6, 2018, in anticipation of closing on Monday, July 9, 2018. (Ex. 147; Ex. 145).

312.     On Friday, July 6, 2018, the rest of the deal team discovered that the broker for Potential Mezzanine Lender 1 actually had requested a four-point fee as part of its bid for the junior mezzanine loan. (Ex. 148).

313.     The deal team had significant concerns that Plaintiff had not adequately communicated this request to the rest of the team. (Ex. 149; Ex. 148, at BARCLAYS_CMBS_000013566-3567; Ex. 150).

314.     On Friday, July 6, 2018, Plaintiff sent an email to the deal team blaming the fee oversight on Mr. Higgins. (Ex. 149, at BARCLAYS_CMBS_000014803).

*Plaintiff's Alleged Concerns Regarding Client 1 Deal "Risks"*

315.     On July 7, 2018, in an email exchange regarding a broker fee for the Potential Mezzanine Lender 1 bid, Plaintiff stated to the deal team: "Take your time, review all the documents, especially settlement and closing statements. Ask if you're not sure. Better to delay

closing a day and get things right than to have to go back to the client asking for money or changes later because we made a mistake. I've been 100% clear about not rushing on this deal since day 1 given the complexity." (Ex. 149, at BARCLAYS_CMBS_000014799).

316.    On July 9, 2018, Plaintiff emailed the CMBS deal team about his concerns regarding the "risks" he perceived would result from the CMBS team's decision to close the Client 1 loan before it finalized the intercreditor agreement ("ICA")—i.e., that Potential Mezzanine Lender 1 was "potentially not OK with the intercreditor"—and that Barclays had not yet received comments on the agreement from another mezzanine lender (hereinafter, "Potential Mezzanine Lender 2"). (Ex. 151).

317.    An ICA is a document governing the relationship between the mortgage lender and mezzanine lender. (Ex. 1, at 318:16-18).

318.    In that July 9, 2018 email, Plaintiff stated that any risks could be "completely mitigate[d]" if "[y]ou delay mezzanine closing until we have the final comments from both [Potential Mezzanine Lenders 1 and 2]," and Plaintiff further stated, "If you decide to proceed[,] you're willingly taking the risks as outlined above plus any unforeseen outcomes. My view is and continues to be – we wait until everything is ticked/tied and signed off by [Potential Mezzanine Lenders 1 and 2] if we're agreeing to trade with them such that the failure risk is as close to zero as possible." (Ex. 151, at D000324-0325).

319.    Steven Caldwell, Managing Director and Barclays' Head of CMBS Originations, responded to Plaintiff's concerns stating: "Thank you for highlighting the risks. We need to proceed with closing today." (Ex. 151, at D000324).

320.    Daniel Vinson, a Managing Director at Barclays, responded to Plaintiff's risks concerns stating, in part: "If we can get comments, if any, from [Potential Mezzanine Lender 2]

tonight or this week, we can incorporate those changes so that they are reflected in the [offering circular] and also run them by Moody's. We'll announce after that. There is some risk that post close there is a Moody's negative ICA change that affects levels, but some of that might be covered by the flex. As for [Potential Mezzanine Lender 1] – if their comments will come the same time frame as [Potential Mezzanine Lender 2], then we proceed as outlined above. If their comments come later, then I think we take the risk and if they have changes that would have effected disclosure or RA levels, then we have to put back the mezz to [Client 1]." (Ex. 151, at D000324)

321.    The CMBS team considered Plaintiff's concerns, but determined that several factors mitigated the risks, including a "put option" that the CMBS team had negotiated with Client 1 and the "flex" that was part of the deal. (Ex. 6, at 168:18-169:2; Ex. 151, at D000324; Ex. 152).

322.    "Flex" refers to the ability to adjust the pricing of a deal and mitigates risk in a deal. (Ex. 6, at 105:11-19).

323.    The "put option" permitted Barclays to require Client 1 to fund the junior mezzanine loan if Barclays could not find a third party willing to purchase the loan at a rate acceptable to Client 1, thus protecting Barclays if it funded the Client 1 deal without pre-placing the junior mezzanine loan and limiting its downside exposure. (Ex. 152).

324.    In response to Plaintiff's concerns, Mr. Wiele specifically asked, "aren't those risks pretty well covered/mitigated by the [Client 1] backstop? [Potential Mezzanine Lender 2] shouldn't be a big exposure/risk, right?" (Ex. 153, at BARCLAYS_CMBS_000226770-6771).

325.    In response, Plaintiff stated that the put option only backstopped the junior mezzanine loan and the senior mezzanine lender "[m]ay bail" if the junior mezzanine lender dropped out. (Ex. 153, at BARCLAYS_CMBS_000226770).

326.    Mr. Wiele forwarded Plaintiff's thoughts on risk to Mr. Kravetz, who considered and disagreed with Plaintiff's assessment and noted:

> We would all like to take no risk prior to closing loans. We would also be out of business. The risks are acknowledged and addressed in the flex. It may or may not be adequate, but we ran numbers and are ok with the risk.
>
> The only issue that wasn't adequately acknowledged and addressed was the 2 pt broker fee and that sits squarely on BLB's shoulders, which is [sic] is incapable of accepting. He feels it's everyone's fault except him.
>
>                        \*\*\*
>
> He can no longer assess and take risk. He is gun shy and his co-workers have lost their confidence in him.

(Ex. 153, at BARCLAYS_CMBS_000226770).

327.    In response to Mr. Kravetz's statement that Plaintiff was unable to assess risk, Mr. Wiele noted that he was "on board with everything" in the Client 1 transaction. (Ex. 153).

328.    The fact that the ICA was on a form that previously had been approved by one of the mezzanine lenders significantly diminished the risk associated with the fact that the ICA was not final, lowering the risk of significant disagreement over its terms. (Ex. 151, at D000325; Ex. 153, at BARCLAYS_CMBS_000226770).

329.    Dan Vinson noted that Plaintiff's ICA risk concerns also were addressed by the fact that Barclays had flexibility to make changes to the ICA prior to Barclays providing the offering circular for the deal. (Ex. 151, at BARCLAYS_CMBS_000081845).

330.    The additional flex built into the deal adequately addressed other "risks" Plaintiff raised. (Ex. 6, at 321:21-322:10; Ex. 153, at D008222).

331.    Barclays' partner in the Client 1 deal, another investment bank, was comfortable with the deal and its terms. (Ex. 6, at 74:22-75:2).

332.     Barclays did not lose money on the Client 1 transaction. (Ex. 1, at 20:4-13).

333.     The mortgage loan closed on July 9, 2018, and the securitization closed on August 15, 2018, when the bonds were issued to investors. (Ex. 1, at 324:8-13; Ex. 6, at 100:15-16).

334.     Plaintiff never raised concerns within Barclays about any risk of fraud or violation of any law, SEC rule or regulation with respect to the Client 1 transaction. (Ex. 154; Ex. 155; Ex. 151; Ex. 153).

**N.     The Client 2 Transaction**

335.     On May 25, 2018, Barclays began pursuing an engagement for "Client 2," referred to internally as "Project Lynx," which related to Client 2's attempt to acquire certain hotels for approximately $3.5 billion. (Ex. 12, at 5:14-21; Ex. 156).

336.     Under the proposed engagement, Barclays would commit to funding a portion of Client 2's acquisition of the hotels in a joint financing arrangement with another bank. (Ex. 156).

337.     Once Barclays committed to the Client 2 transaction, Mr. Kravetz had the CMBS team run dozens of pricing scenario analyses to consider various potential profit/loss outcomes for the deal and confirm the reasonableness of the interest rate terms under negotiation. (Ex. 12, at 55:21-56:8; Ex. 157, at 4:10-16).

338.     Mr. Kung ran various scenarios on the Client 2 deal, which was a typical practice the CMBS team used to analyze potential upside and downside scenarios in any transaction. (Ex. 12, at 49:11-21; Ex. 13, ¶¶ 8-9).

339.     On May 29, 2018, Plaintiff called Mr. Wiele, a member of the IBDC. (Ex. 157).

340.     During his May 29, 2018 call with Mr. Wiele, Plaintiff stated, in part, that Mr. Kung and Mr. Taylor had "run probably three dozen different scenarios" and discussed his assessment of potential downside risk." (Ex. 157, at 4:10-16).

341.     Plaintiff further stated with respect to the transaction: "there's been a heavy supply calendar of this exact type of stuff. Is this on the better end of that? Absolutely." (Ex. 157, at 8:17-19).

342.     During the May 29, 2018 call, Plaintiff encouraged Mr. Wiele to seek the input of others on the team regarding the scenarios, including Mr. Kung and Mr. Taylor. (Ex. 157, at 4:10-16).

343.     During his May 29, 2018 call with Mr. Wiele, Plaintiff expressed his "personal feeling" that the deal had limited upside and "in the worst case could wipe out half to all of our year to date P&L so far." (Ex. 157, at 3:5-12; 9:4-16).

344.     Plaintiff also said to Mr. Wiele: "I feel like I'm happy to do whatever the senior folks want to do and I'll support it and do everything I can to try to make I happen. I just feel the going in price and the risk-reward is not something that I would want to do as a shareholder here. That's just my view." (Ex. 157, at 9:8-22).

345.     During his May 29, 2018 call with Mr. Wiele, Plaintiff did not state that he thought there was anything fraudulent or illegal taking place with respect to the Client 2 transaction. (Ex. 157).

346.     To address the risk of market movements over the term of the loan, the proposed spreads included some "flex," which allowed Barclays to reprice the loan at Client 2's expense if the bonds traded wider than expected. (Ex. 157, at 4:17-5:8).

347.     Successfully completing the Client 2 transaction likely would lead to more opportunities with Client 2, one of the largest and most significant players in the real estate investment space. (Ex. 157, at 9:25-10:6, 13:21-24).

348.     On May 30, 2018, Mr. Wiele considered Plaintiff's concerns about the deal and discussed them with Mr. Attea in a separate phone call. (Ex. 158).

349.     During the conversation between Mr. Attea and Mr. Wiele, Mr. Attea stated: "[T]here's some great assets there, and it's a great sponsor and it's going to be a huge marquee trade." (Ex. 158, at 4:9-18).

350.     Mr. Attea further posed the concern that Plaintiff "is negative about [the deal] just because Larry [Kravetz] likes it," and "the fact that Larry likes it is making [Plaintiff] like it less." (Ex. 158, at 4:16-5:6).

351.     On May 30, 2018, the deal team exchanged emails regarding the need for a summary of pricing runs for the Client 2 deal, including upside and downside scenarios in summary form, which Mr. Kravetz needed to review with Tim Hartzell, Barclays' Global Head of Portfolio Management (and the Chair of the IBDC). (Ex. 81, at D008472-8474).

352.     In response, Plaintiff emailed the team offering his take on the base spread and stressed scenario, citing the large size of the deal and "consistent supply of similar risk type deals available to the market." (Ex. 81, at D008472-8474).

353.     Later in the evening on May 30, 2018, Plaintiff emailed Mr. Wiele and Mr. Attea providing his thought process on the deal and encouraging them to chat with Mr. Kung, Mr. Taylor, Mr. Wu, and Mr. Caldwell to obtain their personal opinions. (Ex. 81, at D008472-8474).

354.     In Plaintiff's May 30, 2018 email to Mr. Wiele and Mr. Attea, he listed his perceived "pros" and "cons" of the Client 2 transaction, and he noted his views that Barclays would be using up its "flex" in the deal immediately and that the "downside risk is material." (Ex. 81, at D008472-8474).

355.    After raising these concerns about the potential downside of the deal, Plaintiff continued to be involved in conversations with the deal team regarding the Client 2 transaction. (Ex. 12, at 97:1-14, 111:1-21; Ex. 159; Ex. 160; Ex. 161).

356.    Not all pricing runs were included in the materials presented to the IBDC regarding any potential transaction; the CMBS deal team would curate a subset of runs that reflected the most relevant data. (Ex. 12, at 55:21-56:16).

357.    For the Client 2 transaction, as part of the typical process, members of the CMBS deal team played a role in deciding which upside and downside scenarios to present to the IBDC. (Ex. 12, at 55:21-56:16, 57:18-22).

358.    The pricing scenarios presented to the IBDC were different from the scenarios Plaintiff had shared with the CMBS deal team on May 30, 2018. (Ex. 12, at 57:23-58:5).

359.    The deal team overall believed some of the loss scenarios Plaintiff had presented were irrelevant because they included transactions that were not comparable, and the deal team chose different scenarios that included the most reasonable range of outcomes. (Ex. 12, at 57:23-58:14; Ex. 13, ¶ 12).

360.    On June 4, 2018, Plaintiff sent an email to Ms. De Martin and Mr. Lee in connection with the Tweed investigation (described above), and that email included concerns about Barclays' participation in the "Client 2" transaction. (Ex. 81, at D008465).

361.    Plaintiff wrote that although there were "many merits" to the potential "high profile transaction for Barclays," "the client's suggested pricing does not reflect current market conditions" such that taking on the proposed transaction "would be taking material risk," and it was "foreseeable the transaction could result in a material P&L loss to the firm in the 4th Quarter . . . ." (Ex. 81, at D008465).

362.    Plaintiff also stated in his June 4, 2018 email:

> My intention of reporting this to you is to advise you that I have
> been excluded from the process of considering and managing risk
> for the firm which is part of my role as Head of Primary CMBS
> Trading & Distribution and this is unusual behavior. It is clear I am
> being excluded because of my cautious view is contradictory to
> Origination's desire to pursue the deal. This also prevents me from
> doing my job and diminishes my reputation in the firm amongst my
> peers, it is clear I'm being excluded.

(Ex. 81).

363.    Plaintiff further stated that he had "heard" from David Kung and Peter Taylor that
Mr. Kravetz had directed them to "massage" the data related to the Client 2 transaction to
understate risk to Barclays. (Ex. 81, at D008466).

364.    Plaintiff did not say in his June 4, 2018 email that Barclays was engaging in any
fraudulent conduct or otherwise in violation of any law, or any SEC rule or regulation. (Ex. 81).

365.    Mr. Kung did not "massage" the scenarios related to the Client 2 transaction. (Ex.
13, ¶ 9; Ex. 12, at 116:22-117; Ex. 1, at 378:24-382:6).

366.    Mr. Kravetz did not instruct Mr. Kung or Mr. Taylor to improperly "massage" or
"cherry pick" data related to the Client 2 transaction. (Ex. 13, ¶ 10).

367.    Mr. Kung did not tell Plaintiff that he had been directed by Mr. Kravetz to
"massage" data for the Client 2 transaction. (Ex. 13, ¶ 11).

368.    Plaintiff received, and was given the opportunity to comment on, the final materials
for presentation to the IBDC. Plaintiff suggested no comments or changes. (Ex. 162).

369.    On June 5, 2018, the Client 2 Transaction proceeded to IBDC Stage 1 approval,
and Plaintiff participated in that meeting. (Ex. 163; Ex. 164, at D007416-7491).

370.    Plaintiff presented his perspective on the Client 2 transaction to the IBDC on June
5, 2018. (Ex. 1, at 388:11-17; Ex. 12, at 60:1-14; Ex. 165).

371.     During that meeting, Plaintiff did not state that the downside scenarios that had been presented to the IBDC were fraudulent or misleading; he instead noted that there was "fatigue" for hotels in 2018. (Ex. 165, at D015079; Ex. 12, at 63:18-64:18).

372.     Mr. Caldwell disagreed with Plaintiff's perspective on the potential downside of the Client 2 transaction based on the unique nature of the transaction due to its size, its higher quality, and market conditions. (Ex. 12, at 63:18-64:18, 105:3-14).

373.     Mr. Caldwell agreed that there was, in fact, a material potential downside risk to the Client 2 transaction, but that the downside risk concern raised by Plaintiff was not realistic. (Ex. 12, at 71:24-72:9; 82:12-83:17; 88:2-24).

374.     The deal team felt the risks of the Client 2 deal were worth taking because Client 2 was the largest borrower in the CMBS space and because Client 2 had rewarded banks who take risks for them with additional business. (Ex. 166, at D005794; Ex. 12, at 84:7-85:1, 107:3-15, 129:25-130:4).

375.     Mr. Kravetz disagreed with Plaintiff's comment to the IBDC about hotel "fatigue" stating that Plaintiff's "point [to the IBDC] was that the market was showing signs of fatigue on hotel deals and on [Client 2] hotel deals in particular . . . Brian's [Client 2] comment was factually inaccurate, as to that point [Client 2] hotel CMBS deals totaled $1.3bn." (Ex. 93, at D000255).

376.     The IBDC, after considering Plaintiff's concerns, approved the deal as presented. (Ex. 163).

377.     As of June 12, 2018, the Client 2 transaction terms for Barclays changed when Mr. Kravetz negotiated for additional flex in the deal and Barclays' participation in the loan increased to 40 percent, with another bank taking on 60 percent of the loan. (Ex. 167).

378.     In a separate email exchange with Mr. Wiele and Mr. Attea on June 12, 2018, Plaintiff raised his perspective about using the flex in the deal on day 1, stating: "So the flex isn't really flex," and in response, Mr. Attea responded stating, "Agree re flex, but I can't ignore extra flex or fact it feels like [the] rest of the market is improving since we had committee." (Ex. 168, at D007410).

379.     Plaintiff also emailed Will Zak, Managing Director, Head of Securitized Products Trading, providing his perspective on the Client 2 deal. (Ex. 169).

380.     On June 13, 2018, because of the changes in the deal terms, the deal team gave the IBDC an update on the Client 2 transaction for a re-vote, reflecting those new terms, including Barclays' increased share of the loan and the increased additional flex negotiated in the deal. (Ex. 170).

381.     The IBDC approved the deal with the new terms on June 13, 2018. (Ex. 170, at D004712; Ex. 171, at D007693).

382.     Mr. Kravetz presented Plaintiff's view of the downside risks of the Client 2 transaction to Mr. Hartzell, Chair of the IBDC. (Ex. 12, at 78:24-79:22)

383.     Mr. Kravetz also discussed the potential downside risks of the Client 2 transaction with other senior managers at Barclays, including Barclays' then-Head of Global Capital Markets, Barclays' then-Global Head of Debt Capital Markets and Risk Solutions, Barclays' Co-Head of Global Fixed Income Syndicate, Mr. Attea, Mr. D'Ercole, and Mr. Wiele. (Ex. 166; Ex. 12, at 81:12-83:21).

384.     The IBDC and senior management at Barclays were aware of Plaintiff's opinion of the potential downside risks of the Client 2 transaction. (Ex. 12, at 96:6-97:14).

385.    Ultimately, while there was some upside to the Client 2 transaction and a material downside risk, the deal team fairly presented the risks of the transaction to the IBDC and decided to take the risk for recognition as the lead banking relationship for Client 2. (Ex. 12, at 108:11-18).

386.    Plaintiff separately raised his concerns regarding the Client 2 transaction to Mr. Wiele and Mr. Attea, both of whom considered Plaintiff's perspective, but disagreed with his risk assessment. (Ex. 81, at D008472-8474).

387.    Others on the deal team, including but not limited to Mr. Caldwell, were similarly aware of Plaintiff's perspective of the risks of the Client 2 transaction and disagreed with Plaintiff's opinion of the same. (Ex. 12, at 63:9-64:18; Ex. 13, ¶ 12).

388.    The Client 2 transaction never proceeded to IBDC Stage 2 approval, and Barclays' participation in the transaction with Client 2 ended in September 2018 when Client 2 was outbid on the transaction at a rate nearly 50 percent higher than its offer. (Ex. 1, at 384:2-8).

389.    Plaintiff's concerns regarding the Client 2 transaction, including his comments to supervisors, were presented as differences opinion on attractiveness of the deal, given Plaintiff's view of potential profitability and downside scenarios, not as concerns about illegal or fraudulent whistleblower conduct. (Ex. 12, at 63:9-64:18; Ex. 13, ¶ 13).

O.    **Plaintiff's External Complaints to the SEC and OSHA**

390.    On June 14, 2018, Plaintiff submitted his first complaint to the SEC—his first complaint to any regulator about Barclays. (Ex. 173; Ex. 1, at 237:3-238:5).

391.    Prior to Barclays' termination of Plaintiff's employment, no one involved in the decision to terminate Plaintiff was aware that he had filed complaints with any regulatory authority. (Ex. 84, ¶ 15; Ex. 19, ¶¶ 15-16).

392.    Plaintiff filed a complaint with the U.S. Department of Labor, Occupational Safety and Health Administration on October 26, 2018. (Ex. 173).

**P.     Plaintiff Contacts Compliance Regarding His Direct Report on July 11, 2018—After Barclays Decided to Terminate Plaintiff's Employment**

393.     As of July 2018, Mr. Hasan, Plaintiff's direct report, did not yet have the licenses necessary to solicit investments in securities. (Ex. 174).

394.     On July 11, 2018, Plaintiff emailed Mr. Hasan, stating that Mr. Hasan was "not authorized to send out [capital] stacks with bonds mentioned, only mortgage + mezz." (Ex. 174, at D007857).

395.     On July 11, 2018, Plaintiff forwarded his email to Mr. Hasan to Ms. Zhuravitsky and Ayana Andrews of Barclays' Compliance, stating that he had told Mr. Hasan about this issue in the past and asked Compliance to let him know "what I need to do." (Ex. 174, at D007857).

396.     In a separate email to Mr. Hasan on July 11, 2018, Plaintiff stated that while Mr. Hasan could discuss mezzanine loans or mortgages with investors, as those items are not considered securities, he was not permitted to discuss securities. (Ex. 175).

397.     On July 11, 2018, Mr. Hasan responded to Plaintiff's email, stating that he "will make sure to not forward, email or be in any discussions in which securities are mentioned until such time as I am licensed." (Ex. 175, at D024638).

398.     Through his July 11, 2018 email, Plaintiff clarified for Mr. Hasan that he should not even forward a communication if securities are mentioned, which Mr. Hasan previously did not understand; Mr. Hasan replied to Plaintiff, "I appreciate the clarity in your messaging below and now understand that if there is a mention of securities or a rating I will not go near it even if there is a mezzanine tranche related to it." (Ex. 175, at D024638).

399.     On July 11, 2018, Plaintiff also emailed Mr. Lee in ER and Ms. De Martin in Compliance Investigations and stated that Mr. Hasan had "sent out multiple emails to clients last

night soliciting potential interest in securities" despite not being licensed and noting that both Mr. Wiele and Compliance had been notified. (Ex. 176; Ex. 177).

400.     Though Plaintiff had already escalated to Ms. Zhuravitsky in Banking Compliance, when HR and Compliance Investigations received Plaintiff's complaint about the licensing issue, they also separately notified Banking Compliance, to ensure "any concerns regarding soliciting potential clients" were appropriately addressed. (Ex. 177).

401.     Ms. Zhuravitsky emailed Ms. De Martin regarding the issue on July 13, 2018, and on July 25, 2018, Ms. Andrews emailed Ms. Zhuravitsky to open an investigation in response to Plaintiff's concern that Mr. Hasan was sending securities related emails to clients without the proper license. (Ex. 177; Ex. 178).

402.     On July 13, 2018, Mr. Wiele also emailed Mr. Hasan to emphasize the importance of Mr. Hasan completing his licensing exams. (Ex. 179).

403.     Compliance conducted a targeted review of Mr. Hasan's emails for a 45-day period. (Ex. 180).

404.     Compliance reviewed the results of the review with Registrations Compliance and discussed the applicable requirements for registration and interacting with clients. (Ex. 180)

405.     Based on this review, Compliance concluded, and Registrations Compliance agreed, that the emails reviewed were "real-estate related, rather than securities related" and that Mr. Hasan, who had not solicited securities transactions in those communications, had not violated any of Barclays' policies. (Ex. 180).

406.     Barclays concluded that Mr. Hasan's emails were real estate related rather than securities related, and "none were found to reference securities/bonds." (Ex. 180, at D000334).

407.    Additionally, Mr. Hasan was in the process of obtaining the necessary licenses from

FINRA and is now licensed. (Ex. 180, at D000334).

New York, New York                         EPSTEIN BECKER & GREEN, P.C.
Dated: April 8, 2022

                                            By:  */s/ Ronald M. Green*

                                                Ronald M. Green
                                                875 Third Avenue
                                                New York, NY 10022
                                                Tel: 212.351.4500
                                                Fax: 212.878.8600
                                                RGreen@ebglaw.com


                                            BALLARD SPAHR LLP

                                                Elizabeth K. McManus
                                                1675 Broadway, 19th Floor
                                                New York, NY 10019
                                                Tel: 212.223.0200
                                                McManusE@ballardspahr.com


                                                *Attorneys for Defendant*
                                                *Barclays Capital Inc.*