UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN LABELLE,

                              Plaintiff,

              - against -

BARCLAYS CAPITAL INC.,

                              Defendant.

Civil Action No. 19-CV-03800
(JPO) (GWG)

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**


Dated: April 8, 2022

EPSTEIN BECKER & GREEN, P.C.
Ronald M. Green
John F. Fullerton III
875 Third Avenue
New York, NY 10022
Tel: 212.351.4500
Fax: 212.878.8600
RGreen@ebglaw.com
JFullerton@ebglaw.com

BALLARD SPAHR LLP
Elizabeth K. McManus
1675 Broadway, 19th Floor
New York, NY 10019
Tel: 212.223.0200
McManusE@ballardspahr.com

*Attorneys for Defendant
  Barclays Capital Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .............................................................................................1

STATEMENT OF UNDISPUTED FACTS .........................................................................2

    A.   Barclays' Commercial Mortgage-Backed Securities ("CMBS") Business & Plaintiff's Employment...................................................................................2

    B.   Plaintiff's 2017 Mandatory Block Leave ........................................................3

    C.   The Events of January 4, 2018 .......................................................................4

    D.   On June 12, 2018, Barclays Decides to Terminate Plaintiff's Employment. ................6

    E.   The Client 1 Transaction ................................................................................8

    F.   The Client 2 Transaction ..............................................................................10

    G.   Plaintiff Contacts Compliance Regarding His Direct Report on July 11, 2018 ...........12

ARGUMENT ......................................................................................................................13

I.    MBL CONCERNS ARE NOT SOX PROTECTED ACTIVITY. ...........................13

    A.   MBL Falls Outside of SOX's Scope. .............................................................13

        i.   MBL is a Voluntarily Adopted Internal Policy - Not an SEC Rule or Regulation. ..................................................................................14

        ii.   It Was Not Reasonable for Plaintiff to Believe that the Conduct He Complained of Constituted a SOX-Related Fraud or Violation. ..........................16

    B.   Plaintiff Did Not Engage in Protected Activity with Respect to the Client 1 Transaction, Nor Can He Show a Causal Connection to His Termination. .................19

        i.   Gettys Report .....................................................................................19

        ii.   Pre-Marketing and Closing "Risks"....................................................20

    C.   Plaintiff Did Not Engage in Protected Activity in the Client 2 Transaction. ...............22

    D.   Licensing Concerns ......................................................................................24

CONCLUSION....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andaya v. Atlas Air, Inc.*,
   No. 10-7878, 2012 WL 1871511 (S.D.N.Y. Apr. 30, 2012) ............................................16, 21

*Bechtel v. Admin. Rev. Bd., U.S. Dep't of Labor*,
   710 F.3d 443 (2d Cir. 2013)...................................................................................................13

*Day v. Staples, Inc.*,
   555 F.3d (1st Cir. 2009) .................................................................................................. *passim*

*Erhart v. Bofl Holding, Inc.*,
   Nos. 15-2287, 15-2353, 2020 WL 1550207 (S.D. Cal. Mar. 31, 2020) ...........................14, 15

*Fraser v. Fiduciary Trust Co. Int'l*,
   No. 04-6958, 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009), *aff'd* 396 F.
   App'x 734 (2d Cir. 2010).................................................................................................22, 23

*Hill v. Komatsu America Corp.*,
   No. 14-2098, 2015 WL 5162129 (N.D. Ill. Aug. 26, 2015) ...................................................18

*Jones v. Rochester City Sch. Dist.*,
   676 F. App'x 95 (2d Cir. Jan. 25, 2017) ..........................................................................19, 21

*Leshinsky v. Televent GIT, S.A.*,
   942 F. Supp. 2d 432 (S.D.N.Y. 2013)..............................................................................13, 18

*Marcavage v. City of New York*,
   689 F. 3d 98 (S.D.N.Y. 2012)...............................................................................................17

*Murray v. UBS*,
   No. 14-927 (S.D.N.Y. Jan. 5, 2018), ECF No. 274 ...............................................................16

*Murray v. UBS Securities, LLC*,
   No. 14-927, 2017 WL 149051 (S.D.N.Y. Mar. 31, 2017)......................................................17

*Ngai v. Urban Outfitters, Inc.*,
   No. 19-1480, 2021 WL 1175155 (E.D. Pa. Mar. 29, 2021) ........................................20, 21, 24

*Nielsen v. AECOM Tech. Corp.*,
   762 F.3d 214 (2d Cir. 2014)........................................................................................13, 14, 25

ii

*Northrop Grumman Sys. Corp. v. U.S. Dept. of Labor, Admin. Review Bd.,*
    927 F.3d 226 (4th Cir. 2019) ................................................................................................14

*Scott v. Harris,*
    550 U.S. 372 (2007)............................................................................................................17

*Slattery v. Swiss Reinsurance Am. Corp.,*
    248 F.3d 87 (2d Cir. 2001)...........................................................................................19, 21

*Wadler v. Bio-Rad Labs., Inc.,*
    916 F.3d 1176 (9th Cir. 2019) ............................................................................................15

**Statutes**

18 U.S.C. §1341 .............................................................................................................................13

18 U.S.C. § 1514A(a)(1)...........................................................................................................13, 14

Sarbanes-Oxley Act of 2002, Section 806, 18 U.S.C. § 1514A ........................................... *passim*

## PRELIMINARY STATEMENT

Defendant Barclays Capital Inc. ("Barclays") respectfully submits this Memorandum in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of the Amended Complaint filed by Plaintiff Brian LaBelle ("Plaintiff") in its entirety. Based on the material undisputed facts, Plaintiff's claim under Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX" or "Section 806"), fails as a matter of law because every instance of Plaintiff's alleged "whistleblowing": 1) fails to constitute protected activity as prescribed by SOX, and/or 2) lacks any causal connection to the decision to terminate his employment because the alleged "whistleblowing" occurred *after* that decision was made.

When Plaintiff failed to meet the standard expected from a highly compensated Director at Barclays, he was terminated after a series of significant performance issues, including persistent unexplained absences, lapses in judgment, and insubordination. Rather than improve his performance when offered critical feedback, Plaintiff, in a misguided and self-destructive fit of pique toward his supervisors, instead attempted to manufacture episodes of alleged retaliation out of nearly every personal dispute or difference of opinion. However, the indisputable contemporaneous record of documents, emails, and audio recordings surreptitiously made by Plaintiff demonstrate that he cannot sustain his SOX retaliation claim because he never engaged in protected activity that caused the decision to terminate his employment.

Accordingly, Plaintiff cannot satisfy the *prima facie* elements required to sustain his claim, and Barclays is entitled to summary judgment on these narrow grounds, without regard to any immaterial disputed issues of fact.

## <u>STATEMENT OF UNDISPUTED FACTS</u>[1]

A.    ***Barclays' Commercial Mortgage-Backed Securities ("CMBS") Business &
      Plaintiff's Employment***

Plaintiff joined Barclays in July of 2015. (SOF ¶ 7). At the time of his termination on
August 1, 2018, he was Director, Head of CMBS Primary Trading and Distribution. (SOF ¶¶ 17,
252). In that role, Plaintiff was responsible for, among other things, pricing, hedging and
distribution of commercial mortgages, securities, and subordinate debt. (SOF ¶ 18).[2] Although his
direct supervisor was Brian Wiele (Managing Director, Global Head of Securitized Products–
Syndicate), Plaintiff worked primarily under Larry Kravetz (Managing Director, Head of Primary
CMBS Origination). (SOF ¶¶ 8-9, 14). Kravetz oversaw Plaintiff in his role arranging the
distribution of bonds and mezzanine debt associated with commercial real estate loan offerings.
(SOF ¶ 10). Kravetz is supervised by Managing Director, Martin Attea. (SOF ¶ 13). Plaintiff also
worked with Eric Wu (Managing Director, Head of Originations for Large Loan Commercial Real
Estate), who led the Origination team until June 2018. (SOF ¶¶ 11, 12).

Plaintiff exhibited performance shortcomings noted in 2016, including his inadequate
attendance and tardiness, lack of attention to detail, and issues meeting certain Compliance
requirements, which persisted into 2017. (SOF ¶¶ 46-53, 60-62). These failures were reflected in
a rating of "Improvement Needed" on the "Values (the 'How')" aspect of his 2017 Performance
Review, which Barclays uses to refer to how an employee is valued by peers, services clients and
customers. (SOF ¶¶ 55-56). In accordance with Barclays' year-end performance review process,
Plaintiff's 2017 performance ratings were submitted in November 2017, and locked-in by early

---

[1] Unless otherwise indicated, all references are to Barclays' Local Civil Rule 56.1 Statement of Undisputed Material
Facts in Support of its Motion for Summary Judgment ("SOF"), which provides a more detailed factual background.

[2] All members of the CMBS Primary Origination and Syndicate-Securitization teams are responsible for risk
management. (SOF ¶ 6).

December 2017. (SOF ¶¶ 54, 57-58).[3] On December 19, 2017, Plaintiff was allocated a bonus of $500,000 in Barclays' system. (SOF ¶¶ 68, 72). Bonus amounts were finalized in early January, and on January 6, 2018, Barclays *increased* Plaintiff's bonus by an additional $10,000, bringing Plaintiff's total compensation for the 2017 performance year to $910,000. (SOF ¶¶ 66-67, 69, 73-75).

### B.    Plaintiff's 2017 Mandatory Block Leave

Plaintiff was subject to certain internal Barclays policies during his employment, including Mandatory Block Leave ("MBL"). (SOF ¶¶ 31, 37). Under Barclays' MBL Standard, "Covered Individuals" are required "to take 10 consecutive business days off each year," and are to refrain from engaging in certain business activities during that time. (SOF ¶ 32). Although it is a common practice in financial services firms, there is no law, rule or regulation of the Securities and Exchange Commission ("SEC") that requires Barclays (or any other SOX-covered company) to adopt an MBL policy. (SOF ¶¶ 33-35; Green Decl. ¶ 29 & Ex. 28, at 4-6). Rather, MBL is an internal policy that Barclays voluntarily adopted. (SOF ¶¶ 31, 33-36).

In order to satisfy the MBL requirement under Barclays' policy, a Covered Individual (and their individual manager) must each submit an attestation at the end of the leave period stating that the individual on MBL did not engage in certain business activities during the leave. (SOF ¶¶ 39-40). It is not unusual for Covered Individuals to ultimately have to work during a leave that was intended to be used as MBL. (SOF ¶¶ 42-45). Such work does not violate the policy provided that the individual does not attest to completing MBL. (SOF ¶ 41).

---

[3] On March 29, 2022, Judge Gorenstein ordered Barclays to produce additional discovery related to this process to Plaintiff. (ECF No. 217). Barclays may seek to supplement its briefing based on that discovery, or any other additional discovery sought, if needed to support its motion.

In 2017, Plaintiff originally scheduled his MBL for August 28, 2017, but he cancelled the MBL before it began because of anticipated work obligations and rescheduled his leave for December 18 to December 29, 2017. (SOF ¶¶ 79, 81-82). Plaintiff was out of the office during his December 2017 scheduled MBL while vacationing in the Bahamas, and for several days beyond the two weeks he had designated as MBL. (SOF ¶¶ 85-87). Plaintiff did not seek to cancel or raise any other concerns about his December 2017 MBL prior to January 4, 2018. (SOF ¶¶ 88-91, 101-02, 115).

### C.    *The Events of January 4, 2018*

On January 4, 2018,[4] Plaintiff was scheduled to have lunch in Manhattan with Kravetz and significant foreign clients. (SOF ¶ 104). At 8:18 AM, without prior notice to Kravetz, who was in the office, Plaintiff emailed Kravetz and the clients canceling the lunch meeting due to inclement weather. (SOF ¶¶ 105-108). After Plaintiff unilaterally cancelled the lunch, Kravetz inquired as to whether Plaintiff was coming to the office. (SOF ¶ 108). Plaintiff, viewing Kravetz's question as taking "a shot at [him] for working from home on a snow day" (SOF ¶ 138), responded:

> [The investor] just called me to cancel lunch today because of the weather. Given the blizzard conditions I will be working from home today along with a few members of my team. As you are aware[,] I was able to field questions and calls from team Barclays and our clients while on my two week mandatory block leave resulting in a smooth closing on 225 PAS, Grand Lakes Mezz A and keeping Red Roof alive, (all massively critical deals for Barclays per senior banking and risk management)[.] I'm fully capable of performing my role while working remotely. If this is an issue I'd be happy to discuss further.

(SOF ¶ 109). In this email, which serves as the catalyst for this entire litigation, Plaintiff said nothing about any unlawful or potentially illegal activity or any violation of Barclays' MBL policy or the MBL attestation process. (SOF ¶¶ 109, 114).

---

[4] All dates hereinafter refer to 2018 unless otherwise indicated.

Because Kravetz was in fact ***not*** aware that Plaintiff allegedly had worked during his scheduled MBL, he was upset that Plaintiff might have worked during his leave and angry at being falsely accused of knowing about that transgression. (SOF ¶¶ 102-103, 115, 117, 126-33). Kravetz called Plaintiff and chastised him—using strong language—for displaying poor judgment in sending an email that cavalierly touted a potential violation of Barclays' policy and falsely implicated Kravetz in the same. (SOF ¶¶ 116-17, 136-37).[5] After that call, Kravetz contacted Compliance, as he told Plaintiff he would do, and then emailed Plaintiff stating: "Since you haven't attested to taking your MBL, you still have the opportunity to cancel it. When you get the request, make sure you cancel it – ***do not attest to it.***" (SOF ¶¶ 118, 122, 142-44) (emphasis added).

Later that day, Kravetz called Plaintiff again and, unbeknownst to Kravetz, Plaintiff recorded that conversation. (SOF ¶¶ 126-27). Kravetz repeated his concerns that Plaintiff had demonstrated "horrible judgment" and stated that Plaintiff's statement that he knew Plaintiff had worked during his MBL was "an outright lie." (SOF ¶¶ 134-35). At no time did Kravetz pressure Plaintiff to attest. (SOF ¶¶ 116-21, 126-42). Instead, Kravetz stated that if "you felt you weren't going to be able to attest to it when you came back, then there are ways to handle it, and this was not the way." (SOF ¶ 141). Without refuting Kravetz's statement that he had not told Plaintiff to work during his leave, Plaintiff admitted that he sent his January 4 email as a reaction to Kravetz's frustration that Plaintiff had unilaterally cancelled a client meeting, stating that "[t]he email was sent to show you I am completely effective working from home." (SOF ¶¶ 132-39).[6]

Plaintiff also surreptitiously recorded a conversation with Wu on January 4. (SOF ¶¶ 145-61). During the call, Wu noted that Plaintiff had made errors in judgment "a couple of times" and

---

[5] In this call, Kravetz was clear that he wanted to contact Compliance to minimize the potential consequences to Plaintiff of Plaintiff's actions. (SOF ¶ 118).

[6] On January 16, 2018, Kravetz met with Plaintiff, who again recorded without Kravetz's knowledge. (SOF ¶¶ 191-206). During this discussion, Plaintiff stated that "[n]othing nefarious happened" during his MBL. (SOF ¶ 195).

that Kravetz was reacting to how Plaintiff had "acted in the past couple of years," including Plaintiff's repeated absences. (SOF ¶ 146). Wu also discussed other concerns related to Plaintiff's work performance, including his overuse of work flexibility for personal matters, his refusal to do "just simple things like going to Marty[ Attea's] holiday party," and the "5,000 other things" Plaintiff did that "drove [Kravetz] crazy." (SOF ¶¶ 148-50, 152-53, 156-60).

That same day, Plaintiff also called Anna Zhuravitsky (Director, Banking & Capital Markets Compliance); Elyse Gonzalez (Human Resources Business Partner ("HRBP")); and Monica De Martin (Director, Head of Americas Compliance Investigations and Whistleblowing-Conduct Oversight), and he recorded those conversations as well. (SOF ¶¶ 122, 162, 168). During these calls, Plaintiff reported that because clients and co-workers had contacted him during his scheduled December 2017 MBL, he had to work. (SOF ¶ 165). Plaintiff did not report that he (or anyone else at Barclays) had committed MBL-related fraud. (SOF ¶¶ 122-25, 162-67, 168-79).[7] After the January 4 call with De Martin, Barclays opened a Compliance investigation to assess Plaintiff's MBL concerns and determine whether Barclays' internal MBL policy had been breached. (SOF ¶ 183). The investigation concluded that there was no MBL policy violation because Plaintiff had not signed Barclays' MBL attestation. (SOF ¶¶ 184-89).

### D.   On June 12, 2018, Barclays Decides to Terminate Plaintiff's Employment.

In the five months that followed, Kravetz sought guidance from Barclays HRBPs Gonzalez and Amanda Cohen regarding ongoing performance issues with Plaintiff. (SOF ¶¶ 218-37).

---

[7] Years into this litigation, Plaintiff, for the first time, tried to recast his concerns regarding his MBL as a report related to the use of personal devices in violation of SEC regulations. But, at no point during his discussions while he was still employed at Barclays did Plaintiff advise anyone that he was complaining about Barclays' employees conducting trading on their personal devices in violation of securities laws or regulations. (SOF ¶¶ 162-66, 168-79). Instead, Plaintiff simply complained that he had not been given a firm-issued device and wanted one and that he had been contacted via calls or texts to complete work during his block leave. (SOF ¶¶ 165, 174). In his call with De Martin on January 4, Plaintiff confirmed that he was not "doing any hedging or security work" from his personal cell phone during his scheduled MBL. (SOF ¶ 172).

Eventually, on June 12, Kravetz met with Cohen and Anne Marie DeVoti (Director, HRBP, Banking Americas). (SOF ¶¶ 215, 238-40). During that meeting Kravetz stressed that Plaintiff disrupted the team to such an extent that it could not continue to operate properly, and it became clear that the right thing for the team was to terminate Plaintiff's employment. (SOF ¶ 240). After that meeting, Cohen had conversations with her colleagues in HR and Employment Legal and, following those discussions, reached the conclusion that Plaintiff should be terminated because he had lost the trust and confidence of the business and was no longer effectively performing his duties. (SOF ¶¶ 241-42). Following that June 12 decision, Cohen met with managers in Plaintiff's reporting line on June 15 and June 19, who agreed with the decision to terminate Plaintiff's employment because of his ongoing failures and deficiencies. (SOF ¶¶ 242-44, 248).[8]

Although the decision to terminate Plaintiff was made on June 12, Kravetz determined that he could not immediately terminate Plaintiff for two reasons. First, Kravetz's team had two important deals pending at this time, which required assistance from someone acting in Plaintiff's role. (SOF ¶¶ 245, 247). Second, the team was already down a member after Wu resigned on June 18. (SOF ¶ 246). Kravetz sought to delay Plaintiff's termination date until those two deals closed in mid-July. Plaintiff's termination was ultimately scheduled for the end of July but had to be moved because Plaintiff was out of the office. (SOF ¶ 251). On August 1, Wiele informed Plaintiff that Barclays had terminated his employment because of his performance, as the team had lost confidence in his ability to do his job. (SOF ¶ 252).

---

[8] Plaintiff first complained to the SEC on June 14—after Barclays decided to terminate his employment. (SOF ¶¶ 242, 390).  At no time prior to Plaintiff's termination, was any Barclays employee involved in the decision to terminate Plaintiff's employment aware that Plaintiff had complained to any regulator.  (SOF ¶¶ 249, 391).

### E. *The Client 1 Transaction*

While Plaintiff was still employed at Barclays in mid-2018, Barclays (along with another investment bank) was engaged by "Client 1" as lead manager and joint bookrunner for refinancing a portfolio of Courtyard by Marriott hotels that it owned. (SOF ¶¶ 253-56). The debt for the deal was structured to include a mortgage, a senior mezzanine loan, and a junior mezzanine loan, and the mortgage note was securitized into bonds. (SOF ¶ 257-58).

At the time Barclays was engaged to underwrite the loan, Client 1's management agreement with Marriott was due to expire in 2025, prior to the end of the loan term. (SOF ¶¶ 267-68). Client 1 proposed to negotiate an early extension of the agreement, and while the agreement was expected to include a high-level schedule of planned capital improvements, Barclays initially believed these capital expenditures would be discretionary. (SOF ¶¶ 268-69). On or around June 2, however, Barclays learned that the amended management agreement would require mandatory renovations, which Client 1 estimated would cost approximately $81 million. (SOF ¶¶ 270-71).

Taking an independent "trust-but-verify" approach towards this estimate, Barclays voluntarily decided to conduct additional due diligence to gain further comfort that Client 1 had reasonably budgeted for the amount it would need to invest in the properties. (SOF ¶¶ 273, 280). To do so, Barclays selected the Gettys Group ("Gettys"), a consulting company specializing in budgeting, development, branding, design, and procurement services for select service hotels, to perform a "desktop" assessment of the portfolio's anticipated capital expenditure needs for renovations. (SOF ¶¶ 275-77, 278). This report was not an "appraisal," nor is it a standard third party report required in a CMBS transaction. (SOF ¶¶ 272, 274). Plaintiff was not involved in either the selection of or any discussions with Gettys. (SOF ¶ 279).

At the time Gettys was retained, Client 1 was still negotiating the scope of the management agreement, and it was unclear what improvements would ultimately be required. (SOF ¶ 268-69).

Consequently, Gettys made a number of assumptions and did not perform any site visits as part of its analysis. (SOF ¶¶ 278, 281-82). Gettys' initial June 19 analysis estimated that the cost to comply with expenditures called for by the amended management agreement would be approximately $136 million and noted that Gettys would revise its analysis to reflect any additional information Barclays or Client 1 could provide. (SOF ¶¶ 283-84).

Client 1 realized that Gettys' initial analysis assumed it would have to make a number of enhancements not actually required in the management agreement. (SOF ¶¶ 289-91). Barclays then chaperoned calls between Client 1 and Gettys, and based on the additional information from Client 1, Gettys issued a revised report on June 20, and a final report on June 21, estimating that Client 1 would need to invest $88 million to meet the required expenditures per the amended management agreement. (SOF ¶¶ 285-87). Gettys made revisions based on refining the scope of work required for the renovations, consistent with the management agreement. (SOF ¶¶ 287-93).

On June 21, the Barclays' CMBS team had a call to discuss pre-marketing the Client 1 deal to potential mezzanine lenders and the Gettys report. (SOF ¶ 294). Plaintiff participated in that call and was neither critical of the Gettys report process, nor expressed any misgivings about its legitimacy. (SOF ¶¶ 295-97). The next day, CMBS team member Matt Higgins prepared a draft email to send to potential mezzanine lenders, which included an attached copy of the final Gettys report. (SOF ¶ 298). In relevant part, the draft email noted: "The report concluded that the required work would be a total of $88.8MM vs [Client 1's] estimate of $80.7MM, which we considered to be within the realm of reasonable given the scope of the report, [Client 1's] extensive relationship with Marriott (over 200 Marriott-branded hotels in their portfolio) and economies of scale that [Client 1] can bring to the table." (SOF ¶ 299). Members of the CMBS team, including Plaintiff, reviewed the draft email, and Plaintiff responded that the email "look[ed] good" and "should get

9

folks comfortable." (SOF ¶ 300).[9] On June 22, Plaintiff sent a version of that draft email to several potential mezzanine lenders, attaching the final Gettys report. (SOF ¶¶ 301, 306-07). In those transmittals, Plaintiff did not indicate he thought the Gettys report was fraudulent. (SOF ¶ 301).

The closing of the Client 1 deal was delayed from June 25 to July 9 to permit Barclays adequate time to complete due diligence. (SOF ¶ 308). The deal received Investment Banking Deal Committee ("IBDC") Stage 2 approval on July 6. (SOF ¶¶ 259-66, 309-10). On July 9, Plaintiff emailed the CMBS team about his concerns regarding the "risks" he perceived would result from the decision to close the loan before it finalized the intercreditor agreement ("ICA"), a document governing the relationship between the mortgage lender and mezzanine lender. (SOF ¶¶ 316-17). Plaintiff stated that any risks could be "completely mitigate[d]" if "[y]ou delay mezzanine closing until we have the final comments from [two Korean investors that were expected to purchase the mezzanine tranches of the loan]." (SOF ¶ 318). The CMBS team, including Kravetz, Wiele, and other senior bankers, considered Plaintiff's concerns, but disagreed with them and determined that several features of the deal mitigated those risks. (SOF ¶¶ 319-34). Kravetz commented: "We would all like to take no risk prior to closing loans. We would also be out of business. The risks are acknowledged and addressed in the flex. It may or may not be adequate, but we ran numbers and are ok with the risk." (SOF ¶ 326). Ultimately, both Barclays and its co-lender completed internal risk assessments and were comfortable with the deal. (SOF ¶ 319-34).

### F.    The Client 2 Transaction

On May 25, Barclays began pursuing an engagement for Client 2's attempt to acquire certain hotels for approximately $3.5 billion, an extremely important deal for one of the largest and most significant players in the real estate investment space. (SOF ¶¶ 335, 347). Once Barclays

---

[9] In response to a separate June 22, 2018 email from Mr. Higgins regarding the Gettys report, Plaintiff's sole response was "excellent." (SOF ¶ 302).

committed to the Client 2 transaction, Kravetz had the CMBS team run dozens of pricing scenario analyses in order to consider various potential profit/loss outcomes for the deal. (SOF ¶ 337). David Kung, who worked with Plaintiff as part of the CMBS deal team, ran various scenarios on the Client 2 deal, which was a typical practice for the CMBS team. (SOF ¶¶ 15, 338).

During a May 29 call with Wiele, and in a May 30 email to Wiele and Attea, Plaintiff raised concerns regarding what he considered significant potential downside risk of the deal along with his perceived "pros" of the transaction. (SOF ¶¶ 339-46, 353-54). On the May 29 call, Plaintiff recognized that the portfolio was "absolutely" on the "better end" of the hotel market and indicated he was "happy to do whatever the senior folks want to do." (SOF ¶¶ 341, 344).[10] On June 4, Plaintiff emailed De Martin and Ho Chan Lee of Employee Relations ("ER") in connection with an ER investigation they were conducting into claims Plaintiff had raised about how Mr. Kravetz was treating him, and Plaintiff mentioned concerns about the Client 2 transaction. (SOF ¶¶ 207-17, 360). Plaintiff wrote that while there were "many merits" to the potential "high profile transaction for Barclays," in his view, "the client's suggested pricing does not reflect current market conditions" such that taking on the proposed transaction "would be taking material risk," and that it was "foreseeable the transaction could result in a material P&L loss to the firm in the 4th Quarter . . . ." (SOF ¶ 361). Plaintiff also claimed that he had "heard" from Kung and Peter Taylor (another member of the CMBS team) that Kravetz had directed them to "massage" the data related to the Client 2 transaction to understate risk to Barclays. (SOF ¶¶ 16, 363).[11] Plaintiff raised these concerns because, despite having the opportunity to discuss these exact concerns with Wiele and Attea, he felt he was nevertheless being "excluded" from the process, which he thought would

---

[10] Wiele considered Plaintiff's concerns and discussed the same with Attea during another call on May 30. (SOF ¶¶ 348-50).

[11] To be clear, Barclays disputes this claim, but for present purposes—i.e., resolving whether Plaintiff engaged in protected activity as defined by SOX–what matters is the concerns stated by Plaintiff in his email.

negatively impact *him*. (SOF ¶ 362). At no point during his communications with Wiele and Attea, or Compliance and ER, did Plaintiff raise concern that Barclays was engaging in fraudulent conduct or otherwise violating any law, SEC rule or regulation. (SOF ¶¶ 345, 353-54, 360-64).

On June 5, the deal proceeded to IBDC Stage 1 approval, which included a presentation of upside and downside risk scenarios. (SOF ¶¶ 369, 371). In preparing the materials for the IBDC, the team discussed various pricing scenarios. (SOF ¶¶ 351, 368). Plaintiff shared his recommended loss scenarios, but others disagreed with the relevance of the comparable transactions he had selected as well as his perspective of downside risk, and ultimately the team chose to include the scenarios that they believed captured the most reasonable range of outcomes. (SOF ¶¶ 352-59, 372-75). Plaintiff attended the IBDC meeting and had an opportunity to present his perspective on the deal; he did not state that he felt that the downside scenarios that had been presented to the IBDC were somehow fraudulent or intentionally misleading. (SOF ¶¶ 369-71, 389).

Plaintiff again raised his perspective on the deal in emails with Wiele and Attea on June 12 and June 13. (SOF ¶ 378). In addition, Plaintiff's view of the transaction was presented by Kravetz to Tim Hartzell (Global Head of Portfolio Management and the Chair of the IBDC). (SOF ¶ 382). Kravetz also discussed the potential downside risks of the Client 2 transaction with senior managers at Barclays. (SOF ¶ 383). Members of the IBDC and senior management at Barclays were aware of Plaintiff's opinion of the potential downside risks—they simply disagreed with Plaintiff's assessment. (SOF ¶¶ 376-79, 380-87). In September 2018, Barclays' participation in the transaction ended when Client 2 was outbid by another real estate investment trust. (SOF ¶ 388).

### G.    *Plaintiff Contacts Compliance Regarding His Direct Report on July 11, 2018*

Plaintiff was responsible for direct supervision of Shazim Hasan. (SOF ¶19-20). In response to an email Hasan sent on July 11, 2018, Plaintiff told Hasan that he was "not authorized to send out [capital] stacks with bonds mentioned, only mortgage + mezz." (SOF ¶¶ 393-94).

12

Plaintiff then forwarded that email to Compliance to raise his concern that it contained a discussion of securities and determine to next steps. (SOF ¶ 395). In response, on July 25, 2018, Compliance opened an investigation and reviewed Hasan's emails for a 45-day period and concluded that he had not solicited securities or violated any Barclays' policies. (SOF ¶ 401, 403-06).

**ARGUMENT**

To sustain a retaliation claim under SOX, a plaintiff "must prove by a preponderance of the evidence that (1) [he] engaged in a protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Admin. Rev. Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013). The first element of Plaintiff's *prima facie* burden requires him to show that he reported conduct he "reasonably believes constitutes a violation of [18 U.S.C.] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). The standard "contains both subjective and objective components . . . a plaintiff must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation." *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (internal quotation marks omitted). Summary judgment is appropriate here because Plaintiff cannot establish that he engaged in protected activity under SOX and because most of Plaintiff's alleged protected activity occurred *after* the decision to terminate his employment.

## I.   MBL CONCERNS ARE NOT SOX PROTECTED ACTIVITY.

### A.   *MBL Falls Outside of SOX's Scope.*

Plaintiff cannot establish a *prima facie* case under Section 806 because an alleged violation of Barclays' MBL policy does not fit into any of the six specific categories covered by SOX,

13

including, most importantly here, "any rule or regulation" of the SEC. *See Leshinsky v. Televent GIT, S.A.*, 942 F. Supp. 2d 432, 441-43 (S.D.N.Y. 2013) (holding that "[a] complainant fulfills his duty under [SOX] when he identif[ies] conduct that falls within the ample bounds of the anti-fraud laws....") (alteration in original). As such, Plaintiff cannot have had a "reasonable belief" that a SOX violation occurred as a matter of law because "[t]o be reasonable, the purported whistleblower's belief cannot exist wholly untethered from [1514A's] specific provisions." *Nielsen*, 762 F.3d at 222 n.6; *see Northrop Grumman Sys. Corp. v. U.S. Dept. of Labor, Admin. Review Bd.*, 927 F.3d 226, 229-30 (4th Cir. 2019) ("The whistleblower provision does not extend protection to every employee complaint about possible improper or even illegal conduct. The provision prohibits retaliation only if the employee provides information regarding conduct that he or she reasonably believes violates one of six categories listed by Congress in § 1514A(a)(1)."). In other words, Plaintiff must prove that he had a reasonable belief that one of the six categories covered by SOX was being violated, not that he had a reasonable belief that conduct he complained about was covered by one of the six categories.

i.   <u>MBL is a Voluntarily Adopted Internal Policy - Not an SEC Rule or Regulation.</u>

Although Plaintiff need not cite to a law rule or regulation at the time he engaged in the alleged protected activity, at the summary judgment stage, Plaintiff must connect his alleged protected activity to an enumerated provision of § 1514A. *See Erhart v. Bofl Holding, Inc.*, Nos. 15-2287, 15-2353, 2020 WL 1550207, at *11 (S.D. Cal. Mar. 31, 2020). Plaintiff cannot do so because MBL is not an SEC "rule or regulation." There is no SEC requirement that a company adopt any MBL policy; instead, publications from the SEC and FINRA suggest that organizations *consider* MBL as part of their overall control environment and not as a stand-alone control measure. *See* Green Decl. ¶ 30 & Ex. 29, at 2 ("*Though not mandated by law,* federal and state bank and securities regulatory agencies *recommend* implementing mandatory vacation *policies* as

part of an effective internal control protocol") (emphasis added); Green Decl. ¶ 31 & Ex. 30 (providing a non-exhaustive list of "insights" of various control measures that companies are "encouraged" to consider, including "mandatory vacations"); Green Decl. ¶ 29 & Ex. 28, at 4-6). Similarly, FINRA's regulatory notice regarding "mandatory vacation" explicitly acknowledges that such a "policy may not be feasible or reasonable for all firms." Green Decl. ¶ 32 & Ex. 31.

In *Erhart,* the Court's analysis emphasized the critical need for the plaintiff to identify an underlying law or SEC rule or regulation:

> The Court has previously warned Erhart that for his Sarbanes–Oxley claim to be viable, his beliefs must be tethered to the segments of laws listed in § 1514A. (ECF No. 22.) Hence, although Erhart did not have to cite a code section or rule when engaging in protected activity, *he now—with the aid of counsel—must demonstrate to the Court that the jury could conclude he reasonably believed the conduct he reported violated a law that is covered by § 1514A.* If he cannot meet this burden, summary judgment in Bofl's favor is appropriate.

2020 WL 1550207, at *11 (emphasis added). In rejecting most of the plaintiff's alleged protected activity as insufficiently tied to the provisions of SOX, the court "underscore[d] that § 1514A is not a general compliance statute. It does not police all employee grievances and suspicions of wrongdoing." *Id*. at *21.

Here, permitting Plaintiff's MBL claim to proceed past summary judgment would expand SOX to a general compliance statute and require this Court to "fish" for a relevant SEC rule or regulation to instruct a jury at trial. *See id.,* at *11 (citing *Wadler v. Bio-Rad Labs., Inc*., 916 F.3d 1176 (9th Cir. 2019)) ("Exploring how [the plaintiff's] Sarbanes-Oxley claim would function at trial further informs the Court's summary judgment inquiry."). If Plaintiff's claim based on MBL concerns were to proceed to a jury, the Court would need to instruct a jury as to precisely what

federal law or rule or regulation of the SEC Plaintiff's alleged protected activity relates to. *See id.* No such law, or SEC rule or regulation exists.

Because Plaintiff reported only an alleged violation of a voluntarily adopted, internal policy, he did not engage in protected activity under SOX. *See Day v. Staples, Inc.,* 555 F.3d, 42, 58 (1st Cir. 2009) ("[C]omplaints about purely internal practices that are not financial in nature and are not reported to shareholders do not meet the materiality requirement for an objectively reasonable belief in shareholder fraud."); *Andaya v. Atlas Air, Inc*., No. 10-7878, 2012 WL 1871511, at *5 (S.D.N.Y. Apr. 30, 2012) ("Andaya's complaints largely related to internal corporate policies concerning corporate waste, personnel matters, and relationships with vendors. These are not the subjects courts have found covered by SOX."); Transcript of Jury Instructions, *Murray v. UBS*, No. 14-927 (S.D.N.Y. Jan. 5, 2018), ECF No. 274, at 2350:14-21 (instructing jury that to constitute protected activity under SOX, the conduct a plaintiff reports "must relate in some understandable way to one of the provisions of federal law listed in the Sarbanes-Oxley Act. Reports alleging violations of purely internal UBS policies do not constitute protected activity.").

 ii. <u>It Was Not Reasonable for Plaintiff to Believe that the Conduct He Complained of Constituted a SOX-Related Fraud or Violation.</u>

Barclays has adopted an MBL policy for the purpose of detecting potential fraud being committed by the employee ***who is on MBL***. (SOF ¶¶ 35-36, 39). Indeed, Plaintiff's own explanation of his understanding of the purpose of MBL undermines his assertion that he reasonably believed that his reported MBL concerns were akin to a report that any SOX-actionable "fraud" was taking place because Plaintiff admits that MBL was designed to ferret out "fake" or "illegal" trades. (SOF ¶ 181). At no time did Plaintiff report that either he—or anyone else at Barclays—had engaged in unlawful trades, or that instances of unlawful trades were going undetected. (SOF ¶ 182).

With respect to Plaintiff's assertion that he felt "pressured" to attest to having completed MBL in December 2017, there is no evidence to support this claim. When pressed at his deposition to provide a reasonable basis for his alleged belief, Plaintiff responded only with vague statements, referencing Kravetz's "anger" in response to Plaintiff's January 4 email and the "unsavory things and unspoken rules" Wu allegedly referred to on January 4—which, as the transcript of that call shows, is not what Wu said and had nothing to do with MBL. *See Marcavage v. City of New York*, 689 F. 3d 98, 110 (S.D.N.Y. 2012) ("Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiffs as the non-moving parties, when there is reliable objective evidence—such as a recording—the evidence may speak for itself.") (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)). Plaintiff admitted during his deposition that neither Kravetz nor Wu ever told him to falsely attest to having completed his MBL. (SOF ¶ 171). Indeed, the record shows that on the same day Plaintiff informed Kravetz that he had worked during his scheduled MBL, Kravetz specifically instructed: "do not attest to it." (SOF ¶ 144).[12]

None of these undisputed facts support any objectively reasonable belief that Plaintiff was reporting a SOX-cognizable "fraud" or violation in the form of pressure to attest to the successful completion of his MBL. Indeed, Plaintiff's purported concerns are readily distinguishable from SOX cases wherein the plaintiff's assertions survived summary judgment because those plaintiffs: 1) reported conduct that actually was tethered to a law, SEC rule or regulation; ***and*** 2) reported conduct as potentially "illegal" in real time, which Plaintiff never did. *See Murray v. UBS Securities, LLC*, No. 14-927, 2017 WL 149051 at * 4 (S.D.N.Y. Mar. 31, 2017) (denying summary judgment where the plaintiff had reported that he thought an employer's conduct "was not only

---

[12] While Plaintiff claims that Kravetz told him, during an unrecorded call, that everyone works on their block leave, Kravetz expressly denied ever making that statement; during the call Plaintiff *actually* recorded, Kravetz made clear that he said "everybody works on their vacations," which makes logical sense as neither Kravetz nor Wu were required to take MBL in 2017 or 2018. (SOF ¶¶ 38, 197-99).

unethical but illegal"); *Leshinsky v. Televent GIT*, 942 F. Supp. 2d 432, 437 (S.D.N.Y. May 1, 2013) (denying summary judgment where Plaintiff reported to his employer that its conduct was "unethical, certainly immoral, and may even be illegal"). In contrast, here, Plaintiff stated—without prompting—during his January 16 conversation with Kravetz, that "[n]othing nefarious happened" during his MBL. (SOF ¶ 195). Plaintiff's attempt to recant his real-time admission to Kravetz or to contort Wu's statements out of context is insufficient to create a genuinely disputed issue of material fact.

Finally, in 2021, Plaintiff amended his MBL allegations to separately include an assertion that he engaged in a protected activity by reporting that communications from his personal device "were not being captured by Barclays as was required by the securities law." Am. Compl., ECF No. 147 at ¶ 23). Plaintiff cannot rely on information received only years *after* his termination to support a reasonable belief that he engaged in protected activity back in 2018. *See Hill v. Komatsu America Corp.,* No. 14-2098, 2015 WL 5162129, at *5 (N.D. Ill. Aug. 26, 2015) ("All evidence to support the argument that his concern was objectively reasonable occurs after employment and thus, his actions are not protected."). The record is clear that not even Plaintiff believed that he was engaged in such protected conduct: indeed, both Plaintiff's initial complaint to the Department of Labor in October 2018 (SOF ¶ 392) and his Complaint filed with this Court in April 2019 are entirely devoid of ***any mention whatsoever*** of the use of personal devices.

Beyond his assertions added in 2021, there is no basis to conclude that in 2018 Plaintiff "actually believed" he was reporting use of personal devices in violation of any law, SEC rule or regulation. This theory must be rejected. *See Leshinsky*, 942 F. Supp. 2d at 444. Indeed, Plaintiff has conceded that this belated claim about personal devices arose solely as a result of information obtained long after this litigation commenced via the discovery process and SEC/FINRA fines

issued in 2020 against other investment banks—some two years after his alleged protected activity took place. (*See* ECF No. 145 at 4).

> **B.**     ***Plaintiff Did Not Engage in Protected Activity with Respect to the Client 1 Transaction, Nor Can He Show a Causal Connection to His Termination.***

Plaintiff claims that he engaged in protected whistleblowing with respect to the Client 1 transaction regarding changes between the draft and final version of the Gettys report, premarketing of the transaction, and the risks of its closing timeline. Plaintiff cannot establish a *prima facie* case of SOX retaliation with respect to this aspect of his Complaint for three reasons. First, the decision to terminate Plaintiff's employment took place *before* the final Gettys report was even issued, and *before* Plaintiff raised any concerns related to premarketing the deal or "risks" of the closing timeline. Second, even if Plaintiff had raised such concerns prior to the decision to terminate his employment, his claim would still fail because he never actually engaged in protected activity at Barclays concerning the Gettys report. Third, there is no objectively reasonable basis for Plaintiff's assertions regarding that report, the premarketing of the deal, or the closing timeline.

> i.     <u>Gettys Report</u>

The indisputable evidence establishes that the decision to terminate Plaintiff's employment was made on June 12. Because the final Gettys report was not issued until June 21, any concerns Plaintiff may have had about the final report could not have served as a contributing factor to the termination decision and a resulting predicate for any SOX liability for Barclays. *See Jones v. Rochester City Sch. Dist.*, 676 F. App'x 95, 97 (2d Cir. Jan. 25, 2017) (affirming the district court's ruling that all of Appellant's retaliation claims failed on the merits "because the defendant disciplined [the plaintiff] before it was aware that he had filed a complaint"); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no inference of retaliation where gradual adverse job actions began before plaintiff engaged in protected activity).

Further, Plaintiff's SOX claim fails for the separate and independent reason that he never actually reported to anyone at Barclays a belief that the Gettys report constituted fraudulent conduct or potential violation of a law, SEC rule or regulation covered by SOX. To the contrary, Plaintiff reviewed Higgins' draft email to send to potential mezzanine lenders, which attached a copy of the Gettys report, responded that the email "look[ed] good" and sent a version of that draft email and the Gettys report to potential mezzanine lenders. (SOF ¶¶ 300-01). Even assuming that Plaintiff raised a concern regarding the Gettys report, and did so *before* Barclays decided to terminate his employment (both inconsistent with the undisputed record), Plaintiff did not have an objectively reasonable belief that changes to the final version of the Gettys report were the product of "misrepresentation and deceit," which are the "hallmarks of fraud." *Day*, 555 F.3d at 58.

  ii. <u>Pre-Marketing and Closing "Risks"</u>

Plaintiff never complained to anyone at Barclays that the pre-marketing of bonds for the Client 1 deal or the deal closing timeline constituted a violation of any law, rule or regulation covered by SOX. Instead, in emails sent in July, Plaintiff advised the team not to "rush" the deal, and that in moving forward with the scheduled closing on July 9, Barclays ran the risk that Korean investors would be "potentially not OK" with the ICA. (SOF ¶ 316). Neither of these statements reflect a concern regarding, or came anywhere near putting his managers on notice of, any potential illegality, and such "proceed with caution" statements and broad-brush concerns of potential "risks" in a business deal do not rise to the level of SOX protected whistleblowing activity. *See Day*, 555 F.3d at 56 ("A claim of 'needless loss of revenue' is not a claim of fraud."); *Ngai v. Urban Outfitters, Inc.*, No. 19-1480, 2021 WL 1175155, at *17 (E.D. Pa. Mar. 29, 2021) ("Generic references to mismanagement, unlawful business practices, lost profits, and losses to shareholders fall short of connecting [defendant's] own conduct (or inaction) in any understandable way to mail fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or federal law relating

to shareholder fraud."). In any event, these alleged concerns were raised well *after* Barclays decided to terminate Plaintiff's employment and fail as a SOX predicate for that independent reason. *See Jones*, 676 F. App'x at 97; *Slattery,* 248 F.3d at 95.

Further, Plaintiff lacked an objectively reasonable basis to think that anything illegal was occurring because a person with the same training and experience would understand that the risks of the Client 1 transaction were typical and appropriately mitigated by the terms of the deal, and therefore not akin to any conduct prohibited by § 1514A. Plaintiff has acknowledged that taking risk is a critical part of the business. (SOF ¶¶ 21, 22) ("[W]e're taking a s**tload of risk, especially at this point in the market. You have to."). And, Plaintiff has admitted, as he must, that there are times when members of the deal team have disagreed about deals or the amount of risk to take, stating: "there's always going to be natural debate when you're involved in deal[-]making and risk-taking and how to win and how to protect the firm." (SOF ¶¶ 23-24).

Because Plaintiff and the CMBS team were in the business of assessing deal risk, disagreements with his colleagues about those risks were part of Plaintiff's job, undermining the notion that a reasonable employee tasked with assessing such risk would believe that raising concerns related to risk "implicated his employer in criminal fraud." *See Andaya,* 2012 WL 1871511, at *3 ("To determine whether the employee's belief is reasonable, the Court considers 'the knowledge available to a reasonable person in the circumstances with the employee's training and experience.'") (internal citation omitted); *Ngai*, 2021 WL 1175155, at *17 ("A reasonable employee tasked with curtailing waste and maximizing profits would not reasonably believe that raising concerns related to those goals implicated his employer in criminal fraud."). That Plaintiff disagreed with the legitimate assessment of risk by Kravetz, others on the deal team, or even Barclays' co-lender, does not constitute protected activity under SOX; such disagreement simply

does not raise any concerns that Barclays was or could be committing fraud or violating an SEC rule or regulation.

### C.   *Plaintiff Did Not Engage in Protected Activity in the Client 2 Transaction.*

Plaintiff's concerns regarding the Client 2 transaction were presented at Barclays as differences of opinion on potential deal profitability and as a disagreement with the scenarios chosen to demonstrate potential downside risks of the deal—never as concern about illegal or fraudulent conduct that would fit into any category covered by SOX. The mere fact that Plaintiff raised concerns regarding his different view of the transaction risk is insufficient to survive summary judgment. *See Fraser v. Fiduciary Trust Co. Int'l,* No. 04-6958, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) (holding that summary judgment was appropriate where the plaintiff made "a general inquiry regarding a business decision rather than a specific complaint of fraud"), *aff'd* 396 F. App'x 734 (2d Cir. 2010); *Day*, 555 F.3d 42 ("Several of Day's complaints amount to allegations that the company's practices did not maximize shareholder profits. Day's belief is not itself an objectively reasonable belief that shareholders have been or are likely to be defrauded."). For example, in discussing the potential downside risks of the deal with Wiele on May 29, 2018, a member of the IBDC responsible for assessing risk, Plaintiff couched his statements about the Client 2 deal as his "personal feeling" and encouraged Wiele to speak to others on the team to get their view. (SOF ¶¶ 339, 342-43). Plaintiff's own emails show that he did not himself believe he was reporting some sort of ongoing shareholder or securities fraud. (SOF ¶¶ 353-54, 362-64).

On May 30, Plaintiff emailed Wiele and Attea, listing both the perceived "pros" and "cons" of the deal. In his list of "cons," Plaintiff did not raise any concerns about fraud, illegality, or any potential violation of law or SEC rule or regulation, but rather noted his views about the downside risks of the deal. (SOF ¶ 354). Such "cons" were presented in conjunction with Plaintiff's list of "pros" in favor of the deal, again undermining the notion that Plaintiff was sounding the alarm

about potential SOX violations. (*Id.*). Similarly, in Plaintiff's June 4 email to De Martin and Lee, as part of an overall discussion regarding Plaintiff's ongoing HR-related concerns, Plaintiff raised his concern about the downside risks of the Client 2 transaction alongside the statement that there were "many merits" to the potential "high profile transaction for Barclays." (SOF ¶ 361). Plaintiff further stated that he had heard from Kung and Taylor that Kravetz had directed them to "massage" the data related to the deal "showing the lowest potential loss to the firm." (SOF ¶ 363).

As an initial matter, there is no evidence to support Plaintiff's assertion that Kravetz ever said this to either Kung or Taylor. Moreover, "massaging the data" has no inherent pejorative meaning, as CMBS professionals run many risk scenarios in any transaction, from highest to lowest risk. (SOF ¶ 338). Plaintiff did not voice a claim that the data was being falsified to commit some sort of fraud or in furtherance of any potentially illegal conduct. Indeed, Plaintiff's own stated intentions in raising such concerns were that he was being "excluded," because of his "cautious view" which was hurting his reputation (SOF ¶¶ 362, 364)—not because he thought any potentially fraudulent or illegal conduct was afoot. Thus, Plaintiff's "own explanation of his reason for sending the email . . . negates his argument that he was attempting to report fraud or misconduct." *Fraser*, 2009 WL 2601389, at *5; *see also Day*, 555 F.3d at 56 (finding that the plaintiff's assertions of alleged "data manipulation" that was "unrelated to the financial condition of the company" and "never reported to shareholders" was a "claim of 'needless loss of revenue'" and not a claim of fraud"). Indeed, the day *after* Plaintiff emailed De Martin and Lee, he participated in the IBDC meeting for the Client 2 deal, and he did not raise any concern that he thought the downside scenarios were somehow fraudulent. (SOF ¶ 371).

Even if Plaintiff's communications within Barclays prior to the decision to terminate his employment had raised a SOX concern—which they do not—an individual with Plaintiff's

training and experience could not have an objectively reasonable belief that any fraudulent or illegal conduct was occurring. A disagreement about the appropriate pricing scenarios and potential risks of a transaction among people whose very job it is to assess and take financial risk does not constitute protected activity under SOX. *See Ngai*, 2021 WL 1175155, at *17. As a matter of necessity and routine, certain pricing runs for potential transactions are necessarily excluded, and the IBDC is presented only with a subset of most relevant pricing runs. (SOF ¶¶ 357, 359). This process played out in typical fashion for the Client 2 transaction. (*Id.*) The fact that Plaintiff may have believed that his downside scenarios were more accurate than scenarios run by others does not undermine the well-founded reasons why Plaintiff's favored scenarios were deemed irrelevant by other members of the deal team. (SOF ¶¶ 359, 372-74).

Ultimately, the Client 2 transaction—like any deal—had downside risk potential. The deal team considered those risks, including those presented by Plaintiff, and deemed them worth taking because: (1) those potential risks were mitigated by the additional "flex" that Barclays negotiated in the deal, and (2) Barclays had larger, long-term strategic business objectives in completing a deal with Client 2, the largest borrower in the CMBS space known for rewarding banks with additional business. Barclays' decision to pursue this strategic business objective is entirely legitimate. To be sure, "[a] company may legitimately decide for a number of reasons that maximizing short-term profits through certain practices is not its goal, particularly if the practices lead to consumer unhappiness." *Day*, 555 F.3d at 56.

### D.    Licensing Concerns

Plaintiff also seeks to rest his SOX claim on his concerns raised to Compliance on July 11, 2018, that Hasan, Plaintiff's direct report, was selling securities without a license. (SOF ¶ 395). Even assuming for the sake of argument that this report constituted "protected activity" under SOX, this claim cannot establish a *prima facie* case because there is no causal connection between

this issue and Plaintiff's termination, because Plaintiff raised it long after the June 12, 2018 decision to terminate. Thus, the alleged protected activity cannot serve as "a contributing factor in the unfavorable action." *Nielsen*, 762 F.3d at 219.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court issue an order granting Defendant's motion for summary judgment, dismissing the case in its entirety and granting Defendant such other and further relief as the Court deems just and proper.

New York, New York
Dated: April 8, 2022

EPSTEIN BECKER & GREEN, P.C.

By:   */s/ Ronald M. Green*

Ronald M. Green
875 Third Avenue
New York, NY 10022
Tel: 212.351.4500
Fax: 212.878.8600
RGreen@ebglaw.com

BALLARD SPAHR LLP

Elizabeth K. McManus
1675 Broadway, 19th Floor
New York, NY 10019
Tel: 212.223.0200
McManusE@ballardspahr.com

*Attorneys for Defendant*
*Barclays Capital Inc.*

25