UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN LA BELLE,

                Plaintiff,

       -v-

BARCLAYS CAPITAL INC.,

                Defendant.

19-CV-3800 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Brian La Belle brings this action against Barclays Capital Inc., his former employer, asserting claims under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), codified at 18 U.S.C. § 1514A.  Before the Court are Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment.  For the reasons that follow, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied.

I.     **Background**

The following facts are from Defendant's Local Rule 56.1 Statement (ECF No. 224 ("Def.'s SOF")), Plaintiff's Opposition to Defendants' Local Rule 56.1 Statement (ECF No. 243) ("Pl.'s SOF Opp."))[1], Plaintiff's Local Rule 56.1 Statement (ECF No. 244 ("Pl.'s SOF")), Defendant's Opposition to Plaintiff's Local Rule 56.1 Statement (ECF No. 263 ("Def.'s SOF Opp."), and Defendant's Reply to Plaintiff's Opposition to Defendant's Local Rule 56.1 Statement (ECF No. 264 ("Def.'s SOF Reply")), and the underlying evidence cited therein.[2]  The

---

[1] For brevity and clarity's sake, references to opposition and reply papers also incorporate by reference the underlying 56.1 paragraph to which they respond.

[2] Local Rules 56.1(a) and (d) require that a moving party file "a separate, short[,] and concise statement . . . of the material facts as to which the moving party contends there is no

facts recited here are undisputed unless otherwise noted, and construed in the light most favorable to the non-movant.

### A.    Parties and Key Personnel

La Belle joined Barclays, a multinational bank, in July of 2015.  (Def's SOF at ¶ 7; Pl.'s SOF at ¶ 408.)  La Belle began his employment with Barclays as a Vice President in Securitized Products.  In March 2016, Barclays promoted him to Director and Head of CMBS Primary Trading and Distribution.  (Def.'s SOF at ¶ 17.)  At all relevant times La Belle's role involved risk management, that is, "dealmaking and risk-taking."  (Def.'s SOF at ¶¶ 21 – 24.)

Initially, La Belle reported primarily to Larry Kravetz, the Managing Director and Barclays' Head of Primary Commercial Mortgage-Backed Securities ("CMBS") Origination.  (Def's SOF at ¶ 7.)  As a result of a reorganization in 2016, La Belle's position changed such that he also officially reported to Brian Wiele, Managing Director and Barclays' Global Head of Securitized Products-Syndicate.  (Def's SOF at ¶ 8.)  Even after this change, most of La Belle's work continued to be for the CMBS desk, and he continued to report to Kravetz as well.  At the CMBS desk La Belle also worked with Eric Wu, who was then the Managing Director and Barclay's Head of Originations for Large Loan Commercial Real Estate.  (Def.'s SOF at ¶ 12.)

### B.    Mandatory Block Leave

This action and Barclays' motion to for summary judgment revolve around mandatory block leave ("MBL"), an element of Barclays' "enterprise risk management framework."  (Pl.'s

---

genuine issue to be tried," "followed by citation to evidence."  Consistent with the text and spirit of the Rule, the Court disregards the statements in the parties' Rule 56.1 statements that are legal conclusions, or which fail to cite supporting admissible evidence.  *See Congregation Rabbinical Coll. of Tartikov, Inc, v. Vill. of Pomona, NY*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

SOF at ¶ 443.)  Functionally, Barclays' MBL policy requires certain "covered individuals" to take ten consecutive business days per year out of the office and without access to Barclays' systems; the policy thus by necessity prohibits them from performing certain business activities during this time.  (Def.'s SOF at ¶ 23.)  Upon completing their MBL, covered employees must submit a signed attestation that they did not engage in prohibited activities during their MBL.  (Def.'s SOF at ¶ 40.)  The employee's manager then approves this attestation.  (Def.'s SOF at ¶ 40.)  Though employees are required to complete MBL each calendar year, they can obtain an extension until March 31 of the following year if necessary.  (Def.'s SOF at ¶ 44.)  La Belle's work at Barclays meant that he was one such "covered individual" and correspondingly required to take MBL.  (Pl.'s SOF at ¶ 444.)

MBL is "an important internal safeguard against internal fraud."  (Def.'s SOF at ¶ 33; Pl.'s SOF at ¶ 442 – 43.)  The theory of MBL is that it protects the firm from undetected fraud and embezzlement by individual employees "because most frauds or embezzlements require the continued presence of the wrongdoer."  (Pl.'s SOF at ¶ 442.)  In other words, Barclays' MBL policy is meant to help the firm detect traders who are secretly conducting unauthorized activity while under Barclays' umbrella, and potentially at its expense, by restricting their access to firm resources for a continuous period of ten days.  This prevents wrongdoers from covering their tracks during that time, increasing the likelihood that their illicit activity will be discovered.  Of necessity, employees are intended not to perform any of their actual work during this period and to delegate their work to others at the firm.  (Def.'s SOF at ¶ 23; Pl.'s SOF at ¶ 542.)

Mandatory block leave is not legally required.  La Belle contends that this fact is in dispute, despite his failure to identify a specific rule or regulation requiring MBL.  All the evidence provided by the parties, however, shows that MBL is recommended, but not required.

This includes the evidence on which La Belle relies to argue that MBL is generally required by regulators as an "internal control."  For example, La Belle cites Defendant's 56.1 Exhibit No. 29, a report on "Mandatory (Two-Week) Vacation Policy" by Practical Law Labor & Employment.  (*See* ECF. No. 242 at 15.)  This publication, however, describes the guidance on MBL thus: "*Though not mandated by law*, federal and state bank and securities regulatory agencies recommend implementing mandatory vacation policies as part of an effective internal control protocol."  (ECF No. 225-30 at 2.) (emphasis added).  Likewise, La Belle cites FINRA Regulatory Notice 08-18.  (*See* ECF. No. 242 at 15; ECF No. 225-32.)  That Notice, however, is explicitly classed under "Guidance" and describes MBL as one of several "sound practices for preventing and detecting unauthorized proprietary trading," which FINRA "urge[s] firms to consider adopting" but acknowledges "may not be feasible or reasonable for all firms."  (ECF No. 224-32 at 3.)  La Belle also refers to statements of Barclays employees in support of his belief that MBL was legally required.[3]  While these statements show that some employees at Barclays held mistaken beliefs about the law, they do not demonstrate that it was legally required. In short, it cannot be plausibly disputed that Barclays was not, in fact, required to specifically adopt MBL by SEC rule or regulation — which La Belle ultimately concedes.  (*See* ECF No. 242 at 19 ("[T]here may be no specific SEC rule or regulation requiring Barclays to have MBL").)

---

[3] For example, in a recorded phone call with La Belle, Monica De Martin, then a Director and Barclays' Head of Americas Compliance Investigations and Whistleblowing Conduct Oversight, described MBL as "a regulatory requirement that the firm has to complete" and said MBL is a "regulatory control that the bank has to have in place.  It's mandatory.  We have to do it . . . you have to be on block leave because it's a control so that we can see whether you're doing any improper trading or improper things."  (Pl.'s SOF at ¶¶ 486, 489.)

### C.      Alleged Protected Reports ('Whistleblows')

#### 1.      Mandatory Block Leave Dispute and Events of January 4, 2018

La Belle first scheduled his 2017 MBL from August 28 through September 8, 2017.

(Def.'s SOF at ¶ 79.)  Work intervened, however, and La Belle cancelled this scheduled MBL

after consultation with Kravitz and Wu.[4]  (Def.'s SOF at ¶ 81 – 82.)  He then rescheduled his

2017 MBL for December 18 through December 29, 2017.  (Def.'s SOF at ¶¶ 85 – 86.)  La Belle

spent his two weeks out of the office in the Bahamas and planned to be back in the office on

February 3, 2018.  (Def.'s SOF at ¶ 87.)

La Belle and Kravetz had a scheduled lunch with several clients of Barclays on January

4, 2018.  (Def.'s SOF at ¶ 104; Pl.'s SOF at ¶ 462.)  At 8:49 that morning, La Belle emailed

Kravetz and the investors and told them that he would reschedule the lunch due to the inclement

weather in New York.  (Def.'s SOF at ¶ 106; Pl.'s SOF at ¶ 463.)  Kravetz responded by asking

whether La Belle intended to come into the office that day.  (Def.'s SOF at ¶ 108; Pl.'s SOF at

¶ 463.)  In response, La Belle sent the following email to Kravetz:

> "[The investor] just called me to cancel lunch today because of the weather. Given the
> blizzard conditions I will be working from home today along with a few members of my
> team.
>
> As you are aware I was able to field questions and calls from team Barclays and our
> clients while on my two week mandatory block leave resulting in a smooth closing on
> 225 PAS, Grand Lakes 57 Mezz A and keeping Red Roof alive, (all massively critical
> deals for Barclays per senior banking and risk management)
>
> I'm fully capable of performing my role while working remotely. If this is an issue I'd be
> happy to discuss further." (Def.'s SOF at ¶ 109; Pl.'s SOF at ¶ 463.)[5]

---

[4] The parties disagree about the details of how the postponement of La Belle's August
MBL occurred.  This dispute is immaterial to the resolution of the pending motions for summary
judgment.

[5] Whether or not the investor in fact called La Belle is in dispute.  Though La Belle stated
later that day that the investor called his cell phone to cancel, there are no phone calls to or from
the investor on La Belle's phone bill on January 4, 2018, and the investor responded to La

Kravetz called La Belle at 9:02 AM in response to this email, demonstrably angry. Kravetz yelled and cursed, chastising La Belle for writing in an email that La Belle had worked during his MBL.  He also expressed anger that La Belle alleged in the email that Kravetz knew he had worked during his block leave, which Kravetz denied knowing.  La Belle's wife, who overheard the call, testified that Kravetz told La Belle he was "stupid for having put in writing that he worked on his block leave."  (Def.'s SOF at ¶ 120.)  Kravetz told La Belle not to contact Barclays' compliance department ("Compliance") regarding his MBL issue, saying that he (Kravetz) would do it himself.  (Def.'s SOF at ¶ 117; Pl.'s SOF at ¶ 464.)

After Kravetz and La Belle got off the phone, La Belle called Anna Zhuravitsky, in Barclays Banking & Capital Markets Compliance.  This time, La Belle surreptitiously recorded his portion of the call.  (Def.'s SOF at ¶ 122.)  La Belle conveyed to Zhuravitsky that he was shaken after his conversation with Kravetz and he was worried about "A, getting fired, or B, having [his] bonus."  (Def.'s SOF at ¶¶ 123 – 25.)

Kravetz called La Belle back that afternoon after speaking with Compliance himself. (Def.'s SOF at ¶ 126.)  This time, La Belle surreptitiously recorded both sides of the phone call. (Def.'s SOF at ¶ 127.)  Kravetz told La Belle he had exhibited "horrible judgment."  Kravetz also told La Belle he had not known that La Belle had worked during his MBL, and that after searching through his (Kravetz's) phone records, he had found no communications from him.[6] Kravetz further said that if La Belle had had to work he should have cancelled his MBL, as he had in August, and that if La Belle felt upon his return he could not truthfully attest to

---

Belle's 8:49 AM email at 9:54 AM noting that they were still available for lunch that afternoon with Kravetz. (*See* Pl.'s SOF Opp. at ¶¶ 109 – 112.)

[6] La Belle indicates that he may have mistakenly texted Kravetz's work number.

completing his MBL, there were other ways to handle the issue.  (Def.'s SOF at ¶¶ 134 – 49; Pl.'s SOF at ¶¶ 473 – 75.)  Kravetz, after receiving further guidance from Compliance, emailed La Belle instructing him not to attest to taking MBL and to "cancel" it instead.  (Def.'s SOF at ¶¶ 143 – 44.)

La Belle also received a call that day from Wu.  La Belle's wife recorded this phone call. (Def.'s SOF at ¶ 145.)  Wu and La Belle discussed La Belle's relationship with Kravetz and La Belle's history and behavior at Barclays.  (Def.'s SOF at ¶¶ 146 – 61; Pl.'s SOF at ¶¶ 478 – 83.) Wu told La Belle that Kravetz's reaction was not solely in reaction to the email or the "one day" that La Belle worked from home, but the "25 days that [La Belle] did that" and to "5,000 other things you did that drove him crazy."  (Def.'s SOF at ¶¶ 156 – 60.)  Wu also counseled La Belle to do things that La Belle might "philosophically" disagree with or find "distasteful," giving as examples going to certain meetings and a co-worker's holiday party.  He also referred to "unwritten rules" at Barclays.  (Def.'s SOF at ¶¶ 148 – 150; Pl.'s SOF at ¶ 478.)  The explicit contents of the call are undisputed — after all, La Belle's wife recorded it — but the parties disagree on the correct interpretation of what Wu meant.

After the call with Wu, La Belle called Monica De Martin and recorded the call.  (Def.'s SOF at ¶ 168.)  La Belle told De Martin that while not explicitly told to work during his MBL, he nevertheless understood that he had been expected to do so in order to close an important deal by the end of the year, which he had, and that in his first (unrecorded) phone call, Kravetz had told him that "everybody" works during their MBL.[7]  (Def.'s SOF at ¶¶ 168 – 80; Pl.'s SOF at

---

[7] While Barclays admits that La Belle told De Martin this, Barclays disputes the truth of the report, contending that Kravetz had said instead that "everybody works during their vacations."  (Def.'s SOF Opp. at ¶ 485; Def.'s SOF at ¶ 198.)

¶ 493.)  La Belle said that he had not been explicitly told to sign his attestation, but believed he was implicitly expected to do so.  (Pl.'s SOF at ¶¶ 168 – 80; Pl.'s SOF at ¶ 493.)

De Martin told La Belle that "working on the MBL happens all the time unfortunately," but that a breach of the policy occurred only when an employee, having worked on his MBL, falsely attested to having taken it — which La Belle had not done.  (Def.'s SOF at ¶ 175; Pl.'s SOF Opp. at ¶ 176.)  Later that day, La Belle repeated his concerns regarding Kravetz and his MBL in an email to De Martin at her request.  (Pl.'s SOF at ¶¶ 497 – 98.)

La Belle and Kravetz spoke again on January 16, 2018.  La Belle recorded this call as well.  La Belle told Kravetz that "nothing nefarious" occurred during La Belle's December MBL.  Kravetz denied telling La Belle that "everyone works on their MBL," saying that he had said "everyone works on their vacations" and noted that the employees he had specifically referred to other than La Belle who "worked through vacations," including himself, were not subject to MBL requirements.  Kravetz also assured La Belle that there would be no repercussions for La Belle because of his compliance concerns regarding his MBL.  (Def.'s SOF at ¶¶ 192 – 206.)

Following the above events, Barclays initiated both compliance and HR investigations into La Belle's management of his block leave, whether Kravetz had pressured La Belle to work or knew that he had worked, and Kravetz's response to La Belle's email on January 4 cancelling the investor lunch and asserting that he had worked during his MBL, including an investigation into whether Kravetz and Wu began a retaliation campaign against La Belle following the January 4 email.  (Def.'s SOF at ¶¶ 183, 297; Pl.'s SOF at ¶¶ 504, 644.)

### 2.    Use of Personal Devices

When La Belle spoke to De Martin on January 4, he told her that the alleged work during his MBL occurred through the use of his personal devices, as he did not have a firm-issued

8

phone.  He told her "I've asked for a firm phone, and there's something between banking and syndicate.  And I don't have one.  They haven't given me one."  (Def.'s SOF at ¶ 174.)  Though a Barclays employee suggested an investigation into this issue, it did not occur.  (Pl.'s SOF at ¶ 517 fn. 10.)  De Martin asked if he did securities work on his phone; La Belle said no.  De Martin testified in her deposition that because she understood from their conversation that La Belle did not do hedging or securities work from his personal device, she understood that this was not a violation of the communications policy.  (Def.'s SOF Opp. at ¶ 517.)[8]

On January 19, 2018, members of Barclays HR wrote in an email that they had just met with La Belle, noting that he was concerned about the ramifications of his January 4 email and retaliation for future promotions, and that "he has Compliance concerns about MBL and about the fact that he is not allowed to have a Firm device and needs to conduct calls/business on his personal device, which we referred him to Compliance to address."[9]  (Pl.'s SOF at ¶ 517.)  On January 22, 2018, La Belle emailed Compliance asking: "any update on the firm devices for my team? At the moment we are all using personal mobile phones with the Good App."  (Def.'s SOF Opp. at ¶ 494.)  The "Good App" is a Barclays-approved communication channel.  (*Id.*)

---

[8] La Belle repeated this complaint in his email to De Martin later that day.  He wrote that during his scheduled December MBL, "[n]umerous Barclays team members who were aware that I was on my block leave continued to call me and text me about the closing and other closings and live deals on my personal cell phone . . . .  I have previously requested a Barclays devise [*sic*], but have yet to receive one due to conflicts between the banking and markets groups, of which I am a member of both."  (Pl.'s SOF at ¶ 455.)  That same day he also called Elyse Gonzalez, Barclays' Human Resources Business Partner, and recorded the call.  (Def.'s SOF at ¶ 162.)  La Belle also told Gonzalez that "folks are calling me at home on block leave and I don't have a firm device because of the banking syndicate split. So I don't have a Blackberry. I have my personal cell, and that's all I have. And they're calling me at home."  (Def.'s SOF at ¶ 165.)

[9] Barclays disputes whether La Belle in fact "need[ed]" to conduct calls on his personal device.  (Def.'s SOF Opp. at ¶ 494.)

La Belle added this claim regarding his use of a personal cell phone by amending his complaint in 2021.  (*See* ECF Nos. 145–46.)  He did not include it in his original complaint in 2019, or in his complaint to the Department of Labor in October 2018.  In seeking leave to amend his complaint to add this claim, La Belle wrote:

> As Barclays' counsel has advised Plaintiff during the discovery process, it is Barclays' policy that employees only conduct work on firm issued or approved devices. As Plaintiff has learned during discovery, this policy is driven, at least in part, by the SEC's and FINRA's record retention rules which require Barclays to retain and preserve certain communications.

(ECF No. 145 at 4.)

### 3.   Client 1 Transaction

In May 2018, Barclays began working with another investment bank to assist "Client 1" with refinancing a portfolio of Courtyard by Marriott hotels that Client 1 owned.  (Def.'s SOF at ¶¶ 257 – 58.)  Client 1 managed the hotels for Marriott pursuant to a management agreement, which would expire in 2025, prior to the end of the loan term.  (Def.'s SOF at ¶¶ 267 – 68.)  Barclays learned during the deal process that the new management agreement, then in negotiation, included mandatory renovations to the properties, which Client 1 estimated would cost around $81 million.  (Def.'s SOF at ¶¶ 270 – 71; Pl.'s SOF at ¶ 610.)  Because Barclays initially believed these improvements would be discretionary, this new information represented a possibly significant change to the degree of risk associated with the loan.  (*Id.*)

Barclays engaged an outside firm, the Gettys Group ("Gettys") to assess how much Client 1 would have to invest in the renovations and to produce a report ("Gettys Report").  (Def.'s SOF at ¶¶ 270 – 71; Pl.'s SOF at ¶ 611.)  In its initial analysis, provided on June 19, 2018, Gettys estimated that the renovations would cost $136 million.  (Def.'s SOF at ¶¶ 283 – 84; Pl.'s SOF at ¶ 613.)  Its initial estimate, however, assumed that Client 1 would be required to

make several enhancements that the management agreement itself did not require. (Def.'s SOF at ¶¶ 289 – 91.) Barclays facilitated calls between Client 1 and Gettys to discuss the scope of the improvements specifically required by the management agreement. Ultimately, the final Gettys report, issued on June 21, 2018, estimated that Client 1 would need to invest $88 million, an amendment based on refining the scope of the work required for the renovations. (Def.'s SOF at ¶¶ 287 – 93.)

On June 18 and 19, 2018, La Belle, who was responsible for finding investors for parts of the deal, sent several emails inquiring about the "update on the PIP" ("planned improvement plan," the subject of the Gettys report), asking for a "concise estimate of cost and updated structure to account for the material increase in estimated PIP expense" because it would be "critical for any of the junior mezz guys before they firm up." (Def.'s SOF Opp. at ¶ 670.) La Belle also participated in a call on June 21, 2018, in which he and other Barclays employees discussed the Gettys Report and the ongoing revisions removing "low-hanging fruit" such as fitness room expansions from the Gettys estimate. (Def.'s SOF at ¶ 296 – 297; ECF No. 231-17). In this call, La Belle noted that he could not "in good faith" pre-market the loans until the "delta" between the Client 1 and Gettys estimate was "sorted out." (*Id.*)

On June 22, 2018, La Belle reviewed a draft of an email describing the final report. He responded to its drafter that it "look[ed] good" and was "a draft/guide on how we intend to mitigate the situation, should get folks comfortable." (Def.'s SOF at ¶ 300.) He also responded "excellent" to a separate email describing the contents of the report and the new, lower estimate. (Def.'s SOF at ¶ 302.) Shortly afterward, he forwarded a finalized draft email to several potential investors, along with the final version of the Gettys report and added the comment "finally." (Def.'s SOF at ¶ 301.)

Barclays also prepared an offering circular for the proposed deal, disclosing that Client 1 planned to invest approximately $80.7 million into the properties during the loan and specifying where those costs would go, but advising potential clients that it could not "assure [them] that the funds in the applicable Reserve Funds will be sufficient to pay all costs and expenses that may be incurred with connection with such immediate repairs and required capital improvement plans." (Def.'s SOF at ¶ 303.)  It also included an appendix noting that "hard goods" — e.g., furniture and fixtures — were not included in this renovation plan.  (The choice not to include "hard goods," which Gettys initially thought would be required, formed a significant part of the decrease in the Gettys report estimate from $136 to $88 million.)  (Def.'s SOF at ¶ 289.)

On July 10, 2018, La Belle submitted a complaint (his second) to the SEC's "Tips, Complaints, and Referrals" page.  In this complaint, La Belle alleged that he was told not to share the Gettys Report with investors, both before and after the revisions, and that the decrease in the Gettys estimate was "magical."  (ECF No. 251-20.)  He also averred that he orally alerted investors of the contents of the Gettys Report and the decrease in the estimate, and that they should do their own due diligence.  (ECF No. 251-20.)  The SEC opened an investigation into this complaint and requested documents from Barclays.  (Def.'s SOF Opp. at ¶ 637.)

### 4. Client 2 Transaction

La Belle also contends he made a SOX-protected report of misconduct with respect to another deal, the "Client 2" transaction.  La Belle and others at Barclays, including Kravetz, disagreed about the risk associated with the potential deal, and therefore its desirability.  (Def.'s SOF at ¶¶ 337 – 59; Pl.'s SOF at ¶¶ 627 – 35.)

On June 4, 2018, La Belle sent an email to De Martin reporting that after he expressed doubts about the deal at an internal CMBS meeting, he had been excluded from meetings about it.  He also included the following message:

David Kung and Peter Taylor have advised me, Larry has been directing them to "massage" the potential loss scenarios into a state of perfection; ie showing the lowest potential loss to the firm adjusting the pricing data in various ways to present a very "positive" scenario for our committee meeting tomorrow with Tim Hartzell. In my view this understates the potential risks to the firm. Notice the difference in potential loss as calculated by David Kung in the attached two emails on two different dates.

You should reach out to David and Peter directly regarding their specific feedback and view regarding this process, and Larry's direction to "massage" the data.

My intention of reporting this to you is to advise you that I have been excluded from the process of considering and managing risk for the firm which is part of my role as Head of Primary CMBS Trading & Distribution and this is unusual behavior. It is clear I am being excluded because of my cautious view is contradictory to Origination's desire to pursue the deal. This also prevents me from doing my job and diminishes my reputation in the firm amongst my peers, it is clear I'm being excluded.

(ECF No. 226-32.)

On June 5, 2018, the deal was presented to the Investment Banking Deal Committee, which makes decisions on which deals to pursue. La Belle received a draft of the materials CMBS had prepared to present on the deal, including its assessment of the risks involved, the night before. La Belle also participated in this meeting and expressed his view of the downside risk of the deal, as indicated in contemporaneous notes. (Pl.'s SOF Opp. at ¶¶ 368 – 67.) La Belle's superiors disagreed with his assessment of the upside and downside risks involved, and Barclays continued pursuing the deal. (Def.'s SOF at ¶¶ 372 – 76.)

On June 14, 2018, La Belle submitted his first report to the SEC's Tips, Complaints, and Referral page. (ECF No. 251-1.) This report primarily concerned MBL and the events of January 4 and La Belle's belief that after that date, Kravetz and Wu began retaliating against him by cutting him out of deals and undercutting his management. La Belle, for example, alleged: "I

am still being circumvented in the management of my team and I am being excluded from risk management discussions and analyses which prior to my reporting of the block leave breach I would have been included in."  (ECF No. 251-1 at 5.)  La Belle also reiterated the above allegation regarding David Kung and Pete Taylor being told to "massage" data, and at the end of his recounting of the MBL issues, La Belle stated that "I am also extremely concerned David Kung and Pete Taylor advised me of the massaging of data with respect to the consideration of a [Client 2] transaction that severely understated the potential risk and loss to our firm."  (ECF No. 251-1 at 5.)

### 5.      Securities License Issue

Finally, La Belle claims that, on July 11, 2018, he reported that one of his direct subordinates, Shaz Hasan, inappropriately sent an email related to securities without a license. La Belle chastised Hasan and informed Wiele, as well as Compliance, of the issue.  (Pl.'s SOF at ¶¶ 638 – 42.)  Hasan responded by apologizing for any misunderstanding and confirming that he would stay away from securities-related work until licensed.  (Def.'s SOF Opp. at ¶ 642.) Weile also emailed Hasan to emphasize the importance of completing his securities exams. (Def.'s SOF at ¶ 402.)  Barclays investigated the incident and concluded that Hasan's pertinent emails were not securities related, but rather real estate related.  (Def.'s SOF Opp. at ¶ 638.)

### D.      La Belle's Termination from Barclays

Prior to 2018, La Belle generally received positive performance reviews, though he also received feedback from Wiele that he needed to improve on his "values" score.  He was told in his 2016 performance review that several other employees had "commented" on his hours in the office and that he needed to be more proactive about attending certain meetings.  The review also noted that his managers had "at various times . . . spoken to [La Belle] about working harder and being in the office more."  (Def.'s SOF at ¶¶ 48 – 57.)  La Belle acknowledged this feedback.

(Def.'s SOF at ¶ 52.)  La Belle's 2017 review, which Wiele delivered to La Belle on January 29, 2018, also addressed some of these themes, documenting several issues with La Belle's performance that the review said created "a pattern of behavior that needs to be corrected." (Def.'s SOF at ¶¶ 59 – 63.)

Throughout 2018, Kravetz and Wu continued communicating with members of Barclays HR and legal teams via email and (recorded) phone calls, citing issues with La Belle's attendance and performance.  (Def.'s SOF at ¶¶ 220 – 37.)[10]  During this time, Kravetz and Wu maintained a close watch on La Belle's attendance.  In part, they monitored La Belle's movements, and his presence and absence in the office, by surreptitiously tracking the tail number on his plane.  (Pl.'s SOF Opp. at ¶¶ 220 –37.)

On June 8, 2018, Barclays concluded an internal HR investigation into whether Kravetz and Wu retaliated against La Belle after the January 4 MBL incident.  (Pl.'s SOF at ¶ 650.)  The report concluded that there had been no retaliation, but also issued recommendations for Kravetz and Wu to change some of their behaviors toward La Belle.  (Pl.'s SOF at ¶ 654.)  On June 12, 2018, Ho Chan Lee, an HR employee, sent an email to Barclays' in-house counsel, noting that one result of the investigation was that Wiele, not Kravetz, would manage La Belle going forward.  (Pl.'s SOF at ¶ 655.)

Also on June 12, 2018, two members of Barclays' HR team, Ms. Cohen and Ms. DeVoti, met with Kravetz to discuss the results of the report and the recommended reporting-line change. (Pl.'s SOF at ¶ 656.)  At this meeting, Kravetz indicated that the reporting-line change was unfeasible.  The end result of this meeting was the decision to terminate La Belle's employment.

---

[10] La Belle contends that Kravetz and Wu intentionally trumped up this paper trail to cover their own retaliation campaign.  (Pl.'s SOF Opp at ¶¶ 220 – 37.)

(Def.'s SOF at ¶ 242.)  In a call on June 18, 2018, Wiele asked Kravetz if anything was "new"

after the June 12 conversation regarding La Belle, and Kravetz responded that "we're gonna . . .

move forward and get him out of here" and noted that the timing of the separation might be

delayed to accommodate ongoing business La Belle was staffed on, such as the Client 1 and 2

transactions.  (Def.'s SOF at ¶ 244.)  They also discussed La Belle's termination on a call on

June 19, 2018, in which Kravetz stated that La Belle's impending termination was in part based

on "lack of trust."  (Pl.'s SOF at ¶ 671.)

   Barclays asserts that the decision of La Belle's managers and HR contacts to terminate La

Belle was made on June 12, 2018, and approved as of June 19, 2018.  (Def.'s SOF at ¶ 249.)

Kravetz and Wiele continued discussing La Belle's imminent termination during the time

between mid-June and the end of July.  For example, on July 17, 2018, they discussed when they

would "launch him" and on July 24, 2018, they discussed that they would "pull the trigger" after

an impending deal closed.  (Pl.'s SOF at ¶¶ 671 – 695.)  On July 26, 2018, HR revised talking

points for La Belle's termination.  (Pl.'s SOF at 694.)  Barclays states and provides documents

showing that they planned to inform La Belle of his termination on July 27, 2018, but ultimately

terminated his employment on August 1, 2018, because La Belle was out of the office on July

27th.  (Def.'s SOF at ¶ 251.)  In La Belle's separation conversation, Wiele told La Belle that he

was terminated because of his performance and because his team had lost confidence in him.

(Def.'s SOF at ¶ 252.)

   La Belle disputes this timeline, offering several alternatives that at times conflict with

each other.  He states that his fate was "sealed" as of June 1, 2018, and also that the decision to

terminate him was made "just days" after the June 8, 2018 conclusion of the HR investigation

into La Belle's retaliation claim.  (Pl.'s SOF at ¶¶ 602, 661.)  But La Belle also contends that the

decision to terminate him was not made until July 27, 2018.  This latter contention is, according to La Belle, supported because (1) he was not told of the decision to terminate him, (2) Kravetz continued documenting performance issues and monitoring La Belle's attendance in the time in between June 12, 2018, and August 1, 2018, and (3) July 27, 2018 is the date his termination was recorded in one of Barclays internal tracking programs.  (Pl.'s SOF at ¶¶ 671 – 95.)  Barclays claims that this record is unrelated to the date of the actual decision.  (Def.'s SOF Opp. at ¶¶ 671 – 95.)

## II.   Legal Standards

### A.   Summary Judgment

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if "it might affect the outcome of the suit under the governing law."  *Hurley v. Tozzer, Ltd.*, No. 15 Civ. 2785, 2018 WL 1087946, at *1 (S.D.N.Y. Feb. 26, 2018) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)).  The party moving for summary judgment bears the burden of showing that no genuine dispute of material fact exists, *id.*, and in assessing whether the movant has carried this burden, a court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his or her favor."  *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 166 (S.D.N.Y. 2006).

### B.   The Sarbanes-Oxley Act

La Belle brings this action under Section 806 of the Sarbanes-Oxley Act, or "SOX," codified at 18 U.S.C. § 1514A.  To sustain a retaliation claim under Section 806, a plaintiff "must prove by a preponderance of the evidence that (1) [he] engaged in a protected activity; (2)

the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Admin. Rev. Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013).  A plaintiff's activity is "protected" only if he (1) "provide[s] information," (2) "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," to (3) a federal agency, Congress, or "a person with supervisory authority over the employee."  18 U.S.C. § 1514A; *see also Leshinsky v. Telvent GIT, S.A.,* 942 F. Supp. 2d 432, 441–42 (S.D.N.Y. 2013) (providing further background about the Sarbanes-Oxley Act).

In a recent decision, the Second Circuit also clarified that to prevail on the "contributing factor" element of this claim, a plaintiff must "prove that the employer took the adverse employment action against the whistleblower-employee with retaliatory intent—*i.e.*, an intent to 'discriminate against an employee . . . because of' lawful whistleblowing activity."  *Murray v. UBS Sec., LLC,* 43 F.4th 254, 259 – 60 (2d Cir. 2022).

Once a plaintiff has made out his *prima facie* case, a defendant-employer prevails only if "it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior."  *Id.*  (citation and internal quotation marks omitted); *see also* 18 U.S.C. § 1514A(b) ("An action brought under paragraph (1)(B) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code."); 49 U.S.C. § 42121(b)(2)(B)(ii) ("[N]o investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing

evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.").

At the summary judgment stage under Section 806 of the Sarbanes-Oxley Act, a plaintiff need only demonstrate that a rational factfinder could determine that Plaintiff has made his *prima facie* case. Assuming a plaintiff does so, summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record clearly and convincingly demonstrates that the adverse action would have been taken in the absence of the protected behavior. *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013).

## III.    Discussion

La Belle identifies five separate instances in which he reported alleged misconduct to his superiors and/or the SEC, each of which he contends independently sustains his SOX claim.

### A.    Mandatory Block Leave

Most of the ink in this litigation has been spent on the issue of MBL. To obtain relief regarding his MBL claim, La Belle must show as the first element of his *prima facie* case that he reported conduct that he reasonably believed constitutes a violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), or § 1348 (securities fraud), any rule or regulation of the SEC, or any provision of Federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A(a)(1). La Belle does not argue that it falls under the first four categories, leaving only the two catch-all categories: "any rule or regulation of the SEC" and "any provision of Federal law relating to fraud against shareholders." And within these categories, La Belle primarily contends that he has shown the first element of his *prima facie* case because he "reasonably believed" MBL was a law, rule, or regulation covered by the Sarbanes-Oxley Act,

relying on his prior experience in the financial sector and statements from other Barclays employees about its importance (as detailed above).

Employees need not be correct that their employer violated one of the enumerated categories in § 1514A to obtain protection under the Sarbanes-Oxley Act.  It is by now well-established that the "critical focus" of a SOX inquiry "is on whether the employee reported conduct that he or she *reasonably believes* constituted a violation of federal law."  *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 221 (2d Cir. 2014) (emphasis added); *see also Leshinsky*, 942 F. Supp. 2d at 443 (rejecting the prior "definitively and specifically" standard); *Ashmore v. CGI Grp. Inc*., 138 F. Supp. 3d 329, 342 (S.D.N.Y. 2015), *aff'd*, 923 F.3d 260 (2d Cir. 2019) ("The Sarbanes-Oxley whistleblower provision focuses on the plaintiff's state of mind rather than the defendant's conduct.").

Whether a belief is "reasonable" contains both subjective and objective components.  That is, "a plaintiff must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation."  *Nielsen*, 762 F.3d at 221 (citing *Livingston v. Wyeth, Inc.*, 520 F. 3d 344, 352 (4th Cir. 2008)).  Therefore, an employee may still fall within Sarbanes-Oxley's protections if they are mistaken about the fact that conduct occurred or mistaken that the conduct they reported in fact violated a specific law, rule, or regulation enumerated in § 1514A — provided that their mistaken belief was both subjectively and objectively reasonable.  *See, e.g.*, *Guyden v. Aetna, Inc.*, 544 F. 3d 376, 384 (2d Cir. 2008), *superseded on other grounds by statute as described in Wong v. CKX, Inc*., 890 F. Supp. 411, 421 (S.D.N.Y. 2012) ("[A] whistleblower need not

show that the corporate defendant committed fraud to prevail in her retaliation claim under § 1514A.").[11]

But the situation here is slightly but importantly different than the above scenario. Here, even assuming the truth of all La Belle's averments regarding MBL violations at Barclays and the truth of his subjective belief, he was still be mistaken about the *existence* of an SEC rule or regulation requiring MBL in the first place. The relevant question therefore is whether the focus on the plaintiff's state of mind extends not only to the employer's conduct, but also to the enumerated provision at issue.

The Second Circuit has questioned the latitude given to plaintiffs under SOX regarding the enumerated provisions of § 1514A. In *Nielsen*, the court largely adopted the legal reasoning of the ARB in *In the Matter of: Kathy J. Sylvester and Theresa Neuschafer, Complainants v. Parexel International LLC, Respondent*, 2011 WL 2165854, at *18, thereby abrogating the previous, stricter "definitively and specifically" standard in favor of "reasonable belief." *Sylvester* at *18; *Nielsen* at 221. The ARB, however, also asserted that a § 1514A complaint need not even approximate specific elements of the enumerated provision. *See id.* The Second Circuit expressly doubted this proposition:

> We are less certain whether the ARB was correct in concluding that a § 1514A complaint need not even 'approximate specific elements' of the enumerated provisions allegedly violated, or that there is no requirement that the violation must be 'material.' We note that the statute does require plausible allegations that the whistleblower reported information based on a reasonable belief that the employer violated *one of the enumerated provisions* set out in the statute. Thus, the statutory language suggests that, to be reasonable, the

---

[11] Courts also recognize that employees need not report a *completed* legal violation — they may also obtain protection for reporting what they reasonably believe will be a *future* violation of one of the enumerated categories. *See Murray v. UBS Sec., LLC*, No. 14 Civ. 927, 2017 WL 1498051, at *10 (S.D.N.Y. Apr. 25, 2017).

> purported whistleblower's belief cannot exist wholly untethered
> from these specific provisions.

*Nielsen,* 762 F.3d at 222 n. 6 (quoting *Sylvester*, 2011 WL 2165854, at *17-*18) (citing 18

U.S.C. § 1514A(a)(1)).

　　While the Second Circuit in *Nielsen* followed the ARB's decision in lowering a

plaintiff's burden under Section 806 of the Sarbanes-Oxley Act, it also ultimately affirmed the

district court's decision to dismiss the plaintiff's complaint under the new standard.  The Second

Circuit concluded that the plaintiff failed to show that it was objectively reasonable for him to

believe the behavior he complained of violated an enumerated provision.  *Id.* at 223.  Not only

was the alleged misconduct "trivial," but the court determined that, fatally, the plaintiff failed to

allege "any facts plausibly suggesting that this supposed misconduct implicated *any* of the

enumerated provisions in § 1514A."  *Id.  Nielsen* therefore instructs that while a plaintiff need

only "reasonably believe" that the *conduct* at issue violated an enumerated provision, she *must*

allege facts indicating that the conduct violated an *actual enumerated provision* of § 1514A.

　　None of the cases cited by La Belle indicates otherwise.  In fact, most skirt this issue.  In

*Yang v. Bank of New York Mellon*, for example, the court stated that "the plaintiff 'is not required

. . . to cite a particular provision that he believes the defendants violated."  2021 WL 1226661 at

*5 (quoting *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 32 576, 589 (S.D.N.Y. 2019)).  La

Belle relies on this quote, used in isolation, to argue that he can succeed without citing a

particular provision here.  (*See* ECF No. 242 at 8.)  In context, however, the court was addressing

the defendant's argument that the plaintiff had not sufficiently "reported" information because *at

the time he reported it*, he did not specifically identify to his employers the provisions he

believed were violated — the Investment Advisors Act of 1940, SEC Rule 206(4)-8, and Section

77 of the Securities and Exchange Act.  In *Yang*, even the defendants did not dispute that "these

provisions all constitute a 'rule or regulation of the Securities and Exchange Commission' and / or a 'provision of Federal law relating to fraud against shareholders." *Id.*

Plaintiff also cites *Tonra v. Kadmon Holdings* for the general proposition that courts in this Circuit have construed Section 806 broadly. Yet in *Tonra v. Kadmon Holdings*, the court nonetheless dismissed the plaintiff's SOX claim. There, the plaintiff alleged that he engaged in protected activity when he complained to management that the company needed to report negative test results to the FDA and shareholders. 405 F. Supp. 3d 576, 590 (S.D.N.Y. 2019). The court concluded that the plaintiff's SOX claim failed because he did not allege how the failure of the firm to report certain information "would impact shareholder decision-making," or "constituted material misrepresentations or omissions in violation of a relevant securities law." *Tonra v. Kadmon Holdings, Inc*., 405 F. Supp. 3d 576, 590 (S.D.N.Y 2019). The court thus held that the plaintiff had failed to allege a violation of an enumerated SOX category because he did not adduce reasonable belief that the *conduct* he reported met the standard of the qualifying categories he identified, 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5.[12] *Id.*

*Ashmore v. CGI Group*, another case cited by La Belle, is similarly unavailing. 138 F. Supp. 3d 329 (S.D.N.Y. 2015). In *Ashmore,* the defense argued the plaintiff failed to establish his *prima facie* case because he "objected to conduct that he claimed was in violation of HUD and federal procurement requirements, not the provisions enumerated under Section 806." *Id.* at 341. The court disagreed, noting that the plaintiff not only complained of violations of HUD and

---

[12] Notably, both material misrepresentation and a plausible impact on shareholder decision-making are standard elements of a shareholder fraud claim. *See, e.g.*, *Kocourek v. Shrader,* 391 F. Supp. 3d 308, 320 (S.D.N.Y. 2019) (describing the standard). *Tonra* therefore follows *Nielsen* in concluding that a plaintiff cannot succeed where she fails to "even approximate specific elements of the enumerated provisions allegedly violated." *Nielsen* at 222 n. 6.

federal procurement regulations, but also alleged that "the scheme was devised and discussed through e-mail and phone conversations." *Id.* at 342.  Therefore, in light of his specific training and experience, the court "[could not] conclude that it was unreasonable, as a matter of law, for Plaintiff to believe that the alleged scheme implicated the mail and wire fraud statutes." *Id. Ashmore* thus turns on the plaintiff's belief was about whether the conduct ran afoul of an enumerated provision, not whether an enumerated provision existed that prohibited the conduct.

Barclays, meanwhile, primarily relies on *Erhart v. Bofl Holding, Inc.*, a case from the Southern District of California.  2020 WL 1550207.  There, the court succinctly states that "Sarbanes-Oxley does not provide whistleblower protection for any reported company misconduct.  The conduct must constitute a believed violation specifically enumerated in the statute."  2020 WL 1550207 at 5 (internal quotations omitted).  On a surface level, this quotation seems to squarely foreclose La Belle's claim.

Even *Erhart*, however, is not precisely the situation at bar, though it comes close.  A key facet of the court's reasoning in *Erhardt* was its admonishment that the plaintiff could not "broadly argue that he objectively believed there were violations of 'any rule or regulation of the [SEC]' or 'any provision of Federal law relating to fraud against shareholders" because the court could not be expected to "go fishing through securities law and regulation for provisions [the plaintiff] may have believed were violated." *Id.* (internal citations omitted).  La Belle does not (or at least does not only) argue that he objectively believed "any rule or regulation" was violated, nor would the Court here need to fish for a relevant law on which to instruct the jury. La Belle clearly identifies what he believes was violated — Barclays' MBL requirement.  It just does not happen to have actually been an SEC rule or regulation, as he claims he reasonably believed.

24

The Ninth Circuit's decision in *Wadler v. Bio-Rad Labs., Inc*., 916 F.3d 1176 (9th Cir. 2019), which *Erhart* relies on, is also instructive.  In *Wadler*, the plaintiff had complained of misconduct allegedly violating statutory provisions of the Foreign Corrupt Practices Act (FCPA). *Id.* at 1181.  The district court instructed the jury that the FCPA's anti-bribery and books-and-records-provisions were "rules and regulations of the SEC." *Id.* at 1185 – 87.

The Ninth Circuit vacated the jury's verdict because of this jury instruction. Specifically, it held that "806's text is clear: an FCPA provision is not a 'rule or regulation of the [SEC]'" because "Congress uses the phrase 'any rule or regulation of the [SEC]' in the same list in which it uses 'any provision of Federal law relating to fraud against shareholders,' which strongly suggests that there is a difference between the meaning of 'rule or regulation' and 'law.'" *Id.* at 1186.  Accordingly, it held that because the FCPA is a *law*, it cannot as a matter of law be considered a rule or regulation of the SEC under § 1514A.  *Id.*

The Ninth Circuit remanded the case to the district court to consider whether a new trial was warranted.  It reasoned that despite the incorrect jury instruction, a properly instructed jury could conclude that the plaintiff reasonably believed he reported misconduct related to the books-and-records provisions — which unlike the anti-bribery provision of the FCPA, is also an SEC rule or regulation, and therefore falls under § 1514A.  *Id.* at 1888 – 89; *see* 17 C.F.R. § 240.13b2-1.  While *Wadler* focused on the propriety of jury instructions, the Ninth Circuit's reasoning indicates that the misconduct a plaintiff complains of must necessarily run afoul of an actual enumerated provision; even complaints of a violation of the FCPA do not qualify.

Finally, whatever La Belle may have believed, and however subjectively reasonable his belief, at bottom, MBL is an internal Barclays policy, *not* a legal requirement imposed externally.  Where plaintiffs complain of violations of internal policies — even where the alleged

behavior would be clearly wrongful — courts typically decline to find protection under Section 806.  For example, in 2016, a court in this District considered a plaintiff's claim "premised upon a purported non-compliance with the company's internal conflict of interest policy."  *Diaz v. Transatlantic Reinsurance Co.,* No. 16 Civ. 1355, 2016 WL 3568071, at *5 (S.D.N.Y. June 22, 2016).  The court held as a matter of law that the plaintiff could not reasonably believe that this alleged violation fell under the enumerated provisions of § 1514A.  It sustained this holding even though the plaintiff, like La Belle, attempted to link her complaints to concern for the company's shareholders.  The court stated that "Plaintiff's bald assertions that she 'expressed concern about . . . the effect [the purported conflicts of interest] could have on Alleghany's shareholders' and 'on Defendant's reputation in the reinsurance industry' are precisely the type of conclusory statements that cannot sustain a § 1514A claim."  *Diaz,* 2016 WL 3568071, at *5.  Likewise, in *Samaroo v. Bank of New York Mellon*, the court rejected portions of the plaintiff's SOX claim because his "ethics complaints primarily concern alleged nepotism or favoritism" and "nepotism does not violate any of the laws listed under SOX § 806 and does not form the basis of a valid SOX complaint."  *Samaroo v. Bank of New York Mellon,* No. 21 Civ. 02441 2021 WL 5910603, at *4 (S.D.N.Y. Oct. 5, 2021), *report and recommendation adopted,* No. 21 Civ. 2441, 2021 WL 5910408 (S.D.N.Y. Dec. 13, 2021).  *See also Day v. Staples, Inc*., 555 F.3d, 42, 58 (1st Cir. 2009) ("[C]omplaints about purely internal practices that are not financial in nature and are not reported to shareholders do not meet the materiality requirement for an objectively reasonable belief in shareholder fraud."); *Andaya v. Atlas Air, Inc*., No. 10-7878, 2012 WL 1871511, at *5 (S.D.N.Y. Apr. 30, 2012) ("Andaya's complaints largely related to internal corporate policies concerning corporate waste, personnel matters, and relationships with vendors. These are not the subjects courts have found covered by SOX.").

La Belle has made valiant efforts to establish that he reasonably believed that MBL was an SEC rule or regulation.  But ultimately, his efforts fail because it is *not* an SEC rule or regulation.  Accordingly, La Belle has not "alleged any facts plausibly suggesting that this supposed misconduct implicated *any* of the enumerated provisions in § 1514A."  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 223 (2d Cir. 2014).

In addition to his primary argument about the "reasonableness" of his belief that the SEC required MBL, La Belle also levies a few remaining arguments attempting to link MBL to one of the enumerated categories in § 1514A.  Each is addressed in turn.

First, La Belle attempts to shoehorn MBL violations into Section 13(b)(5) of the Securities Exchange Act.  (*See* ECF No. 242 at 17; ECF No. 272 at 7.)  This rule, however, is limited to internal controls specifically pertaining to financial reporting.  Indeed, the SEC's guidance on this rule specifically forecloses its application to a more general compliance measure such as Barclays' MBL policy, explaining that

> [a] few of the commenters urged us to adopt a considerably broader definition of internal control that would focus not only on internal control over financial reporting, but also on internal control objectives associated with enterprise risk management and corporate governance.  While we agree that these are important objectives, the definition that we are adopting retains a focus on financial reporting.

*In Re Mgmt.'s Report on Internal Control over Fin. Reporting & Certification of Disclosure in Exch. Act Periodic Reports*, Release No. 8238, 80 S.E.C. Docket 1014, 2003 SEC LEXIS 1380, 2003 WL 21294970 (June 5, 2003); *see also Erhardt*, 2020 WL 1550207 at 14 (explaining that this section is limited to "compliance with the applicable laws and regulations directly related to the preparation of financial statements" and rejecting a similar argument).

MBL is indisputably an "internal control . . . associated with enterprise risk management and corporate governance."  It was therefore not objectively reasonable for someone with La Belle's experience to believe that this rule required Barclays to adopt MBL as a policy. Moreover, La Belle has also failed to show that he subjectively believed he was reporting a violation of a legal rule, which he mentions for the first time at summary judgment.  "After all, irrespective of whether Plaintiff reported a violation of the relevant law, '[i]t would make no sense to allow [a plaintiff] to proceed if he himself did not hold the belief required by the statute . . . .'" *Leshinsky v. Telvent GIT, S.A.,* 942 F. Supp. 2d 432, 447 (S.D.N.Y. 2013) (quoting *Livingston*, 520 F. 3d at 352).

La Belle next relies on the fact that regulators from the SEC, FINRA, and the Federal Reserve have at times inquired as to the functioning of Barclays' MBL program.  (*See* ECF. No. 242 at 11.)  Individual regulators' discretionary interest into the functioning of a voluntary policy, however, does not translate to that policy being a "rule or regulation of the SEC."[13]  This evidence at most shows that regulators encourage, but do not require, firms to adopt MBL policies as a prophylactic measure against possible fraud or regulatory exposure, and such regulators may at times inquire into the operation of the program *if* a firm has voluntarily enacted it.

La Belle also attempts to argue that his allegations concern  "federal law relating to fraud against shareholders."  In support, La Belle points to public-facing Barclays statements that the firm is "committed to ensuring the broad principles of the Code of Professional Conduct" and

---

[13] *See* ECF No. 245-13 at 19-22, in which Ms. De La Vega testifies that regulators "have" asked for information about the functioning of Barclays' MBL program "as part of a larger examination," but noting that "it's up to the regulator's discretion when or if" they make such inquiries.

fosters a "strong values-based culture."  (ECF No. 242 at 25.)  He contends that his averments show that these statements are fraudulent.  This argument is unpersuasive.  "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

Nor does La Belle succeed in his argument that in reporting violations of an internal prophylactic measure, he could reasonably believe he was preventing fraud against shareholders. MBL is meant to protect *Barclays* from wrongdoing by individual Barclays employees.  A failure of MBL could theoretically, after several intermediate contingent events, have trickle-down effects on shareholders.  But "[t]he connection between [plaintiff's] claims and supposed fraud against shareholders is simply too tenuous."  *Nielsen*, 762 F.3d at 223 (rejecting § 1514A claims where the complaint similarly argued that the complained-of practice "'had the potential of exposing the company to extreme financial risk' and 'thus constituted potential shareholder fraud.'"); *see also Diaz*, 2016 WL 3568071, at *5 (rejecting "bald assertions" from the plaintiff that violations of internal policies would affect shareholders and the company's reputation).

In *Leshinksy*, this Court observed that "courts should construe Section 806 broadly."  942 F. Supp at 440.  But 'broad' is not the same as limitless.  This Court also observed that "a complainant fulfills his duty under Sarbanes-Oxley when he "identifies conduct that falls within the ample bounds of the anti-fraud laws."  *Id.*  MBL falls outside the bounds of these laws.  As a matter of law, it was not objectively reasonable for La Belle to believe that violations of MBL fell afoul of one of § 1514A's enumerated provisions.  Barclays is therefore entitled to summary judgment with regard to La Belle's MBL claim.

### B.    Personal Cell Phone Use

La Belle next asserts a SOX claim with regard to his report that he was using his personal cell phone for work while at Barclays.  During the furor over La Belle's December 2017 MBL and his January 4 email, La Belle also reported to Compliance and his supervisor that other Barclays employees were "calling him at home" because he did not have a work cell.  La Belle also included this detail in his June 10, 2018 report to the SEC about Barclays' adherence to its MBL policy.   La Belle argues that this report was an attempt to raise concerns about non-compliance with the SEC's records retentions rules.

As stated above, to succeed in his *prima facie* case La Belle must show that he reasonably believed he was reporting a violation of one of the enumerated provisions, and this belief must be both subjectively and objectively reasonable.  Despite identifying numerous "whistleblows" in his complaint to the Department of Labor in 2018 and in his initial complaint in this case in 2019, La Belle did not add this particular claim until 2021 and explained his late amendment by saying that he "learned during discovery" that Barclays' record retention policy was driven "at least in part" by the SEC's rules.  If La Belle only learned during discovery after 2019 that the SEC required work to be completed on a firm device, he cannot have believed that he was reporting a violation of such a rule in 2017.  To reiterate what this Court explained in *Leshinsky*, "irrespective of whether Plaintiff reported a violation of the relevant law, it would make no sense to allow a plaintiff to proceed if he himself did not hold the belief required by the statute."  942 F. Supp. 2d at 447 (cleaned up).  Moreover, at the time La Belle reported that he was using his personal phone for work during his MBL, he did not mention the SEC records retention rules or posit that this might be illegal; to the contrary, he assured Kravetz that "nothing nefarious" occurred during his MBL, when he claimed to have worked from both his personal device and a temporary phone that he purchased in the Bahamas.

30

In addition to failing to show that he believed himself to be reporting a violation of SEC rules in 2018, La Belle has also not demonstrated that this alleged protected disclosure was a "contributing factor" in his termination.  La Belle last raised concerns regarding his use of a personal device in January 2018.  His supervisors began discussing his termination in June 2018.  La Belle does not offer any allegation of, nor does he offer any factual basis for, why or how the two events are connected.

### C.    Client 1 Transaction

La Belle also claims to have "blown the whistle" on the Client 1 transaction.  In his summary judgment brief, La Belle clarifies that he is specifically referring to his complaints regarding the revisions to the Gettys Report.  (*See* ECF No. 242 at 22 (explaining that "the gist of this whistleblow was that Barclays knew of and/or actively participated in the fraudulent manipulation of the Gettys' Report").)  Under Section 806, a plaintiff's activity is "protected" only if he (1) "provide[s] information," (2) "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," to (3) a federal agency, Congress, or "a person with supervisory authority over the employee."  *Leshinsky v. Telvent GIT, S.A.,* 942 F. Supp. 2d 432, 441–42 (S.D.N.Y. 2013).

La Belle contends that he "blew the whistle," that is, engaged in protected activity, regarding the Gettys Report first on June 18 and 19, 2018.  In support, he relies on chats and emails in which he asks for an "update on the PIP" and in which Kravetz and Wiele say that La Belle is "complaining about the fact that he's not getting any response from anybody on that management agreement question that he's been asking."  (ECF No. 272 at 15.)

This claim is unpersuasive.  No rational factfinder could conclude that these communications show La Belle reporting concerns about manipulation of the Gettys Report based on the timeline alone:  The initial Gettys Report was not provided *until* June 19, 2018, and the final, changed version was not finished until June 22, 2018.  Therefore, La Belle could not plausibly have been concerned about the changes in the report on June 18 and 19, 2018.[14] Moreover, in none of these communications does La Belle say anything indicating that he believes the Gettys report is suspect, fraudulent, or manipulated; indeed, he participates in a (recorded) June 21, 2018 phone call where the changes are discussed without raising any concerns, he responds positively it being completed on June 22, 2018, and he sends it to investors without caveat.  While La Belle need not have "definitively and specifically" identified what law he believed was broken, "general inquiries do not constitute protected activity."  *Fraser v. Fiduciary Tr. Co. Int'l,* No. 04 Civ. 6958, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009), *aff'd,* 396 F. App'x 734 (2d Cir. 2010).  La Belle cannot show that he objectively or subjectively believed the report was fraudulent or potentially illegal at the relevant time in June, or that he reported that he so believed to supervisors at Barclays.

La Belle does include certain claims regarding the "magical" decrease in the Gettys estimate to the SEC on July 10, 2018.  First, there is the question of whether this constituted a subjectively and objectively reasonable report of a violation of one of § 1514A's enumerated categories.  Not only is his subjective belief still in doubt for the reasons explained above, but it is questionable whether he could objectively have believed that this report was connected to fraud against shareholders given that the prospectus for the deal contained specific caveats about

---

[14] For the same reason, La Belle's claim that Kravetz "knew of Plaintiff's whistleblow" as of June 4, 2018, are implausible.

the very same risks in the deal (for example, that the management agreement might require more capital investment than Client 1 had budgeted).

Furthermore, to pin his retaliation claim on this report, La Belle must demonstrate that this report contributed to unfavorable personnel actions against him. Therefore, he must show that Barclays knew that he reported concerns about the Gettys transaction to the SEC before terminating him.

La Belle has not demonstrated that anyone at Barclays involved in his termination was aware of this report to the SEC prior to deciding on his termination. Though La Belle makes conclusory allegations that his reports to the SEC were "well known," as a threshold issue these allegations appear to refer to his June 14 report to the SEC. More substantively, the sole evidence La Belle provides to show knowledge at Barclays about *any* report to regulators is deposition testimony from Frank Gilhool that unambiguously indicates that Gilhool was aware only that La Belle told regulators of issues regarding MBL. (Pl.'s SOF at ¶ 601, 667 and underlying exhibit.) Gilhool was not involved in La Belle's termination, nor does he allege that anyone else at Barclays was aware of La Belle's reports. La Belle's attempts to paper over holes in his evidentiary record with a conclusory, uncorroborated affidavit are unavailing, particularly when viewed in the context of the otherwise lengthy and detailed documentary record in this case. *See Kunik v. New York City Dep't of Educ.,* 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020), *aff'd,* 842 F. *App'x* 668 (2d Cir. 2021), *as amended* (Jan. 26, 2021) (collecting cases holding that "conclusory, self-serving deposition testimony is insufficient to withstand a motion for summary judgment.")

The record also indisputably shows that La Belle was on thin ice already by mid-June. Both of La Belle's supervisors discussed his impending termination on recorded lines several

times in mid-June and early July.  *See Marcavage v. City of New York*, 689 F. 3d 98, 110 (2d Cir.

2012) ("Although on summary judgment the evidence must be viewed in the light most favorable

to Plaintiffs as the non-moving parties, when there is reliable objective evidence — such as a

recording — the evidence may speak for itself.") (citing *Scott v. Harris*, 550 U.S. 372, 378-81

(2007)).  La Belle did not mention the Gettys Report to the SEC until July 10, 2018.  There can

be no inference of retaliation where the claimed retaliatory action had already been determined,

or where it was the culmination of adverse job actions beginning prior to the alleged instigating

event.  *See, e.g.*, *Gonzalez v. NYU Langone Hosps.*, No. 18 Civ. 01797, 2021 WL 4226042, at *6

(S.D.N.Y. Sept. 16, 2021), *aff'd,* No. 21-2569, 2022 WL 4372199 (2d Cir. Sept. 22, 2022)

(collecting cases).  La Belle's attempts to muddy the waters regarding the record of his

supervisors' discussions of his impending termination are unavailing, particularly given the fact

that he himself offers several contradictory timelines.  (*See* ECF No. 242 at 27 (giving three

different dates for La Belle's termination, two of which predate July 10, 2018, and yet using each

to support a different causality inference)).

       **D.**    **Client 2 Transaction**

La Belle also claims to have engaged in SOX-protected whistleblowing regarding the

Client 2 transaction, relying on a June 4, 2018 email to Compliance, his general concerns about

the transaction and his complaints that he was being sidelined for raising doubts, and his June 14,

2018 report to the SEC.

On June 4, 2018, La Belle emailed De Martin in Compliance alleging in general terms

that he had been sidelined from the deal by Kravetz as part of a continued retaliation campaign

after the MBL issue.  He also alleged that two subordinates had been instructed to "massage"

data regarding a potential deal by Kravetz.  At the conclusion of this email, La Belle writes:

> My intention of reporting this to you is to advise you that I have been excluded from the process of considering and managing risk for the firm which is part of my role as Head of Primary CMBS Trading & Distribution and this is unusual behavior. It is clear I am being excluded because of my cautious view is contradictory to Origination's desire to pursue the deal. This also prevents me from doing my job and diminishes my reputation in the firm amongst my peers, it is clear I'm being excluded.

(ECF No. 226-32.)

La Belle now claims that this email was a report to De Martin of fraud.  The face of the email does not support that La Belle subjectively or objectively believed he was so reporting at the time.  *See Fraser v. Fiduciary Tr. Co. Int'l,* No. 04 Civ. 6958, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009), *aff'd,* 396 F. App'x 734 (2d Cir. 2010) ("[Plaintiff's] own explanation of his reason for sending the e-mail … negates his argument that he was attempting to report fraud or misconduct.").[15]

While the deal was being considered, La Belle continued to raise doubts about its desirability to his supervisors.  Merely expressing different opinions about the risks and benefits associated with a deal, however, is not protected activity.  *See Jones v. Perez*, 550 F. App'x 24, 26 (2d Cir. 2013) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F. 3d 1124, 1129 (2d Cir. 1994)).

---

[15] It is also worth noting that despite La Belle's claims that he was "excluded" from the transaction, he received an advance copy of the deal report before it was presented to the Barclays team for approval and was given opportunity to comment, and he participated in the May 5, 2018 approval meeting where the upside and downside risks of the transaction were discussed.  While contemporaneous notes show that he advocated against the deal on market-based concerns, he does not raise the specter of impropriety.  (Def.'s SOF at ¶¶ 355 – 376.)

La Belle again raised concerns about the "massaging of data with respect to the consideration" of the Client 2 transaction in his June 14, 2018 report to the SEC, though the bulk of his report concerns MBL.  This, at least, can constitute the provision of some information to a regulator.  The next question is whether this report was protected under Section 806, that is, whether it relayed conduct that La Belle reasonably believed, both objectively and subjectively, constituted a violation of one of the enumerated categories of § 1514A.

La Belle attempts to link this report to fraud against shareholders.  On its face, however, his report makes clear that the alleged "massaged" data was viewed only internally as part of a multi-faceted consideration of whether to pursue the deal.  This is not the sort of report that courts have considered adequate to underpin a Section 806 claim.  *See Day v. Staples, Inc.,* 555 F.3d 42, 56 (1st Cir. 2009) (finding that reports of alleged "data manipulation" that was "unrelated to the financial condition of the company" and "never reported to shareholders" was a "claim of 'needless loss of revenue,' which is not a claim of fraud"); *Nielsen,* 762 F.3d at 223 ("The connection between [the Plaintiff's] claims and supposed fraud against shareholders is simply too tenuous."); *see also Fraser* at *5.

Further, the elements of shareholder fraud "typically include a material misrepresentation or omission, scienter, loss and a causal connection between the misrepresentation or omission and the loss."  *Day v. Staples*, 555 F.3d 42, 56 (1st Cir. 2009).  Though the Second Circuit has not held that a Sarbanes-Oxley claim requires a plaintiff to allege every element of a traditional securities fraud claim, as discussed, a report cannot be "wholly untethered" from the enumerated provisions, and the Second Circuit has expressly disclaimed allowing plaintiffs to proceed without even "approximat[ing] specific elements" of the allegedly violated provision.  *Nielsen*, 762 F.3d at 222 n. 6; *see also Tonra,* 405 F. Supp. 3d at 590 (dismissing a plaintiff's claim for

failure to allege materiality or an impact on shareholder decision making, as discussed above).  It is not clear how specifically La Belle must have approximated the elements of a fraud-against-shareholders claim, but as he has not provided *any* approximation of these elements, this report falls short.

Finally, to sustain an SOX claim, La Belle must establish that this report was connected to an unfavorable personnel action.  As noted above, La Belle has failed to provide evidence that anyone at Barclays involved in his supervision was aware of either of his reports to the SEC prior to his termination.

### E.      Securities License Issue

La Belle also claims to have a Section 806 claim because he reported to Compliance and his supervisor on July 11, 2018, that one of his subordinates had sent an email related to transacting in securities without a license.  First, this report shares the causality problem of several of La Belle's later-dated claims, given that his supervisors were indisputably contemplating terminating his employment in mid-June.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F 3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").  Second, as the Second Circuit wrote in *Nielsen*, "it may well be that a complainant's complaint concerns such a trivial matter, in terms of its relationship to shareholder interests, that he or she did not engage in protected activity under § 1514A."  *Nielsen*, 762 F.3d at 222 (cleaned up).  That is the case here.

### F.      Plaintiff's Motion for Summary Judgment

La Belle has failed to make his *prima facie* case even under a standard construing all facts and evidence in his favor.  Accordingly, La Belle's cross-motion for summary judgment is denied for the reasons already explained in this opinion.

**G.      Motions to Seal**

In connection with this briefing, both parties submitted motions to seal certain exhibits. (*See* ECF Nos. 230, 255, 266.)  Those motions are hereby granted.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 223, 230, 241, 255, and 266, and to close this case.

SO ORDERED.

Dated:  March 24, 2023
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge